UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA     :     CASE NO. 3:03CR241(JCH)

V.                           :

GARY AGNEW                   :     November 5, 2004

## GOVERNMENT'S SENTENCING MEMORANDUM

The Government submits this memorandum in connection with
the defendant's sentencing hearing that is scheduled for November
8, 2004 at 2:30 p.m.

## I.     Criminal Offense and Relevant Conduct

Defendant Gary Agnew ("the defendant" or "Agnew") was
employed by the United States Postal Service ("USPS") since the
mid-1970's.  From on or about 1993, the defendant worked in a
limited duty capacity with the USPS because he claimed a
disability involving his right knee.  From 1993 until early 2001,
the defendant's full-time position was to do photocopying.

In or about February 2001, the defendant applied for and
received total disability from the USPS through the United States
Department of Labor ("DOL") which is the government agency that
handles all disability claims for any civilian who is employed by
the United States Government.  In order to apply for and receive
total disability, the defendant submitted a series of CA-7 Forms
claiming that he was disabled and unable to do his work at the
USPS.  CA-7 forms are filed by Government employees who claim

that they are unable to do work based on account of a disability. (Ex. A). Based on the submission of these forms, Agnew received numerous disability checks. See Trial Exs. 17-37.

In or about May 15, 2002, at the request of the DOL, the defendant began to complete annual disability forms (CA-1032 Form) in lieu of the CA-7 periodic forms. (Ex. A). On his May 15, 2002 annual CA-1032 Form, the defendant claimed that he was not engaged in any activities except working as a union official. The defendant fraudulently concealed his ability to work so that he could claim to be totally disabled and receive tax-free disability payments from the DOL. Based on the information contained on this form, disability checks were mailed to the defendant which he in turn deposited into his bank account.

The defendant also provided medical reports in support of his total disability claim. Defendant told his medical doctors that he was not capable of doing any work and concealed his daily activities, including his activities at International Motorcars ("IM") so that his doctors would disable him. At trial, both Drs. Murray and Pillsbury testified that they relied on representations made by the defendant about his ability to do work and both doctors stated that Agnew never told them about any of his activities at IM. (Tr. at PP 385-387 and 903-907)[1].   Dr.

_____

[1] Portions of the referenced transcripts in this memorandum have been attached as Ex. D.

Murray also testified that he was not aware that the defendant's limited duty position at the Post Office was to work in the photocopying room. (Tr. at 383; 393; 422-423).

In addition, on the May 15, 2002 CA-1032 Form, the defendant also failed to disclose that he had sought and obtained an increase of his disability payments from the Veterans' Administration ("VA"). The records retrieved from the VA, show that the defendant had begun to receive 100% in total benefits from the VA based on the same knee injury and relying on the same medical evidence that he had used to support his claim for total disability from the USPS. However, after he became aware of this Office's criminal investigation, Agnew's filed a 2003 CA-1032 Form in June 2003 in which disclosed his activities at IM and the fact that his VA benefits had increased as of March of 2001. (Ex. B).

The Government's evidence proved that the defendant concealed the following material information to DOL and USPO: (1) his ability to work; (2) the fact that he was engaged in doing work at IM; and (3) the fact that he received compensation for doing work at IM. The Government's evidence also established that the increase in his disability payments from the VA were based on the same injury for which he was receiving USPS disability payments. (Tr. Ex. 79) (Ex. E). All of these facts were material to DOL's determinations regarding the defendant's

3

disability claims and his continued receipt of disability
payments.

The Government's evidence also proved that he failed to
disclose the following to his treating physicians, Dr. Pillsbury
and Dr. Murray: (1) his ability to engage in certain activities
and (2) his activities at IM.  Dr. Murray disabled Agnew based on
the defendant's representations regarding his physical condition
and his ability to engage in activities.  DOL relied on Dr.
Murray's reports in making its determination as to whether the
defendant could work at the USPS and the amount of benefits that
he could receive.

Through video and undercover audio surveillance that was
conducted for approximately one-year, the Government proved that
the defendant was working at IM.  In addition, the Government
also proved that the defendant received compensation for his work
at IM.  (Tr. at 467-470 and 735).

In addition, United States Postal Inspectors Millett and
Feeney credibly testified that after the defendant had been
confronted about the on-going criminal investigation, he admitted
to them that he had lied on his forms. (Tr. at 365 and 614).
Moreover, in the 2003 CA Form 1032 - which was completed after
Agnew became aware of the criminal investigation - the defendant
admitted that from September 2001 until February 2003, he had
been "help[ing] out at [a] friends dealership" for which he

4

received cash and other items totaling $4,000. (Ex. B).

In view of this overwhelming evidence, it is not surprising that the jury swiftly and decisively returned a guilty verdict on all counts of the indictment.

## II.  **Loss Calculation**

The defendant has raised several objections to the PSR based on the recent Supreme Court decision in Blakely v. Washington, 124 S.Ct. 2531 (U.S.Wash. Jun 24, 2004). Primarily, the defendant claims the adjusted offense level should be limited to a level 6 because there was no jury finding of any loss in this case.  However, since the Blakely decision, the Second Circuit has held that the guidelines should be followed until such time as the Supreme Court issues an opinion to the contrary[2].  U.S. v. Mincey, 380 F.3d 102 (2d Cir. 2004).

In accordance with the Second Circuit's instruction in Mincey, section 2B1.1, which governs the offense of conviction, applies and provides for a base offense level of 6.  Under specific offense characteristic 2B1.1(b)(1), offense levels are

---

[2] The Government respectfully requests that this Court also impose an indeterminate sentence in order to avoid further litigation should the Supreme Court determine that Blakely applies to the federal sentencing guidelines.  Certainly, under a indeterminate sentencing scheme, the defendant's double-dipping – by receiving both postal benefits and veteran's benefits for the same injury – is a fact that the Court can consider.  Likewise, the Court may and should consider the defendant's obstructive conduct.

5

added based upon the loss attributable to offense and relevant conduct. The calculation of loss need not be precise. Rather, the loss calculation must be a reasonable estimate of the actual loss using the information available to the court. See, e.g., United States v. Burns, 104 F.3d 529, 536 (2d Cir. 1997); United States v. Gomez, 31 F.3d 28, 31 (2d Cir. 1994) (per curiam). Further, under Application Notes 2(A) to U.S.S.G § 2B1.1, intended loss should be used when it is greater than the actual loss.

## A. Loss Attributable to Offense Conduct

The mail fraud offenses of conviction, as well as the worker's compensation fraud offense, concerned a scheme to defraud the United States, beginning in or about February 2001 through August 2003, by seeking and obtaining disability payments from OWCP and DOL through means of false or fraudulent pretenses or representations. The evidence in this case establishes that the defendant concealed his ability to work and his work activities at IM in order to collect disability payments even though he was able to and had been working.

In addition to thousands of dollars received both in periodic disability payments and a lump sum settlement for the same injury since 1989, the defendant submitted claims for and received total disability payments from DOL between February 2001 and March 2004 totaling $89,704.44. (Ex. C). Other than the 4 to

6

6 week periods following his knee replacements in both February
of 2001 and 2002, the defendant worked on a full time basis at IM
and was not entitled to receive those disability payments.
After deducting the disability payments reflected in the checks
issued on 3/30/01 ($3,101.44-covering period 2/13/01 to 3/24/01);
and 2/23/02 ($2,200-covering period 1/27/02 to 2/23/02)[3], the
total net amount of disability payments received by the defendant
equal $84,403.00.

Defendant claims that the total loss should be reduced by
the amounts he received after his treating physician issued a
report that he could return to work. Specifically, defendant
claims that, even if Blakely is held not to apply the guidelines,
the loss amount should be limited to either $57,992.69 or
$66,3288.29. The defendant argues that the Government had an
obligation to return the defendant to work when his doctor
cleared him for work and disability payments made thereafter
should not be included in the loss.

---

[3] While the Government is deducting the entire amount of the
DOL checks issued for the 4 to 6 weeks following the defendant's
surgery, the defendant was also not entitled to those funds based
on the fact that he was receiving benefits from the VA for the
same injury. As set forth in the Relevant Conduct section below,
the defendant's DOL benefits would have been reduced given his
receipt of VA benefits for the same injury. Even though the
defendant was not entitled to those amounts, the Government has
nonetheless not included them in the loss calculation to avoid
confusion and because the resulting loss calculation will not
affect the sentencing guideline range.

7

Indeed, the defendant has tried to use this same argument in a recent attempt to obtain back wages from the United States Postal Service "USPS." In essence the defendant claims that because Government failed to mitigate its loss, Agnew is entitled both to leniency from this Court and the right to receive even more money from the USPS. This claim is not only erroneous, it is disingenuous.

Putting aside the fact that Agnew himself chose not to return to work and not to cancel his disability payments, there is no support for such a reduction in the loss calculation. See e.g., United States v. Glick, 142 F.3d 520 (2d Cir. 1998) (loss amount should not be reduced by legitimate commissions not paid as a result of bribery where no aspect of the defendant's transactions that were legitimate); United States v. Rhodes, 201 F. Supp.2d 906 (C.D. Ill. 2002) (amount of loss is actual amount company had to reimburse victims even if it had mitigated the loss by not selling improperly purchased investments after learning of the fraud). There was simply no duty by the USPS to mitigate damages.

In addition, the letter from Agnew's doctor authorizing him to work was received only after the doctor was informed by Inspectors from the USPS of defendant's activities at IM at which time the doctor was provided an opportunity to observe portions of the surveillance video. (Tr. at 390-392). At that point, the

defendant had already been indicted for fraud.  Moreover, as the
representatives from the USPS Injury Compensation Office and DOL
testified, it is the policy of the office to not initiate any
administrative actions until the criminal matter is resolved.
(Tr. at 124 and 148).

Given the defendant's failure to report to USPS that he was
able to work and that he was working, it is simply disingenuous
for him to make this claim.  (Tr. at 708-709).  There were no
attempts by the defendant to stop payment of funds or return
funds paid to him after he received his doctor's opinion.  In
addition, the defendant continues to protest his "innocence" and
his inability to work; therefore, it is simply absurd for him to
now also claim that the USPS should have restored him to work.

Thus, the loss amount attributable to the offense conduct is
$84,403.00.

### B. Relevant Conduct

In addition to monies received from OWCP and DOL, the
defendant also received disability payments during the same
period and for the same injury from the VA.  As the attached VA
letter and payment schedule indicates, since March 2001, the
defendant received an additional $74,168.00. (Ex. D).  The
defendant obtained those monies by submitting the same
misrepresentations about his ability to work to the VA that he
submitted to OWCP and DOL.  The defendant also lied on his CA-

9

1032 form to DOL on May 15, 2002 by indicating that his VA
benefits had not increased as a result of the same injury.

While the defendant may have been allowed to receive the
100% disability payments from the VA for up to 13 months
following his left knee replacement surgeries, he would not have
been able to collect both payments at the same time and would
have had to make an election between the DOL and VA benefits.
The defendant knew that he was not permitted to collect from two
Government agencies full disability compensation for the same
injury and he lied to DOL to continue to receive his DOL and VA
benefits.  Thus, this Court should take into consideration the
fact that in addition to the $84,403.00 he received from the
Postal Service, the defendant obtained an additional $74,168.00
from the VA.

## C. Intended Loss Calculation

The Court should employ an intended loss calculation.  As
stated above, under Application Notes 2(A) to U.S.S.G § 2B1.1,
intended loss should be used when it is greater than the actual
loss.  In this case, the intended loss is substantially greater
than the actual loss because the defendant's scheme would have
continued but for an anonymous tip.  If the Government had not
received such information and initiated a criminal investigation
and prosecution, the defendant would continue to receive
disability payments from DOL.

Case 3:03-cr-00241-JCH   Document 80   Filed 11/05/2004   Page 11 of 75

Particularly illustrative of the fact that the intended loss in this case is greater than the actual loss is defendant's post trial attempts to continue to receive payments from the Postal Service. For example, the defendant has filed a claim with the USPS for back wages for the period that the USPS allegedly failed to return him to work when his physician opined he was able to work. The defendant fails to acknowledge that he maintained his position that he was not able to return to work despite his doctors' opinions. Absent this prosecution, the defendant intended to and would have continued to receive compensation as follows:

```
Payments 3/01 to 4/04: $ 84,403.00
Payments 4/04 to 5/05: $ 29,640.00 (age 55)
Payments 6/05 to 5/15: $273,600.00 (age 65)
```

Thus, the total intended loss calculation is approximately $387,643.00, assuming no cost of living adjustments.

## D. Total Loss Calculation

Total 2B1.1 Loss

Thus the total 2B1.1 loss calculation, based on actual loss and/or intended loss, for the defendant is as follows:

| DOL (USPS) | Offense Conduct | $ 84,403.00 |
|---|---|---|
| | Intended Loss | $387,643.00 |

**Intended Loss**: Because the $387,643.00 in intended loss is greater than $200,000 and less than $400,000, 12 offense levels

11

are added for a subtotal of 18.  Two additional levels are added

for obstruction of justice[4] based on defendant's false testimony

during the trial, resulting in offense level 20 based on 2B1.1.

An offense level of 20 results in a sentencing guideline range of

33 to 41 months of imprisonment and a $7,500 to $75,000.

## Or Alternatively

**Actual Loss:** Because the $84,403.00 in actual loss is

greater than $70,000 and less than $120,000, 8 offense levels are

added for a subtotal of 14.  Two additional levels are added for

obstruction of justice based on defendant's false testimony

during the trial, resulting in offense level 16 based on 2B1.1.

An offense level of 16 results in a sentencing guideline range of

21 to 27 months of imprisonment and a $5,000 to $50,000.

## III.     Obstruction Enhancement

Given Agnew's perjured trial testimony and continued

denials, the PSR properly recommends a two-level enhancement for

obstruction of justice. Section 3C1.1 requires a two-level

increase in offense level if "the defendant willfully

obstructed or impeded, or attempted to obstruct or impede,

---

[4] As set forth below, the PSR sets forth and the Government
is seeking a two-level increase for obstruction of justice
pursuant to U.S.S.G. § 3C1.1, based on defendant's perjured
testimony.

12

the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction." This enhancement applies to "committing . . . perjury," § 3C1.1, Application Note 4(b), which is providing false testimony under oath "concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." United States v. Dunnigan, 507 U.S. 87, 94 (1993); United States v. Ben-Shimon, 249 F.3d 98, 101 (2d Cir. 2001).

The facts to support an obstruction enhancement need only be proven by a preponderance of the evidence. See United States v. Carty, 264 F.3d 191, 194 (2d Cir. 2001). This Court reviews the findings of fact of a district court in connection with an increase for obstruction of justice for clear error. See United States v. Woodward, 239 F.3d 159, 161 (2d Cir. 2001). However, this Court has held that a ruling as to whether the facts found constitute obstruction of justice or attempted obstruction under the Sentencing Guidelines is a matter of legal interpretation which should be reviewed de novo, giving "'due deference to the district court's application of the guidelines to the facts.'"

13

<u>United States v. Cassiliano</u>, 137 F.3d 742, 745 (2d Cir.
1998) (quoting 18 U.S.C. § 3742(e)).

Courts have recognized that the district court must make
specific findings of perjury to support an obstruction of justice
enhancement.  See <u>United States v. Dunnigan</u>, 507 U.S. 87, 94
(1993) (finding of perjury required for enhancement under
U.S.S.G. § 3C1.1 based upon defendant's false testimony
"concerning material matter with the willful intent to provide
false testimony"); <u>United States v. Onumonu</u>, 999 F.2d 43, 45-46
(2d Cir. 1993) ("A district court may enhance a defendant's
sentence for obstruction of justice if the defendant commits
perjury.").

Because the record here plainly supports a finding of
perjury, Agnew should incur an upward adjustment for obstruction
of justice.  See U.S.S.G. § 3C1.1.  Simply stated, Agnew's
blatant false testimony constituted an effort on his part to
manufacture evidence and obstruct justice.   The defendant
testified falsely on a number of material issues, including but
not limited to: 1) denying that he worked for IM or was
compensated for that work from IM; 2) testifying that he informed
his treating physicians of his activities at the used car
dealership in direct contradiction of both physicians' testimony
that they never knew about the used car dealership; and
3)testifying that he never lied on his CA-1032 (an offense the

14

jury convicted him of) or admitted to the agents that he lied on that form, which stood in stark contrast to the testimony of the case agents.

The defendant testified at trial that he was disabled and was not able to perform the work at the Post Office (Tr. at 708-709; 796). However, his treating physician testified that he had no knowledge of defendant's limited duty position and that, in his opinion, the defendant could perform that work. (Tr. at 383; 393; 422-423).

The defendant also testified at trial that he had "never concealed" from his physicians defendant's activities at IM and even testified that "he talked to Dr. Pillsbury about a few cars in the lot." (Tr. at 727; 793-794). However, both of the physicians were asked and testified that they had no knowledge of IM or defendant's activities at IM. (Tr. at 386-387 and 903-904). Specifically, Dr. Pillsbury testified that they "had no discussion about any outside business" and that "[he] was not in the market for a [car]." (Tr. at 906) Indeed, in its ruling denying Agnew's motion for a new trial, this Court articulated its reasons as to why the jury had ample credible evidence upon which it could find the defendant concealed his work at IM from the Department of Labor and from his doctors and, as such, discredit Agnew's explanation that he did not and could not work. See Court Ruling dated May 25, 2004 at 8.

15

The defendant testified at trial that he did not make false statements to the Department of Labor, specifically on his form CA-1032 or subsequently confess to the agents that he "lied." (Tr. at 746). In fact, he stated, under oath, that "the only time I said lie is when I said 'x-rays don't lie'." (Tr. at 746). Both agents testified that he admitted to lying on form CA-1032. (Tr. at 365). The jury necessarily rejected this testimony by returning a guilty verdict on false statement count charged in count 16. See United States v. Godwin, 272 F.3d 659, 671 (4th Cir. 2001) (affirming obstruction enhancement where jury verdict necessarily rejected defendant's testimony that he did not have fraudulent intent), cert. denied, 535 U.S. (2002).

Although the fact that a verdict necessarily rejects a defendant's testimony does not alone suffice to compel an obstruction enhancement, see Dunnigan, 507 U.S. at 95; United States v. Mitchell, 64 F.3d 1105, 1108 (7th Cir. 1995), there has been no claim here that the defendant's false testimony was simply the result of confusion, mistake or faulty memory. Each of these matters related to the defendant's personal actions and were therefore within the scope of his own knowledge. His testimony was, in short, a false assertion of innocence, which clearly constitutes

16

obstruction of justice based on perjury. See United States v. Webster, 54 F.3d 1, 9 (1st Cir. 1995) (stating that defendant's "protestations of 'absolute' innocence . . . were not in any way ambiguous and amounted to perjury").

Moreover, during his post-trial interview[5] with the probation, Agnew continued to provide false statements about his role at IM. Agnew claimed that he was disabled and that he had not worked since he left his employment at the USPS. This is not only contrary to the testimony of trial witnesses and other evidence, it is contrary to the form that the defendant submitted to the Department of Labor in June of 2003.

## IV. CONCLUSION

In this case, because the falsity of the defendant's testimony was plainly the product of a deliberately false assertion of innocence, and not the result of confusion, mistake

---

[5] It is obvious that defendant's post-trial conduct and claims of innocence, suggest he has yet to accept responsibility for his conduct.

17

or faulty memory, this Court should apply an enhancement for
obstruction of justice.

Respectfully submitted,

KEVIN J. O'CONNOR
UNITED STATES ATTORNEY

MARIA A. KAHN
ASSISTANT UNITED STATES ATTORNEY
FEDERAL BAR NUMBER ct06573
United States Attorney's Office
157 Church Street
New Haven, Connecticut 06510
(203) 821-3700

KRISHNA R. PATEL
ASSISTANT UNITED STATES ATTORNEY
FEDERAL BAR NUMBER ct24433
United States Attorney's Office
157 Church Street
New Haven, Connecticut 06510
(203) 821-3700

18

## CERTIFICATION OF SERVICE

This is to certify that the within and foregoing has been sent by fax (without attachments)and federal express, this 5th day of November 2004, to:

Cheryl E. Heffernan, Esq.
Law Office of Cheryl E. Heffernan
2842 Old Dixwell Avenue
Hamden, CT 06518-3100

Joseph Zampano, USPO
United States Probation Office
Room 211
915 Lafayette Blvd.
Bridgeport, Ct.   06604

MARIA A. KAHN
ASSISTANT UNITED STATES ATTORNEY

19

Employment Standa  .dministration
Office of Workers' Compensation Programs

## SECTION 1 — EMPLOYEE PORTION

| a. Name of Employee | | | OMB No. 1215-0103 |
|---|---|---|---|
| Last *HAGNEW* | First *GARY* | Middle *REID* | Expires: 10/31/99 |

b. Mailing Address (Including City, State, ZIP Code)
*81 LYNN ROAD*
*BRISTOL  CT  06010 4465*

c. OWCP File Number
*010 271843*

d. Date of Injury

| Month | Day | Year |
|---|---|---|
| *9* | *3* | *89* |

E-Mail Address (Optional)

e. Social Security Number
*044 24 2695*

f. Telephone No./FAX No.
*(860) 589-1924*
*(860) 529-6035*

## SECTION 2 — Compensation is claimed for:

Inclusive Date Range
From *4/13/01* To *9/8/01*

Intermittent?

|   |   | Intermittent? | | |
|---|---|---|---|---|
| a. ☑ Leave without pay | | ☐ Yes ☐ No | Go to Section 3 |
| b. ☐ Leave buy back | | ☐ Yes ☐ No | Go to Section 3, and Complete Form CA-7b |
| c. ☐ Other wage loss; specify type, such as downgrade, loss of night differential, etc. Type: ___ | | ☐ Yes ☐ No | Go to Section 3 RECEIVED |
| d. ☐ Schedule Ward (Go to Section 4) | | If intermittent, complete Form CA-7a, Time Analysis Sheet | |

## SECTION 3 — Have you worked outside your federal job during the period(s) claimed in Section 2?
(Include salaried, self-employed, commissioned, volunteer, etc.)

☑ Yes

☐ No
Go to
Section 4

Name and Address of Business:
*LOCAL 301  971 WOODCESTER.    NATICK  MA  01760*

| Name | Address | City | State ZIP Code |
|---|---|---|---|

Dates Worked: *SALARIED*    Type of Work: *UNION OFFICIAL*

## SECTION 4 — Is this the first CA-7 claim for compensation you have filed for this injury?

☐ Yes    Complete Sections 5 through 7 and a Form SF-1199A, "Direct Deposit Sign-up"

☐ No    Has there been any change in your dependents, or has your direct deposit information changed, or has there been a claim filed with U.S. Civil Service Retirement, another federal retirement or disability law, or with the Department of Veterans Affairs since your last CA-7 claim?

☐ Yes — Complete Sections 5 through 7 or a new SF-1199A to reflect change(s)    ☐ No — Complete Section 7

## SECTION 5 — List your dependents (including spouse).

Living with you?

| Name | Social Security # | Date of Birth | Relationship | Yes No | |
|---|---|---|---|---|---|
| *KEITH A HENRY* | *048 54 8628* | *04/11/50* | *SPOUSE* | ☑ ☐ | For dependents not living with you, complete items a and b below. |
| *RYAN C HENRY* | *041 78 5989* | *10/11/82* | *SON* | ☐ ☐ | |
| | | / / | | ☐ ☐ | |

a. Are you making support payments for a dependent shown above?    ☐ Yes ☑ No    If Yes, support payments are made to:

| Name | Address | City | State | ZIP Code |
|---|---|---|---|---|

b. Were support payments ordered by a court?    ☐ Yes ☐ No    If Yes, attach copy of court order.

## SECTION 6

a. Was/Will there be a claim made against a 3rd party?    ☐ Yes ☑ No

b. Have you ever applied for or received disability benefits from the Department of Veterans Affairs?

| ☑ Yes | Claim Number | Full Address of VA Office Where Claim Filed | Nature of Disability |
|---|---|---|---|
| ☐ No | *C0948/659* | *450 MAIN ST  HFD CT 06103* | |

c. Have you applied for or received payment under any Federal Retirement or Disability law?

| ☐ Yes | Claim Number | Date Annuity Began | Amount of Monthly Payment | Retirement System |
|---|---|---|---|---|
| ☑ No | | | | |

## SECTION 7 — I hereby make claim for compensation because of the injury sustained by me while in the performance of my duty for the United States. I certify that the information provided above is true and accurate to the best of my knowledge and belief.

Any person who knowingly makes any false statement, misrepresentation, concealment of fact, or any other act of fraud, to obtain compensation as provided by the FECA, or who knowingly accepts compensation to which that person is not entitled is subject to civil or administrative remedies as well as felony criminal prosecution and may, under appropriate criminal provisions, be punished by a fine or imprisonment, or both. In addition, a felony conviction will result in termination of all current and future FECA benefits.

Employee's Signature _____    Date (Mo., day, year) *12/21/01*

*per telecom 1/3/7/01*

GOVERNMENT'S
EXHIBIT
1
3:03CR241 (JCH)

Form CA-7
Rev. Nov. 1998



**Employing Agency Portion**
**For first CA-7 claim sent, complete sections 8 through 15.**
**For subsequent claims, complete sections 12 through 15 only.**

**SECTION 8**

| Date of Injury: | Show Pay Rate as of Base Pay | Additional Pay Type _____ | Additional Pay Type _____ | Additional Pay Type _____ |
|---|---|---|---|---|
| Date: __/__/__ | $ ____ per ____ | $ ____ per ____ | $ ____ per ____ | $ ____ per ____ |
| Grade: _____ Step: _____ | | | | |
| Date Employee Stopped Work: | | | | |
| Date: 2/13/01 $37,684 YY | Type ____ | Type _____ | Type _____ | |
| Grade: 4 Step: _____ | $ ____ per ____ | $ ____ per ____ | $ ____ per ____ | |

Additional pay types include, but are not limited to: Night differential (ND), Sunday Premium (SP), Holiday Premium (HP), Subsistence (SUB), Quarters (QTR), etc. *(List each separately)*

**SECTION 9**

a. Does employee work a fixed 40-hour per week schedule? Yes ☐ No ☐
   1. If Yes, circle scheduled days:    S    M    T    W    TH    F    S
   2. If No, show scheduled hours for the two week pay period in which work stopped. Circle the day that work stopped.

| FOR EXAMPLE ONLY | S | M | T | W | TH | F | S |
|---|---|---|---|---|---|---|---|
| WEEK 1 From 5/14 to 5/20 | | 8 | 4 | 6 | (6) | | |
| WEEK 2 From 5/21 to 5/27 | | 8 | | 6 | 6 | 4 | |

| | S | M | T | W | TH | F | S |
|---|---|---|---|---|---|---|---|
| WEEK 1 From ____ to ____ | | | | | | | |
| WEEK 2 From ____ to ____ | | | | | | | |

b. Did employee work in position for 11 months prior to injury?   Yes ☐   No ☐
   If No, would position have afforded employment for 11 months but for the injury?   Yes ☐   No ☐

**SECTION 10**  On date pay stopped, was employee enrolled in:

a. Health Benefits under the FEHBP?   ☐ No   ☒ Yes   Code ____
c. Optional Life Insurance?   ☐ No   ☒ Yes   Class C *(D-Z only)*
b. Basic Life Insurance? ☐ No   ☐ Yes
d. A Retirement System?   ☒ No   ☐ Yes   Plan ____ *(Specify CSRS, FERS, Other)*

**SECTION 11**  Continuation of Pay (COP) Received *(Show inclusive dates):*

From ___/___/___   To ___/___/___

Intermittent?   ☐ Yes — Complete Time Analysis Sheet, Form CA-7a
☐ No

**SECTION 12**  Show pay status and inclusive dates for period(s) claimed:

| | | Intermittent? | If Intermittent, complete Form CA-7a, Time Analysis Sheet. |
|---|---|---|---|
| Sick Leave   From ___/___/___ To ___/___/___ | | ☐ Yes ☐ No | |
| Annual Leave   From ___/___/___ To ___/___/___ | | ☐ Yes ☐ No | If leave buy back, also submit completed Form CA-7b. |
| Leave without Pay   From 2/13/01 To 3/8/01 | | ☒ Yes ☐ No | |
| Work   From ___/___/___ To ___/___/___ | | ☐ Yes ☐ No | |

**SECTION 13**  Did employee return to work?   Yes ☐   No ☒
   If Yes, date ___/___/___

If returned, did employee return to the pre-date-of-injury job, with the same number of hours and the same duties?

Yes ☐   No ☐   If No, explain: _____

**SECTION 14**  Remarks:

**SECTION 15**  An employing agency official who knowingly certifies to any false statement, misrepresentation, or concealment of fact, with respect to this claim may also be subject to appropriate felony criminal prosecution.

I certify that the information given above and that furnished by the employee on this form is true to the best of my knowledge, with any exceptions noted in Section 14, Remarks, above,

Signature _____ *(Agency Official)*   Title HR   Date 3/17/01

Name of Agency _____

If OWCP needs specific pay information, the person who should be contacted is:

Name _____   Title _____

Telephone No. 860 610-3 17   Fax No. 860 610-4521

INJURY COMPENSATION OFFICE
U S POSTAL SERVICE
90 EAST RIVER DRIVE
ST HARTFORD CT 06108-3288

JUT-22-02 09:27A LOCAL 301 M.H.U. of N.E.

## U.S. Department of Labor

Employment Standards Administration
Office of Workers' Compensation Programs
Division of Federal Employees' Compensation



10271843

05/10/2002

OMB No: 1215-0151
Expires: 01-31-02

AGNEW GARY PEID
81 LYNN ROAD
BRISTOL CT  06010

**File Number:**
**Date of Injury:**
**Social Security Number:**

Dear Sir or Madam:

The information requested in this letter is required in connection with your benefits under the Federal Employees' Compensation Act (FECA), 5 U.S.C. 8101 et seq. This information will be used to decide whether you are entitled to continue receiving these benefits, or whether your benefits should be adjusted.

You must completely answer all questions and return this statement within 30 days of the date of this letter. Otherwise, your benefits will be suspended in accordance with 20 CFR 10.528. Public Law 100-503 provides that the statements on this form and other information in your claim file may be verified through computer matches.

**READ ALL INSTRUCTIONS CAREFULLY BEFORE FILLING OUT YOUR STATEMENT. YOU MUST ANSWER ALL OF THE QUESTIONS. IF THE QUESTION DOES NOT APPLY TO YOUR CLAIM, STATE "NOT APPLICABLE" (N/A) OR "NONE."**

If you need more space to fully answer any of the questions, use another sheet of paper with your name and claim number at the top. Sign and date each extra sheet.

### WARNING

A FALSE OR EVASIVE ANSWER TO ANY QUESTION, OR THE OMISSION OF AN ANSWER, MAY BE GROUNDS FOR FORFEITING YOUR COMPENSATION BENEFITS AND SUBJECT YOU TO CIVIL LIABILITY. A FRAUDULENT ANSWER, MAY RESULT IN CRIMINAL PROSECUTION. ALL STATEMENTS ARE SUBJECT TO INVESTIGATION FOR VERIFICATION.

This statement covers the 15 months prior to the date you complete and sign the form. Your signature at the end of the statement certifies that you have supplied all information requested for that period of time.

When you have completed the form, return it to the address shown at the top of this letter. If you have any questions about the completion of this form, call your district office.

Sincerely,

**CLAIMS EXAMINER**

Enclosure (s): EN1032

**Public Burden Statement**

Public reporting burden for this collection of information is estimated to average 20 minutes per response, including time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Office of Workers' Compensation Programs, U.S. Department of Labor, Room S3229, 200 Constitution Avenue, N.W., Washington, D.C. 20210.

**DO NOT SEND THE COMPLETED FORM TO THIS ADDRESS.**     You are not required to complete this form unless it

Ltr. CA-1032

File Number: *616771843*
Employee: *Henry Andy Reid*

## PART A – EMPLOYMENT

Read this section completely before answering the questions below and on the next page.

**Report ALL employment for which you received a salary, wages, income, sales commissions, piecework, or payment of any kind.** Such employment includes service with the military forces of the United States, including the National Guard, Reserve component, or other affiliates.

**Report ALL self-employment or involvement in business enterprises.** These include but are not limited to: farming; sales work; operating a business, including a store or restaurant; and providing services in exchange for money, goods, or other services. The kinds of services which you must report include such activities as carpentry, mechanical work, painting, contracting, child care, odd jobs, etc. Report activities such as keeping books and records, or managing and/or overseeing a business of any kind, including a family business. Even if your activities were part-time or intermittent, you must report them.

**Report as your "rate of pay" what you were paid.** Include the value of such things as housing, meals, clothing, and reimbursed expenses, if they were received as part of your employment.

**Report ANY work or ownership interest in any business enterprise,** even if the business lost money or if profits or income were reinvested or paid to others. If you performed any duties in any business enterprise for which you were not paid, you must show as rate of pay what it would have cost the employer or organization to hire someone to perform the work or duties you did, even if your work was for yourself or a family member or relative. You need not list ownership in any publicly traded businesses.

**Severe penalties may be applied for failure to report all work activities thoroughly and completely.**

1.  Did you work for any employer during the past 15 months?
    a. Yes or No: *YES*

    b. If yes, state for each employer:
    Dates of employment: *1/1/95 TO 1/2/02*
    Description of work done: *UNION OFFICIAL*
    Rate of pay: $_____ /hr/wk/mo Actual earnings: $ *330.00*
    Name/address of employer: *NATIONAL POSTAL MAILHANDLER UNION LOCAL 301*
    *971 WORCESTER ST*
    *NATICK MA. 01760*

-2-

File Number: *01027 1843*
Employee: *AGNEW GACY DEAD*

## PART A – EMPLOYMENT (Continued)

2.  Were you self-employed or involved in any business enterprise in the past 15 months?

    a. Yes or No: *YES*

    b. If yes, state:

    Dates of self-employment or involvement in business enterprise: *ELECTED UNION OFFICIAL*

    Description of work or business involvement: *UNION OFFICIAL*

    Rate of pay: $_____ /hr/wk/mo Actual earnings: $ *330 mo*

    Name/address of employment or business: *NATIONAL POSTAL MAILHANDLERS UNION!*
    *LOCAL 301, 971 WORCESTER ST. NATICK MA 01760 2092*

3.  If you answered "No" to both questions 1 and 2, state whether you were unemployed for
    all periods during the past 15 months:   Yes or No: *N/A*
    If no, show dates of employment: _____

### PART B – VOLUNTEER WORK

During the past 15 months, did you perform any volunteer work for which ANY FORM of monetary or in-kind
compensation was received?   Yes or No: *N/A*   If yes, state the kind of work you did:

What were the beginning and ending dates of the volunteer work? *N/A*

How often did you perform this work (hours per week, weeks per month, etc.)? *N/A*

### PART C – DEPENDENTS

A claimant who has no eligible dependents is paid compensation at 66 2/3% of the applicable pay rate.
A claimant who has one or more eligible dependents is paid compensation at 75% of the applicable pay rate.
You must answer the questions below to ensure your compensation is paid at the correct rate.

You may claim compensation for a dependent if you have one or more of the following: (a) a husband or
wife who lives with you; (b) an unmarried child, including an adopted child or stepchild, who lives with
you and is under 18 years of age; (c) an unmarried child who is 18 or over, but who cannot support himself
or herself because of mental or physical disability; (d) an unmarried child under 23 years of age who is
a full-time student and has not completed four years of school beyond the high school level; (e) a parent
who totally depends upon you for support.

(see over)

-3-

File Number: *010271843*
Employee *ASNEW GARY REID*

## PART C — DEPENDENTS (Continued)

You may also claim compensation for a husband, wife or dependent child who does not live with you if a Court has ordered you to pay support to that person. Finally, you may claim compensation for (a) a husband or wife, (b) an unmarried child under 18, or (c) an unmarried child between 18 and 23 who is a full-time student even if that person does not live with you, as long as you make regular direct payments for his or her support.

1. Are you married? Yes or No: *YES*  If yes, does your husband or wife live with you? Yes or No: *YES*
   If no, do you make regular direct payments for his or her support?    Yes or No: _____

2. Do you claim compensation on account of other dependents, such as children? Yes or No: *YES*

   If yes, complete the following for each dependent:

   Full Name: *EVAN GARY ASNEW*

   Date of Birth: *10/11/82*

   Relationship to You: *SON*

   List any other dependents on an extra sheet.

3. If you are receiving compensation for a dependent and are no longer entitled to receive that compensation, state:

   Date the person stopped being a dependent _____ *N/A*

   Reason the person stopped being a dependent _____

## PART D — OTHER FEDERAL BENEFITS OR PAYMENTS

1. **OPM Benefits.**    Report any retirement benefits (either disability or regular) you receive from the Office of Personnel Management (OPM), the Foreign Service, or any other Federal disability or retirement system except for benefits under the FECA.

   a. Have you been assigned a CSA number?    Yes or No: _____
   If yes, write it here: _____

   b. During the past 15 months, have you received a:
   Regular retirement check?    Yes or No _____
   Disability retirement check?    Yes or No _____

File Number: *0102-7/843*
Employee: *ANNEW GACY ZSID*

## PART D – OTHER FEDERAL BENEFITS OR PAYMENTS (Continued)

2. **SSA Benefits.** Report any benefits received from the Social Security Administration (SSA) which you receive as part of an annuity under the Federal Employees' Retirement System (FERS). DO NOT report any benefits received from the SSA on account of employment in the private sector.

   a. Do you receive benefits from the SSA as part of an annuity for Federal service?  Yes or No:  *NO*

3. **VA Benefits.** Report any increase in a Veterans Administration (VA) disability award resulting from the injury for which you receive benefits under the FECA.

   a. Do you receive benefits from the VA on account of service in the Armed Forces of the United States? Yes or No: *YES*

   b. If yes, state your file number: *C 2948/057.*
   Also state the kind of disability for which the award was made: *ULCERATIVE COLITIS + BILATEL CONTAM- MALACHIA OF THE PATELLAS*

   c. Has the percentage of your VA award increased since the injury for which you are receiving benefits under the FECA? Yes or No: *NO*  If yes, give date of increase: _____

4. **Other Benefits.** Report any Federal Black Lung benefits or any other benefits paid by the Federal government, not including benefits under the FECA.

   a. Have you received any other Federally funded or assisted benefits, such as described above? Yes or No: *NO*

   b. If yes, provide the following information for each such benefit or payment:

   Type of Claim/Award/Benefit: *N/A*

   Agency and Address: _____

   Claim or File No.: *N/A*

   Amount/Value Received *N/A* Weekly or Monthly? *N/A*

   Dates for which benefits received: *N/A*

   Do you still receive these benefits regularly? Yes or No: *N/A*

## PART E -- THIRD PARTY SETTLEMENT

1. In the past 15 months, did you receive any settlement or award from a claim or suit against a third party in connection with an injury or illness for which you receive compensation? Yes or No: *NO*

(see over)

-5-

File Number: *01017/843*
Employee: *AGNEW GARY REID*

## PART E -- THIRD PARTY SETTLEMENT (Continued)

2. If yes, state:

Date of judgment or settlement: _____
Party or parties involved: _____
Type of suit or settlement: _____
Amount of judgment or settlement: _____
Legal fees and Court costs: _____

## PART F -- FRAUD/FELONY OFFENSES

1. Have you been convicted of any fraud-related offense in connection with the application for or receipt of workers' compensation benefits? Yes or No

If yes, state date of conviction. _____

2. Have you been incarcerated for any period during the past 15 months for any felony offense? Yes or No

## PART G -- CORRECTIONS

If the name, address, file number, date of injury, or Social Security number (SSN) shown at the top of the first page of this letter is incorrect, provide the correct information in the space provided below. (Do not complete if the information was correct).

Name: *AGNEW, GARY REID*   File Number: *01027/843*
Address: *81 LYNN RD*   Date of Injury: *1/24/89*
*BRISTOL, CT 06010 4465*   Social Security No. *042 42 0015*

## PART H -- CERTIFICATION

I know that anyone who fraudulently conceals or fails to report income or other information which would have an effect on benefits, or who makes a false statement or misrepresentation of a material fact in claiming a payment or benefit under the Federal Employees' Compensation Act may be subject to criminal prosecution, from which a fine or imprisonment, or both, may result.

I understand that I must immediately report to OWCP any improvement in my medical condition, any employment, any change in the status of claimed dependents, any third party settlement, and any change in income from Federally assisted disability or benefit programs.

I certify that all the statements made in response to questions on this form are true, complete and correct to the best of my knowledge and belief. I have placed "Not Applicable" (N/A) or "None" next to those questions that do not apply to me or my claim.

Signature   Date *5/15/02*

Street Address   *860 584 1924*
City, State and ZIP   Telephone

-6-

**U.S. DEPARTMENT OF LABOR**

EMPLOYMENT STANDARDS ADMINISTRATION OFFICE OF
WORKERS' COMPENSATION PROGRAMS
DISTRICT OFFICE 1 - BOSTON
PO BOX 8200
LONDON, KY 40742.8300 (617) 624-6600 FAX
(617) 624-6605



CA1032-FO-CA1032

File Number: *0102 71843*
Date of Injury: *1/24/89*
Employee: *GARY R. AGNEW*
Social Security Number: *04141005*

010271843

05/09/2003

AGNEW GARY REID
81 LYNN ROAD
BRISTOL CT  06010

Dear Sir or Madam:

The information requested in this letter is required in connection with your benefits under the Federal Employees' Compensation Act (FECA), 5 U.S.C. 6101 et sea, This information will be used to decide whether you are entitled to continue receiving these benefits, or whether your benefits should be adjusted.

You must completely answer all questions and return this statement within 30 days of the date of this letter. Otherwise, your benefits will be suspended in accordance with 20 CFR 10.528. Public Law 100-503 provides that the statements on this form and other information in your claim file may be verified through computer matches.

READ ALL INSTRUCTIONS CAREFULLY BEFORE FILLING OUT YOUR STATEMENT. YOU MUST ANSWER ALL OF THE QUESTIONS. IF THE QUESTION DOES NOT APPLY TO YOUR CLAIM, STATE "NOT APPLICABLE" (N/A) OR "NONE."

If you need more space to fully answer any of the questions, use another sheet of paper with your name and claim number at the top. Sign and date each extra sheet.

**WARNING**

A FALSE OR EVASIVE ANSWER TO ANY QUESTION, OR THE OMISSION OF AN ANSWER, MAY BE GROUNDS FOR FORFEITING YOUR COMPENSATION BENEFITS AND SUBJECT YOU TO CIVIL LIABILITY. A FRAUDULENT ANSWER MAY RESULT IN CRIMINAL PROSECUTION. ALL STATEMENTS ARE SUBJECT TO INVESTIGATION FOR VERIFICATION.

OMB Clearance # 1215-0151, Exp. Date 02/28/05  CA1032-1298  Page 1

0102718/3

## PART A--EMPLOYMENT

Read this section completely before answering the questions below and on the next page.

Report ALL employment for which you received a salary, wages, income, sales commissions, piecework, or payment of any kind. Such employment includes service with the military forces of the United States, including the National Guard, Reserve component, or other affiliates.

Report ALL self-employment or involvement in business enterprises. These include but are not limited to: farming; sales work; operating a business, including a store or a restaurant; and providing services in exchange for money, goods, or other services. The kinds of services which you must report include such activities as carpentry, mechanical work, painting, contracting, child care, odd jobs, etc. Report activities such as keeping books and records, or managing and/or overseeing a business of any kind, including a family business. Even if your activities were part-time or intermittent, you must report them.

Report as your "rate of pay" what you were paid. Include the value of such things as housing, meals, clothing, and reimbursed expenses, if they were received as part of your employment.

Report ANY work or ownership interest in any business enterprise, even if the business lost money or if profits or income were reinvested or paid to others. If you performed any duties in any business enterprise for which you were not paid, you must show as rate of pay what it would have cost the employer or organization to hire someone to perform the work or duties you did, even if your work was for yourself or a family member or relative. You need not list ownership in any publicly traded businesses.

SEVERE PENALTIES MAY BE APPLIED FOR FAILURE TO REPORT ALL WORK ACTIVITIES THOROUGHLY AND COMPLETELY.

1.  Did you work for any employer during the past 15 months?

    a.  Yes or No: _YES_
    b.  If yes, state for each employer/
    Dates of employment: _1/1/95 To 1/2/03_
    Description of work done: _UNION OFFICAL_
    Rate of pay: $_330⁰⁰_ /hr/wk/mo Actual earnings: $ _330⁰⁰_
    Name/address of employer: _NATIONAL POSTAL MAILHANDLERS, UNION Local 301_
    _971 WORCESTER ST NATICK MA 01760_

2.  Were you self-employed or involved in any business enterprise in the past 15 months?

    a.  Yes or No: _YES_
    b.  If yes, state:
    Dates of self-employment or involvement in business enterprise: _SEPT 01 To FEB 03_
    Description of work or business involvement: _HELP-OUT AT FRIENDS_
    _DEALERSHIP TO KEEP BUSY. SHOWED CARS ANSWER PHONES RAN ERRANDS_
    _OPEN AND CLOSED DEALERSHIP._

---

## PART A--EMPLOYMENT (Continued)

Rate of pay: $ _NONE_ /hr/wk/mo    Actual earnings: $ _NONE_ ✗
Name/Address of place of employment or business:
_INTERNATIONAL MOTORCARS 68 BERLIN TPKE BERLIN CT 06037_

3.  If you answered "No" to both questions 1 and 2, state whether you were unemployed for all periods during the past 15 months: Yes or No: _____
    If no, show dates of employment: _____

## PART B--VOLUNTEER WORK

During the past 15 months, did you perform any volunteer work for which ANY FORM of monetary or in-kind compensation was received? Yes or No: _NO_ If yes, state the kind of work you did:
_____
What were the beginning and ending dates of the volunteer work?
_____
How often did you perform this work (hours per week, weeks per month, etc.)?:
_____

## PART C--DEPENDENTS

A claimant who has no eligible dependents is paid compensation at 66 2/3 % of the applicable pay rate. A claimant who has one or more eligible dependents is paid compensation at 75% of the applicable pay rate. You must answer the questions below to ensure your compensation is paid at the correct rate.

You may claim compensation for a dependent if you have one or more of the following: (a) a husband or wife who lives with you; (b) an unmarried child, including an adopted child or stepchild, who lives with you and is under 18 years of age; (c) an unmarried child who is 18 or over, but who cannot support himself or herself because of mental or physical disability; (d) an unmarried child under 23 years of age who is a full-time student and has not completed four years of school beyond the high school level; (e) a parent who totally depends upon you for support.

You may also claim compensation for a husband, wife or dependent who does not live with you if a Court has ordered you to pay support to that person. Finally, you may claim compensation for (a) a husband or wife, (b) an unmarried child under 18, or (c) an unmarried child between 18 and 23 who is a full-time student even if that person does not live with you, as long as you make regular direct payments for his or her support.

1.  Are you married? (Yes) or No: _YES_ If yes, does your husband or wife live with you? (Yes) or No: _YES_ If no, do you make regular direct payments for his or her support? Yes or No: _N/A_

✗ _No ACTUAL EARNINGS RECEIVED EXPENSE REIMBURSEMENT AND OCCASIONAL GIFTS INCLUDING MONEY TOTAL APPROX $4000.00 USE OF CELL PHONE._

EN1032-0595    Page 2

### PART C--DEPENDENTS Continued)

2.  Do you claim compensation on account of other dependents, such as children? Yes or (No) _NO_

    If yes, complete the following for each dependent:

    Full Name:_____
    Date of Birth:_____
    Relationship to You:_____

    List any other dependents on an extra sheet.

3.  If you are receiving compensation for a dependent and are no longer entitled to receive that compensation, state:

    Date the person stopped being a dependent _____
    Reason the person stopped being a dependent _____
    _____

### PART D--OTHER FEDERAL BENEFITS OR PAYMENTS

1.  **OPM Benefits.** Report any retirement benefits (either disability or regular) you receive from the Office of Personnel Management (OPM), the Foreign Service, or any other Federal disability or retirement system except for benefits under the FECA.

    a.  Have you been assigned a CSA number? Yes or (No): _NO_
    If yes, write it here:_____

    b.  During the past 15 months, have you recieved a:
    Regular retirement check? Yes or (No) _NO_
    Disability retirement check? Yes or (No): _NO_

2.  **SSA Benefits.** Report any benefits received from the Social Security Administration (SSA) which you receive as part of an annuity under the Federal Employees' Retirement System (FERS). DO NOT report any benefits received from the SSA on account of employment in the private sector.

    a.  Do you receive benefits from the SSA as part of an annuity for Federal service? Yes or (No) _NO_

3.  **VA Benefits.** Report any increase in a Veterans Administration (VA) disability award resulting from the injury for which you receive benefits under the FECA.

    a.  Do you receive benefits from the VA on account of service in the Armed Forces of the United States? (Yes) or No: _YES_

    b.  If yes, state your file number: _C2948/059_
    Also state the kind of disability for which the award was made:
    _ULCERATIVE COLITIS + BILATERAL CONDOMALACHIA of THE PATELLAS_

PART D--OTHER FEDERAL BENEFITS OR PAYMENTS (Continued)

c. Has the percentage of your VA award increased since the injury for which you are receiving benefits under the FECA?

(Yes) or No: YES If yes, give date of increase: 3/01

4. **Other Benefits.** Report any Federal Black Lung benefits or any other benefits paid by the Federal government, not including benefits under the FECA.

a. Have you received any other Federally funded or assisted benefits, such as described above? Yes or (No): NO

b. If yes, provide the following information for each such benefit or payment:

Type of Claim/Award/Benefit: N/A
Agency and Address: ______

Claim or File No.: ______
Amount/Value Received ______ Weekly or Monthly? ______
Dates for which benefits received: ______
Do you still receive these benefits regularly? Yes or No: ______

PART E--THIRD PARTY SETTLEMENT

1. In the past 15 months, did you receive any settlement or award from a claim or suit against a third party in connection with an injury or illness for which you receive compensation? Yes or (No): NO

2. If yes, state:

Date of judgment or settlement: N/A
Party or parties involved: ______
Type of suit or settlement: ______
Amount of judgment or settlement: ______
Legal fees and Court costs: ______

PART F--FRAUD/FELONY OFFENSES

1. Have you been convicted of any fraud - related offense in connection with the application for or receipt of workers' compensation benefits? Yes or (No) NO
If yes, state date of conviction. ______

2. Have you been incarcerated for any period during the past 15 months for any felony offense? Yes or (No) NO

## PART G--CORRECTIONS

If the name, address, file number, date of injury, or Social Security number (SSN) shown at the top of the first page of this letter is incorrect, provide the correct information in the space provided below. (Do not complete if the information is correct).

Name: _____    File Number: _____
Address: _____    Date of Injury: _____
_____    SSN: _____

## PART H--CERTIFICATION

I know that anyone who fraudulently conceals or fails to report income or other information which would have an effect on benefits, or who makes a false statement or misrepresentation of a material fact in claiming a payment or benefit under the Federal Employees' Compensation Act may be subject to criminal prosecution, from which a fine or imprisonment, or both, may result.

I understand that I must immediately report to OWCP any improvement in my medical condition, any employment, any change in the status of claimed dependents, any third party settlement, and any change in income from Federally assisted disability or benefit programs.

I certify that all the statements made in response to questions on this form are true, complete and correct to the the best of my knowledge and belief. I have placed "Not Applicable" (N/A) or "None" next to those questions that do not apply to me or my claim.

Signature _____

Street Address _____
BRISTOL CT 06010
City, State and Zip

Date 6/10/03

Telephone 860-584-1924

| eICPAS Main Menu | Employee Options | Case Options | Accident Options | Reports |



## UNITED STATES POSTAL SERVICE ®

### INJURY COMPENSATION PERFORMANCE ANALYSIS SYSTEM

## WORKER'S COMP CASE EMPLOYEE DETAIL
*RESTRICTED INFORMATION*

**CURRENT INFORMATION:**

OWCP CASE: 010271843

NAME: Agnew, Gary R

ADDRESS1: 81 Lynn Rd

ADDRESS2:

CITY STATE ZIP: Bristol CT 06010-4465

ACCIDENT NUMBER:

SSN: 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

DOB/AGE: 05/06/1950 - 53

EOD DATE: 02/15/1977

YRS/MO SERVICE: 27 / 02

## COMPENSATION TRACKING
*RESTRICTED INFORMATION*

| Check Date | Gross Amount | Period Covered | Paid To | Paid By | Roll Type | Pay Type | Deduction Amount | Net Amount |
|---|---|---|---|---|---|---|---|---|
| 02/21/2004 | $2,280.00 | 01/25/2004 - 02/21/2004 | CL | 01 | P | 1 | $243.86 | $2,036.14 |
| 01/24/2004 | $2,280.00 | 12/28/2003 - 01/24/2004 | CL | 01 | P | 1 | $206.10 | $2,073.90 |
| 12/27/2003 | $2,280.00 | 11/30/2003 - 12/27/2003 | CL | 01 | P | 1 | $206.10 | $2,073.90 |
| 11/29/2003 | $2,280.00 | 11/02/2003 - 11/29/2003 | CL | 01 | P | 1 | $206.10 | $2,073.90 |
| 11/01/2003 | $2,280.00 | 10/05/2003 - 11/01/2003 | CL | 01 | P | 1 | $206.10 | $2,073.90 |
| 10/04/2003 | $2,280.00 | 09/07/2003 - 10/04/2003 | CL | 01 | P | 1 | $206.10 | $2,073.90 |
| 09/06/2003 | $2,280.00 | 08/10/2003 - 09/06/2003 | CL | 01 | P | 1 | $206.10 | $2,073.90 |
| 08/09/2003 | $2,280.00 | 07/13/2003 - 08/09/2003 | CL | 01 | P | 1 | $206.10 | $2,073.90 |
| 07/12/2003 | $2,280.00 | 06/15/2003 - 07/12/2003 | CL | 01 | P | 1 | $206.10 | $2,073.90 |
| 06/14/2003 | $2,280.00 | 05/18/2003 - 06/14/2003 | CL | 01 | P | 1 | $206.10 | $2,073.90 |
| 05/17/2003 | $2,280.00 | 04/20/2003 - 05/17/2003 | CL | 01 | P | 1 | $206.10 | $2,073.90 |
| 04/19/2003 | $2,280.00 | 03/23/2003 - 04/19/2003 | CL | 01 | P | 1 | $206.10 | $2,073.90 |
| 04/14/2003 | $52.86 | 03/01/2003 - 03/22/2003 | CI | 01 | S | 1 | $0.00 | $52.86 |
| 03/22/2003 | $2,228.00 | 02/23/2003 - 03/22/2003 | CL | 01 | P | 1 | $206.10 | $2,021.90 |
| 02/22/2003 | $2,228.00 | 01/26/2003 - 02/22/2003 | CL | 01 | P | 1 | $206.10 | $2,021.90 |
| 01/25/2003 | $2,228.00 | 12/29/2002 - 01/25/2003 | CL | 01 | P | 1 | $146.84 | $2,081.16 |
| 12/28/2002 | $2,228.00 | 12/01/2002 - 12/28/2002 | CL | 01 | P | 1 | $146.84 | $2,081.16 |
| 11/30/2002 | $2,228.00 | 11/03/2002 - 11/30/2002 | CL | 01 | P | 1 | $146.84 | $2,081.16 |
| 11/02/2002 | $2,228.00 | 10/06/2002 - 11/02/2002 | CL | 01 | P | 1 | $146.84 | $2,081.16 |
| 10/05/2002 | $2,228.00 | 09/08/2002 - 10/05/2002 | CL | 01 | P | 1 | $146.84 | $2,081.16 |

Next



EXHIBIT    C

3/20/04 -    2280.00
3/27/04 -        25.71

| eICPAS Main Menu | Employee Options | Case Options | Accident Options | Reports |



## *INJURY COMPENSATION*
## *PERFORMANCE ANALYSIS SYSTEM*

### WORKER'S COMP CASE EMPLOYEE DETAIL
* *RESTRICTED INFORMATION* *

**CURRENT INFORMATION:**

| | |
|---|---|
| **OWCP CASE:** | 010271843 |
| **NAME:** | Agnew, Gary R |
| **ADDRESS1:** | 81 Lynn Rd |
| **ADDRESS2:** | |
| **CITY STATE ZIP:** | Bristol CT 06010-4465 |

| | |
|---|---|
| **ACCIDENT NUMBER:** | |
| **SSN:** | 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 |
| **DOB/AGE:** | 05/06/1950 - 53 |
| **EOD DATE:** | 02/15/1977 |
| **YRS/MO SERVICE:** | 27 / 02 |

### COMPENSATION TRACKING
* *RESTRICTED INFORMATION* *

| Check Date | Gross Amount | Period Covered | Paid To | Paid By | Roll Type | Pay Type | Deduction Amount | Net Amount |
|---|---|---|---|---|---|---|---|---|
| 09/07/2002 | $2,228.00 | 08/11/2002 - 09/07/2002 | CL | 01 | P | 1 | $146.84 | $2,081.16 |
| 08/10/2002 | $2,228.00 | 07/14/2002 - 08/10/2002 | CL | 01 | P | 1 | $146.84 | $2,081.16 |
| 07/13/2002 | $2,228.00 | 06/16/2002 - 07/13/2002 | CL | 01 | P | 1 | $146.84 | $2,081.16 |
| 06/15/2002 | $2,228.00 | 05/19/2002 - 06/15/2002 | CL | 01 | P | 1 | $146.84 | $2,081.16 |
| 05/18/2002 | $2,228.00 | 04/21/2002 - 05/18/2002 | CL | 01 | P | 1 | $146.84 | $2,081.16 |
| 04/20/2002 | $2,228.00 | 03/24/2002 - 04/20/2002 | CL | 01 | P | 1 | $146.84 | $2,081.16 |
| 03/26/2002 | $23.00 | 03/01/2002 - 03/23/2002 | CI | 01 | S | 1 | $0.00 | $23.00 |
| 03/23/2002 | $2,200.00 | 02/24/2002 - 03/23/2002 | CL | 01 | P | 1 | $146.84 | $2,053.16 |
| 02/23/2002 | $2,200.00 | 01/27/2002 - 02/23/2002 | CL | 01 | P | 1 | $146.84 | $2,053.16 |
| 01/26/2002 | $2,200.00 | 12/30/2001 - 01/26/2002 | CL | 01 | P | 1 | $128.72 | $2,071.28 |
| 12/29/2001 | $2,200.00 | 12/02/2001 - 12/29/2001 | CL | 01 | P | 1 | $128.72 | $2,071.28 |
| 12/01/2001 | $2,200.00 | 11/04/2001 - 12/01/2001 | CL | 01 | P | 1 | $128.72 | $2,071.28 |
| 11/03/2001 | $2,200.00 | 10/07/2001 - 11/03/2001 | CL | 01 | P | 1 | $128.72 | $2,071.28 |
| 10/12/2001 | $2,200.00 | 09/09/2001 - 10/06/2001 | CL | 01 | S | 1 | $128.72 | $2,071.28 |
| 10/05/2001 | $2,200.00 | 08/12/2001 - 09/08/2001 | CL | 01 | S | 1 | $128.72 | $2,071.28 |
| 08/17/2001 | $3,378.57 | 06/30/2001 - 08/11/2001 | CL | 01 | S | 1 | $193.08 | $3,185.49 |
| 07/13/2001 | $2,200.00 | 06/02/2001 - 06/29/2001 | CL | 01 | S | 1 | $128.72 | $2,071.28 |
| 06/08/2001 | $2,200.00 | 05/05/2001 - 06/01/2001 | CL | 01 | S | 1 | $128.72 | $2,071.28 |
| 05/18/2001 | $1,100.00 | 04/21/2001 - 05/04/2001 | CL | 01 | S | 1 | $64.36 | $1,035.64 |
| 04/27/2001 | $2,042.86 | 03/26/2001 - 04/20/2001 | CL | 01 | S | 1 | $128.72 | $1,914.14 |

[ Previous ]    [ Next ]


**UNITED STATES**
**POSTAL SERVICE ®**

*INJURY C  MPENSATION*
*PERFORMANCE ANALYSIS SYSTEM*

## WORKER'S COMP CASE EMPLOYEE DETAIL
*\* RESTRICTED INFORMATION \**

**CURRENT INFORMATION:**

**OWCP CASE:** 010271843

**NAME:** Agnew, Gary R

**ADDRESS1:** 81 Lynn Rd

**ADDRESS2:**

**CITY STATE ZIP:** Bristol CT 06010-4465

 :  DENT NUMBER:

**SSN:** 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

**DOB/AGE:** 05/06/1950 - 53

**EOD DATE:** 02/15/1977

**YRS/MO SERVICE:** 27 / 02

## COMPENSATION TRACK NG
*\* RESTRICTED INFORMATION \**

| Check Date | Gross Amount | Period Covered | Paid To | Paid By | Coll Type | Pay Type | Deduction Amount | Net Amount |
|---|---|---|---|---|---|---|---|---|
| 03/30/2001 | $3,101.44 | 02/13/2001 - 03/24/2001 | CL | 01 | S | 1 | $128.72 | $2,972.72 |
| 01/14/2000 | $345.72 | 06/16/1999 - 07/19/1999 | LB | 01 | S | 1 | $0.00 | $345.72 |
| 01/07/2000 | $1,116.95 | 07/21/1999 - 08/06/1999 | CL | 01 |  | 1 | $0.00 | $1,116.95 |

Previous



| eICPAS Main Menu | | Employee Options | | Case Options | | | | dent Options | | Reports |



### INJURY C MPENSATION
### PERFORMANCE ANALYSIS SYSTEM

## WORKER'S COMP CASE EMPLOYEE DETAIL
### * RESTRICTED INFORMATION *

**CURRENT INFORMATION:**

**OWCP CASE:** 010271843

**NAME:** Agnew, Gary R

**ADDRESS1:** 81 Lynn Rd

**ADDRESS2:**

**CITY STATE ZIP:** Bristol CT 06010-4465

**DENT NUMBER:**

**SSN:** 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

**DOB/AGE:** 05/06/1950 - 53

**EOD DATE:** 02/15/1977

**YRS/MO SERVICE:** 27 / 02

## COMPENSATION TRACKING
### * RESTRICTED INFORMATION *

| Check Date | Gross Amount | Period Covered | Paid To | Paid By | oll ype | Pay Type | Deduction Amount | Net Amount |
|---|---|---|---|---|---|---|---|---|
| 03/30/2001 | $3,101.44 | 02/13/2001 - 03/24/2001 | CL | 01 | S | 1 | $128.72 | $2,972.72 |
| 01/14/2000 | $345.72 | 06/16/1999 - 07/19/1999 | LB | 01 | S | 1 | $0.00 | $345.72 |
| 01/07/2000 | $1,116.95 | 07/21/1999 - 08/06/1999 | CL | 01 | | 1 | $0.00 | $1,116.95 |

[ Previous ]



**DEPARTMENT OF VETERANS AFFAIRS**
Hartford Regional Office
450 Main Street
Hartford CT 06103

April 30, 2004

**ATTENTION: ATTY MARIE KAHN**

In Reply Refer To:  308/21
AGNEW, Gary

The records of the Department of Veterans Affairs (VA) disclose that Mr. Gary Agnew is in receipt of the following compensation benefits:

| AMOUNT | EFFECTIVE DATES |
|---|---|
| $956.00 | Dec. 1, 2000 |
| $2,420.00 | Mar. 1, 2001 |
| $2,483.00 | Dec. 1, 2001 |
| $2,516.00 | Dec. 1, 2002 |
| $2,318.00 | Jan. 1,  2003 |
| $1,095.00 | Mar. 1, 2003 |
| $1,117.00 | Dec. 1, 2003 |

Sincerely yours,

*G. Warren*

G. WARREN
Veterans Service Center Manager

Email us at:  hartford.query@vba.va.gov

EXHIBIT    D

**DEPARTMENT OF VETERANS AFFAIRS**
**VARO Hartford**
**450 Main Street**
**Hartford CT  06103**

MAY    3  2001

GARY R AGNEW
81 LYNN RD
BRISTOL CT 06010

In Reply Refer To:  308/211
C 29 481 059
AGNEW, Gary R

Dear Mr. Agnew:

We made a decision on your claim for an increase in your service-connected disability benefits received on March 14, 2001.

This letter tells you about your check amount and payment start date, what we decided, how we made our decision, and what evidence we used to make our decision. We have also included information on additional benefits, what to do if you disagree with our decision, and who to contact if you have questions or need assistance.

## What Is Your Check Amount And Payment Start Date?

Your monthly check amount is shown below:

| Monthly Check Amount | Payment Start Date |
|---|---|
| 2,420.00 | Mar 1, 2001 |
| 2,228.00 | Jul 1, 2001 |
| 1,053.00 | Apr 1, 2002 |

We are paying you as a veteran with 2 dependents. Your payment includes an additional amount for your spouse, Kathy and your child, Ryan. *Let us know right away if there is any change in the status of your dependents.*

## When Can You Expect Payment?

Your payment begins the first day of the month following your effective date. Generally, your effective date is the date we receive your claim. A payment covering the initial amount due under this award will be paid in approximately 15 days. Payment will then be made at beginning of each month for the prior month.



EXHIBIT    E

# FILE COPY

2

C 29 481 059
Agnew, Gary R

## What Did We Decide?

1. An evaluation of 100 percent has been assigned for the period February 14, 2001 to April 1, 2001 based on surgical or other treatment necessitating convalescence.

2. Evaluation of left total knee replacement, which was 10 percent disabling, is increased to 100 percent effective April 1, 2001 (this is after the convalescence granted in decision#1, from 02-14-2001 through to 04-01-2001).

3. Entitlement to special monthly compensation is denied.

4. Eligibility to Dependents' Educational Assistance is not established.

5. An evaluation of 30 percent has been assigned for left total knee replacement effective April 1, 2002 (this has been 10% prior to total knee replacement).

## How Did We Make Our Decision?

We have enclosed a copy of our Rating Decision for your review. It provides a detailed explanation about our decision, including the evidence considered and the reasons and basis for our decision.

## What Evidence Did We Use To Decide Your Claim?

In making our decision, we used the following evidence: Operative Report.

## Are You Entitled To Additional Benefits?

You may be entitled to a clothing allowance because of your service connected disability. Complete, sign, and return the enclosed VA Form 21-8678, "Application for Annual Clothing Allowance."

## What You Should Do If You Disagree With Our Decision.

If you do not agree with our decision, you should write and tell us why. You have *one year from the date of this letter to appeal the decision.* The enclosed *VA Form 4107, "Notice of Procedural and Appellate Rights,"* explains your right to appeal.

## Do You Have Questions Or Need Assistance?

If you have questions or need assistance with this claim, please call us at 1-800-827-1000. If you use a Telecommunications Device for the Deaf (TDD), the number is 1-800-829-4833.

3

C 29 481 059
Agnew, Gary R

If you call, please refer to your VA file number 29 481 059. If you write to us, put your full
name and VA file number on the letter. You can visit our web site at www.va.gov for more
information about veterans' benefits.

A copy of this letter was sent to Disabled American Veterans because you appointed them as
your representative. If you have questions or need assistance completing forms/claim, etc.,
you can also contact them.

If you do not agree with our decision, you should write and tell us why. You have *one year
from the date of this letter to appeal the decision.* The enclosed *VA Form 4107, "Notice of
Procedural and Appellate Rights,"* explains your right to appeal.

Sincerely yours,


MARK MIHALIK
Veterans Service Center Manager

Enclosures:    Rating Decision
               VA Form 21-8678
               VA Form 4107

cc: DAV
211/122 djp

| **Rating Decision** | *Department of Veterans Affairs*<br>*Hartford Regional Office* | | Page 1<br>05/01/2001 |
|---|---|---|---|
| NAME OF VETERAN<br>G. R. AGNEW | VA FILE NUMBER<br>29 481 059 | SOCIAL SECURITY NR<br>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 | POA<br>Disabled American Veterans |

## *ISSUE:*

1. Entitlement to a temporary total evaluation because of treatment for a service-connected condition requiring convalescence. (38 CFR 4.30)

2. Evaluation of left total knee replacement currently evaluated as 100 percent disabling.

3. Entitlement to special monthly compensation because of the need for aid and attendance or being housebound.

4. Eligibility to Dependents' Educational Assistance under 38 U.S.C. chapter 35.

4. Evaluation of left total knee replacement.

## *EVIDENCE:*

On 03-14-2001 Mr. Agnew applied for increased benefits. Attached was a copy of the Operative report.

## *DECISION:*

1. An evaluation of 100 percent has been assigned for the period February 14, 2001 to April 1, 2001 based on surgical or other treatment necessitating convalescence.

2. Evaluation of left total knee replacement, which is was 10 percent disabling, is increased to 100 percent effective April 1, 2001 (this is after the convalescence granted in decision #1, from 02-14-2001 through to 04-01-2001).

3. Entitlement to special monthly compensation is denied.

4. Eligibility to Dependents' Educational Assistance is not established.

5. An evaluation of 30 percent has been assigned for left total knee replacement effective April 1, 2002 (this had been 10% prior to total knee replacement).

## *REASONS AND BASES:*

1. An evaluation of 100 percent has been assigned effective February 14, 2001 based on surgical or other treatment necessitating convalescence.

Mr. Agnew underwent a left total knee replacement on 02-14-2001. Mr. Agnew was then released for recovery. Mr. Agnew is entitled to convalescence for the total knee replacement. This extends through 03-31-2001.

2. The evaluation of left total knee replacement is increased to 100 percent disabling effective April 1, 2001. An evaluation of 100 percent is assigned for 12 months following prosthetic replacement of the knee joint. Since there is a likelihood of improvement, the assigned evaluation is not considered permanent and is subject to a future review examination. The 100% evaluation continues through to 03-31-2002.

3. Additional compensation ("special monthly compensation") may be awarded if the claimant is blind, a patient in a nursing home because of mental or physical incapacity, or when the evidence shows aid and attendance is required to perform routine activities of daily living. Additional benefits may also be paid if the veteran has a single disability ratable at 100 percent and additional disabilities independently ratable at 60

| **Rating Decision** | *Department of Veterans Affairs*<br>*Hartford Regional Office* | | Page 2<br>05/01/2001 |
|---|---|---|---|
| NAME OF VETERAN<br>G. R. AGNEW | VA FILE NUMBER<br>29 481 059 | SOCIAL SECURITY NR<br>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 | POA<br>Disabled American Veterans |

percent or more, or if the veteran is substantially confined to his or her dwelling and immediate premises due to disability. Since none of these requirements have been met, entitlement to special monthly compensation is not established.

There is no objective evidence of either separate 60% evaluation or housebound status based on the evidence of record.

4. Eligibility to Dependents' Educational Assistance is derived from a veteran who was discharged under other than dishonorable conditions and has a permanent and total service-connected disability; or a permanent and total disability was in existence at the time of death; or the veteran died as a result of a service-connected disability. Eligibility to Dependents' Educational Assistance is denied as the evidence does not show the veteran currently has a total service-connected disability, permanent in nature.

5. An evaluation of 30 percent has been assigned for left total knee replacement effective April 1, 2002. An evaluation of 30 percent is granted whenever there is malunion of the tibia and fibula with marked knee or ankle disability. A higher evaluation of 40 percent is not warranted unless a brace is required because of nonunion and loose motion.

Please note that the minimum evaluation following knee replacement is 30% and this the evaluation scheduled for 04-01-2002. VA examination will be scheduled to determine the severity of the left knee after the convalescence and the 1 year at 100%.

| **Rating Decision** | *Department of Veterans Affairs*<br>*Hartford Regional Office* | | Page 3<br>05/01/2001 |
|---|---|---|---|
| NAME OF VETERAN<br>G. R. AGNEW | VA FILE NUMBER<br>29 481 059 | SOCIAL SECURITY NR<br>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 | POA<br>Disabled American Veterans |

| ACTIVE DUTY *(Month/Day/Year)* | | | | | ADDITIONAL<br>SERVICE CODE | COMBAT<br>STATUS | SPECIAL<br>PROVISION CODE | | | FUTURE EXAM<br>*(Month/Year)* |
|---|---|---|---|---|---|---|---|---|---|---|
| EOD | RAD | EOD | | RAD | | | | | | 0302 |
| COPY TO:<br>VAMC Newington 136A<br>DAV | | | S | EFFECTIVE DATE | BASIC | HOSPITAL | LOSS OF USE | ANAT. LOSS | | OTHER LOSS |
| | | | M | | | | | | | |
| | | | C | | | | | | | |

*JURISDICTION:* 020;3 Claim for increase received 03-14-2001.

1. SC (VE INC)
5299-5262     RIGHT STATUS POST MILLER GALANTE II  TOTAL KNEE REPLACMENT
40% from 04-01-1992

5055     LEFT TOTAL KNEE REPLACEMENT, FORMERLY CHONDROMALACIA, LEFT
KNEE
10% from 12-15-73
100% from 02-14-01 (38 CFR 4.30)
100% from 04-01-2001 (Schedular)
30% from 04-01-02

7323     ULCERATIVE COLITIS
10% from 06-19-1974

8. NSC (VE)
5259     POST OPERATIVE MENISECTOMY, RIGHT KNEE

COMB:     SC 60% from 04-01-92
100% from 02-14-01 (38 CFR 4.30)
100% from 04-01-2001 (Schedular)
70% from 04-01-02

43. Bilateral factor of 5.6% for DC 5299-5262 & 5055 - 04-01-2002.

Basic eligibility under 38 U.S.C. chapter 35 is not established.

C. R. JACKSON, Rating Specialist

J. T. GIONET, Rating Specialist1

029481059-010501.RTG

124

1  Q    You could get the process going by which such an

2  investigation could occur?

3  A    Yes, I could.

4  Q    You never did that in this situation?

5  A    No.

6  MS. HEFFERNAN:  I have no further

7  questions.

8  REDIRECT EXAMINATION BY MS. KAHN:

9  Q    Mrs. Theroux, did Mr. -- to your knowledge, did

10 Mr. Agnew ever ask to come back to work?

11 A    No.

12 Q    And what is the practice with your office with

13 respect to once you are notified there's a criminal

14 investigation, what is your practice with respect to

15 initiating administrative proceedings such as the one you

16 were asked about on cross-examination?

17 A    We would not do that.  We wouldn't initiate any

18 administrative actions.

19 MS.  KAHN:  If I may have a moment.

20 No further questions.

21 THE COURT:  You may step down.

22 (Whereupon, the witness was excused.)

23 MS. KAHN:  Government calls Raymond Evers.

24 THE COURT:  Mr. Evers, if you would come up

25 to the witness stand area and remain standing so the clerk

EXHIBIT   F

148

Q    So even though he put down he was a union

official, you still paid him for total disability; is that

right?

A    Correct.

Q    Why is that?

A    With regard to the amount that he actually is

paid.  Of course, it had no value on the open market.

With regard to any other possibilities, the fact is that

we became aware around this time that there was a criminal

investigation of Mr. Agnew and in general, when this

occurs, what we will do is just simply leave this claim

alone and not take any action on it that we would normally

take.

Q    When were you apprised of the criminal

investigation?

A    Around sometime in 2002.

Q    Do you recall when?

A    No, I don't.

Q    And would a position as a union official

otherwise impact someone's disability claim?

A    No.  The only ways are the ways that I

mentioned.

Q    I would like to draw your attention to question

No. 2.  Again, what is the question asking?

A    Were you self-employed or involved in any

1    his duties for that time as making copies.  He further

2    described he does other union duties above and beyond his

3    limited -- permanent limited duty job, that being a union

4    official for the mail handlers union in the Postal

5    Service.

6        Q    Did there come a time during the course of your

7    conversation where you questioned him about any of --

8    about the total disability forms in this case?

9        A    Yes.

10       Q    And could you briefly describe for the members

11   of the jury that conversation?

12       A    We confronted Mr. Micca (sic) with the fact he

13   had been working at International Motor Cars.  He had not

14   notified the Postal Service.  Nor the Department of Labor.

15   That in fact on the compensation forms, he indicated

16   monies he claimed for his union business but did not claim

17   anything at International Motor Cars and to that he

18   replied, yeah, I lied.  It was never a lot of money.

19       Q    Is there anything else about that conversation

20   that you recall?

21       A    Just simply that he's a stand-up guy and he

22   would do the right thing.  Take responsibilities for his

23   actions.

24       Q    Anything else?

25       A    No.

383

1          Q    Did you know whether he had had employment at

2     one point in time?

3          A    Yes.

4          Q    Did you know what that employment was?

5          A    He was working at the U.S. Postal Service.

6          Q    Did you know what his position was at the

7     time?

8          A    No.

9          Q    He didn't tell you?

10         A    He didn't tell me and I don't know if I asked.

11         Q    At some point did you perform surgery on

12    Mr. Agnew?

13         A    Yes.

14         Q    And do you recall when that was?

15         A    Yes.  On February 4, 2002, I performed a

16    revision left total knee replacement.

17         Q    And that was February 4, 2002?

18         A    Yes.

19         Q    And do you know did there come a point in time

20    after the surgery where you determined or you gave an

21    opinion that Mr. Agnew could not return to work?

22         A    Yes.

23              MS. KAHN:  If I may approach the witness,

24    your Honor.

25              THE COURT:  Yes.

385

1    knee and was not able to perform his duties at the

2    U.S. Postal Service, so I totally disabled him from any

3    gainful employment at that time.

4         Q    There's notation in the first paragraph, do you

5    see that on your report, the patient states he's unable to

6    perform his work at the U.S. Post Office?  Do you see

7    that?

8         A    Yes, I do.

9         Q    That's what Mr. Agnew was reporting to you?

10         A    Yes.

11         Q    And on the next page under impressions, you

12    indicated at this time the patient is having pain with

13    prolonged weight-bearing activities.  How did you know

14    that?

15         A    From what he told me.

16         Q    Then you indicated I do not feel he's capable of

17    returning to work at the post office.  I do feel he's

18    totally disabled from any gainful employment that requires

19    prolonged sitting and standing.  What did you base that

20    opinion on?

21         A    Based on what he had told me and partly on

22    physical exam but mainly by what he told me over the past

23    several months.

24         Q    When a patient tells you -- is pain a subjective

25    assessment in some respects?

386

1          A    Yes.

2          Q    And do you have to rely on what the patient

3    tells you?

4          A    Yes.

5          Q    And in reaching your conclusions, do you ever

6    independently investigate the representations of your

7    patients?

8          A    I'm not sure what you mean by that.

9          Q    If a patient tells you no, I'm not able to work,

10   do you accept that as being truthful?

11         A    Most of the time.  There are some patients that

12   I question it, but most of the time I gave the patient the

13   benefit of the doubt and if he tells me that, I tend to

14   believe him.

15         Q    And in this instance, you relied on your

16   opinion -- you relied on, you're saying, what Mr. Agnew

17   told you in terms of his ability?

18         A    Yes.

19         Q    Did he ever tell you that he was working at a

20   car dealership?

21         A    No.

22         Q    Did he ever tell you he was spending time at a

23   friend's dealership?

24         A    No.

25         Q    Did he ever tell you he was taking people on

387

1    test drives?

2         A    No.

3         Q    Did he ever tell you that he was driving to pick

4    up cars or drop off cars?

5         A    No.

6         Q    Did he ever tell you he was opening and closing

7    a business?

8         A    No.

9         Q    That he was working on some days as long as 10

10   hours?

11        A    No.

12        Q    At some point did you learn about these

13   activities?

14        A    Yes.

15        Q    Did you have occasion to meet with

16   Inspector Millett?

17        A    Yes.

18        Q    You and I have never met until just a few

19   minutes ago?

20        A    That's correct.

21        Q    You did meet with Inspector Millett, correct?

22        A    Yes.

23        Q    At the time you met with Inspector Millett, did

24   you meet with him about Mr. Gary Agnew?

25        A    Yes.

1    Q    And did you have occasion to -- after your April

2    meeting with the inspectors, did you have occasion to see

3    Mr. Agnew as a patient again?

4    A    I believe I did.

5              MS. KAHN:  And if I may approach the

6    witness, your Honor.

7              THE COURT:  Yes.

8    Q    Let me show you, Dr. Murray, what's been

9    previously marked and admitted into evidence as Government

10   46.

11             MS. KAHN:  Your Honor, I believe it is

12   marked as a full exhibit, if I may publish it.

13             THE COURT:  It is a full exhibit.  You may.

14   Q    I'm placing on the overhead and you have in

15   front of you, Dr. Murray, a report that you issued on

16   September 4, 2003, correct?

17   A    That's correct.

18   Q    You saw Mr. Agnew when?

19   A    On September 2, 2003.

20   Q    After your meeting with the inspectors,

21   correct?

22   A    That's correct.

23   Q    In this report, did you indicate or make any

24   conclusions with respect to Mr. Agnew's ability to return

25   to work or to work at the U.S. Postal Service?

391

1          A      Yes.

2          Q      And what did you conclude?

3          A      At the end of my report I dictated that I felt

4     that he was capable of working in a sedentary capacity.  I

5     stated that if he were to return to work, he should not

6     stand for more than an hour.  One-half hour at a time.  He

7     should not lift objects weighing more than 20 pounds at a

8     time.  I said if he were to return to work, he should also

9     avoid kneeling and squatting, that these restrictions

10    would be for three months, then he may advance his

11    activities as tolerated.

12         Q      The restrictions you listed were for a set

13    period of time, then they could be relieved as

14    tolerated?

15         A      Yes.

16         Q      And do you see the first line of the last

17    paragraph of your report?

18         A      Yes.

19         Q      Now, it says again the patient reports that he's

20    unable to return to work.  Is that what Mr. Agnew told

21    you?

22         A      Yes.

23         Q      But in this report, you said, however, I do feel

24    he's capable of working in a sedentary capacity.  And why

25    is it -- obviously you have changed your opinion here,

1    correct?

2        A    That's correct.

3        Q    Why is that?

4        A    I hate to see people not working and if the

5    patients keep coming back to me, even though I've disabled

6    them from work, I always talk to them about trying to

7    return to work.  He's a young guy.  I do that with

8    everybody.  I hate to have them out of work.  And I think

9    that's why I said that.

10       Q    When you saw the videotape, did you have an

11   opinion about whether he was able to return to his work at

12   the post office?

13       A    You know, on the videotape -- and I'm sure you

14   have seen it.  Maybe you haven't.  I saw him walking to

15   and from cars.  I saw him driving.  That's really the only

16   activity I saw him doing in those tapes.  And even prior

17   to the videotapes, I assumed he could do that anyways,

18   walk to a car, drive a car, get out of a car.

19       Q    Did you express an opinion to the agents about

20   his ability to work at that time after they showed you the

21   video?

22       A    I was surprised, not at his activity, but more

23   he was doing something -- this is out of my league but

24   doing something that might not be the morally right thing

25   to do.  I was more surprised at that than his actual

1   watching him walk and get in and out of cars.  I knew at

2   the Postal Service he had to lift objects 20 pounds or

3   more and sort mail and stand up for long periods of time.

4   I just wanted him to get back to work if possible.

5       Q    How did you know he had to do those things?  I

6   thought you didn't know what his position was at the post

7   office.

8       A    I take care of a lot of patients.  I see

9   probably about 100 a week.  I see a lot of people from the

10  Postal Service.  So I kind of have an idea what they do.

11  I don't know exactly what they do.  But through my years,

12  taking care of a lot of workers' comp and a lot of Postal

13  Service people, I have an idea.

14      Q    You base -- your idea about what his work was at

15  the post office was based on all the other post office

16  patients that you see?

17      A    That's correct.

18      Q    You assumed he was doing the same kind of

19  activities that those folks were doing there?

20      A    That's correct.

21      Q    Did you ever know that Mr. Agnew had a limited

22  duty position at the post office?

23      A    No.

24      Q    So you had no idea what actually he was required

25  to do at the post office?

1    not a previously scanned document.

2        Q    Dr. Murray, I will ask you a couple of

3    questions.  Is it -- is that a letter to you from the

4    Department of Labor asking you to identify the limitations

5    that Mr. Agnew has with respect to his ability to work?

6        A    Yes.

7        Q    So the Department of Labor did send such a

8    request to your office?

9        A    Yes.

10       Q    Does it ask about whether he could perform a

11   limited duty position and what those restrictions would

12   be?

13       A    Yes.

14       Q    And the following note from Mr. Agnew he's

15   telling the Department of Labor that he can't get a

16   response.  He can't get you to fill out the form because

17   he's trying to get an appointment with you, correct?

18       A    Yes.

19       Q    So that is what -- so, in fact, the Department

20   of Labor was asking your office, asking you whether he

21   could perform a limited duty position, correct?

22       A    That's correct.

23       Q    Do you know what his limited duty position was?

24   You indicated you didn't know he had a limited duty

25   position, correct?

423

1          A     That's correct, and I didn't know what his

2     limited duty activity was.

3          Q     Let me ask you this:  If you were asked on

4     cross-examination whether you had been asked about his

5     ability to return to the post office in a limited duty

6     position, let me ask you if he were given a sedentary

7     position, told he could stand and sit as often as he

8     wanted for as long as he wanted, as short as he wanted or

9     he could sit and operate a copy machine, would you see any

10    problem with that?

11         A     No.

12         Q     And let me show you what I believe has been

13    marked and introduced into evidence as Government Exhibit

14    38A and I want to confirm before I publish, your Honor.

15                    THE COURT:  Yes.

16                    MS. KAHN:  May I publish, your Honor?

17                    THE COURT:  Yes, you may.  It is a full

18    exhibit.

19         Q     Dr. Murray, I'm placing on the overhead and I

20    will give you a copy of the original exhibit in case it is

21    easier for you to read.

22                    MS. KAHN:  If I may approach, your Honor.

23                    THE COURT:  Yes.

24         Q     You see this is a letter to Mr. Agnew asking

25    about a limited duty position.  Do you see that?

467

1      Q      Take a look at this here.  The G 160.  This is

2  one of the ones you highlighted, correct?

3      A      Yes, ma'am.

4      Q      And what does that refer to?

5      A      Money that I charged to the car.

6      Q      What do you mean you charged to the car?

7      A      That I took out of the profit of the car.

8      Q      If you took it out of profit, it would be

9  somewhere up in here, right?

10     A      Yes, ma'am.

11     Q      Does that mean the 160 commission?

12     A      That's what it looks like, yes.

13     Q      Who got paid that?

14     A      It shows Gary.

15     Q      And that would be Gary Agnew?

16     A      Yes, ma'am.

17            MS. KAHN:  Your Honor, I'm going to

18  publish 64C.

19     Q      I'm going to show you one more example.  If you

20  will look at the next yellow tab, Mr. Micca.  Is that

21  another wash sheet?

22     A      Another one of the inside folders, yes.

23     Q      This one again same kind of analysis up here on

24  the upper left-hand side?

25     A      pretty much, yes.

468

1        Q    What car is this?

2        A    A 1998 Subaru Outback.

3        Q    You got the cost of the car?

4        A    Yup.

5        Q    Do you see that amount there?

6        A    Yes, ma'am.

7        Q    And the initials?

8        A    G. A.

9        Q    Who would that be?

10       A    I would have designated for Gary Agnew.

11       Q    Is it fair to say the ones that you tabbed

12  either had a G or G.A.?

13       A    Yes.

14       Q    Do some of them -- do some of them indicate an

15  actual -- the actual written out the name Gary versus just

16  G or G.A.? Let me actually direct your attention to 64L.

17             MS. KAHN:  If I may approach the witness

18  just to show him which page it is.  Thank you.

19             THE COURT:  Yes.

20             MS. KAHN:  I may publish 64L, your Honor?

21             THE COURT:  Yes.

22       Q    Another wash sheet, Mr. Micca?

23       A    Another folder yes, ma'am.

24       Q    Similar kind of analysis of calculation here?

25       A    Similar but I don't understand this one.  For

1    some reason it seems like there are two.  I don't know

2    what they are, though.

3         Q    Let me direct your attention to this part of

4    that.  Do you see that is that 175 commission?

5         A    That's what it says, yes, ma'am.

6         Q    Who is listed for that?

7         A    Paul and Gary.

8         Q    So what does that mean when Paul and Gary are

9    both listed?

10        A    It's the first one I have seen but it is

11   designated that amount was put aside for that.

12        Q    Who would be paid that amount?

13             How would that be attributed, how would that

14   $175 be attributed?

15        A    I don't know what you mean by attributed.

16        Q    Who would get the $175?

17        A    Paul or Gary or both of them got something.

18        Q    Would they split it?

19        A    It's possible, yes.  I'm not sure how the

20   breakdown went.  It could be a lot of different things.

21   I'm not sure.  I don't know what the car is.

22        Q    Did you -- were there occasions where you paid

23   Mr. Agnew in cash?

24        A    Yes, ma'am.

25        Q    And in addition to the ones you tabbed, there

470

1    are other wash sheets in that Government Exhibit 64,

2    correct?

3         A    There's a lot of sheets here, ma'am.

4         Q    And with respect to the other sheets, is it fair

5    to say that most of them don't indicate who gets a

6    commission?  Are a lot of them blank as to who?

7         A    Yeah.  A lot of them are blank and a lot of them

8    don't say commission.  A lot of them are just blank.

9         Q    Is it possible that with respect to those that

10   are blank, that some of those commissions went to Mr.

11   Agnew?

12              MS. HEFFERNAN:  Objection, your Honor.

13   Anything is possible.

14              THE COURT:  Objection sustained.

15        Q    Did some of those -- with respect to the wash

16   sheets that don't indicate G.A. or G next to them or

17   anyone else's names or initials.  Is it possible

18   --withdrawn.

19              Did some of those nonetheless represent

20   commissions to Mr. Agnew?

21        A    Could I have that one more time, ma'am?

22        Q    With respect to those wash sheets that are in

23   Government Exhibit 64 that you did not tab that are blank

24   as to whom the commissions went to, did some of those

25   commissions go to Mr. Agnew?

1    Q    Did you have occasion to ask him about

2    statements he had made on forms to the Department of Labor

3    or the injury comp office?

4        A    Yes.  I specifically asked him, you know, if he

5    was why did he not place this activity at International

6    Motor Cars on the 1032 form or CA7.  That's when Mr. Agnew

7    said I lied.

8        Q    Did you have occasion -- did the case continue,

9    the investigation continue there after?

10       A    Yes.

11       Q    And did you have occasion to obtain any

12   additional forms that Mr. Agnew may have filed or filed

13   with the Department of Labor or the injury comp office?

14       A    Yes.

15       Q    What did you obtain?

16       A    I was able to obtain a subsequent 1032 form that

17   Mr. Agnew filled out in 2003.

18       Q    Is that the 1032 that you reviewed?

19       A    Yes, that's the front page of the form.

20       Q    You had reviewed his earlier 1032, correct?

21       A    That's correct.

22       Q    And on this -- what was the difference between

23   this Government Exhibit 10, the 1032 that was filed in

24   2003 to the 1032 that you had obtained previously?

25       A    On this 1032 in 2003, he did place on this form

708

1    try to go back to work at all?

2        A    Yes.  In May I tried to go back to work.

3        Q    Was this before or after you had the knee

4    popping?

5        A    Right after.

6        Q    Why did you try to go back?

7        A    I wanted to see if I can do the job.  The

8    support.  Going crazy.  I wanted to go back to work.

9    Financially I was hurting and I wanted to go back to

10   work.

11       Q    Did you make any official arrangement with the

12   post office to go back to work then?

13       A    No.

14       Q    What did you do?

15       A    I went into the office to make copies that I

16   mailed up to OWCP.  When I went in that morning, I opened

17   up the door like I was working.  Turned on all the

18   machinery because I needed to make copies for myself.  I

19   went over to where they have the holdout for where we pick

20   up our jobs when they mail it to us, whatever, I grabbed

21   them, I went back in, the machines were already on, I made

22   the copies I needed for myself and tried to do the job.

23       Q    How long did you try to do the job?

24       A    I would say roughly two hours, maybe longer.

25       Q    What happened?

709

1      A    Couldn't do it.  Too much pain.

2      Q    Anyone at the post office that observed you

3   there that day?

4      A    Joe came in after an hour.

5      Q    Which Joe?

6      A    Joe Horvith.

7      Q    And so you were there a couple hours?

8      A    Yeah.  I would say two, two and a half hours.

9      Q    After those couple hours, what happened?

10     A    I was in a lot of pain.

11     Q    What did you do?

12     A    I believe I had my chiro cuff with me.  I know I

13  had my cane.  I had my legs up on my desk.

14     Q    Did you report to your doctor that you tried?

15     A    Yes, I did.  I reported it to Dr. Pillsbury.

16     Q    Now, after the surgery in August, how did your

17  recovery go for that?

18     A    There was still a lot of questions on whether I

19  had an infection.

20     Q    Why?

21     A    Because the leg was still swollen.  Just a lot

22  of pain.

23     Q    And did you have discussions with your doctor

24  about that?

25     A    Yes, we did.

727

1    brother's store.  I was going stir-crazy.  Not a

2    homebody.

3        Q    Are you an active person?

4        A    Very.  I was always very active.  Sports even.

5    Even with my bad knees, when I wore braces, I was still

6    trying to play sports.  Active with Cub Scouts, little

7    league, soccer for my youngest son.  I stayed pretty

8    active. I played in the 35 and older league in Bristol in

9    softball.

10       Q    Did there come a time that you started spending

11   more and more time again at Mr. Micca's?

12       A    Yes.  As I felt better, I was spending more and

13   more time there.

14       Q    Why were you doing that?

15       A    Just out of sheer boredom.  Give me something to

16   look forward to do every day.

17       Q    Did you hide the fact that you were hanging out

18   at Mr. Micca's from your physician?

19       A    No.

20       Q    Did you hide it from the people at the post

21   office?

22       A    No.

23       Q    What type of activities did you do during 2002

24   at Mr. Micca's?

25       A    The same thing I was doing before basically.  A

735

1    hollering help me, help me.  Screaming different people's

2    names.

3         Q    Why would you wake him up?

4         A    So he would know he was safe and not have to

5    worry.  I would call upstairs and try to wake him up.

6    Sometimes ring the phones to try to wake him up.

7         Q    Did you sell cars at International Motors?

8         A    No.  I did sell one or two of my own vehicles,

9    but it was my own personal vehicle or my son's vehicle.

10        Q    Did Mr. Micca or anyone at International Motors

11   ever give you any money?

12        A    Yeah.  I was given some money for reimbursements

13   and stuff and every once in a while, every once in a great

14   while Jimmy would say, here, here's $100.  Take your wife

15   out to eat.  Here's 150, take your wife to the casino

16   tonight.

17        Q    Aside from those type of gifts, were you given

18   any money?

19        A    No.  Just reimbursements for money that I

20   spent.

21        Q    What about bird dogs?

22        A    Yes.

23        Q    What are bird dogs?

24        A    When I would refer somebody to him, close

25   friends or co-workers or family or whatever, I tried to

746

1 towards the end of the conversation Doug Millett said to

2 me you know the doctors will write down anything you tell

3 them to write down. I said yes, sir, but x-rays don't

4 lie.

5      Q    Do you believe the doctor would write down

6 anything you told them?

7      A    No.

8      Q    Then why did you say that?

9      A    I was angry.

10     Q    Did you ever say during the conversation that

11 you knew what you were doing was wrong?

12     A    Never.

13     Q    Did you ever say I lied?

14     A    The only time I said lie is when I said x-rays

15 don't lie. That's the only time that word came out of my

16 mouth that day.

17     Q    You heard Mr. Feeney and Mr. Millett testify

18 that you after being told about the investigation admitted

19 yeah, I lied, but it was never a lot of money. Did you

20 ever say that?

21     A    Never.

22     Q    Is that the truth that you did lie?

23     A    I didn't lie.

24          MS. HEFFERNAN:   Now, your Honor, I would

25 like to go through the videotape with Mr. Agnew and I just

793

1    the job?

2         A    Not climbing stairs.  There's a lot of walking.

3    Everything has to be delivered.  We do very few people

4    that will drop off and ask to pick up later.  It's all

5    been delivered.

6         Q    So did you ever tell Dr. Murray that you

7    couldn't do your postal job?

8         A    Yes, I did.

9         Q    Why did you tell them that?

10         A    Because of my knee conditions.  Especially after

11    he put all the metal into my left leg where I have the rod

12    going from my hip to my ankle connected at the knee.  It

13    was too difficult.  I can't kneel at all.  Before when

14    there was a jam in the machine, I could always kneel on my

15    left leg to clear it or whatever.  I can't do it.

16         Q    Did you ever conceal from Dr. Pillsbury or Dr.

17    Murray that you were hanging out at the car dealership?

18         A    No, I never concealed it from them.

19         Q    Did you ever have conversations with them about

20    --

21         A    I talked to Dr. Murray about a few cars that was

22    in the lot.  One was a 740-IL, which wasn't in the

23    picture.  There was a gold Jag convertible that was in

24    this film that I had talked to him about.

25         Q    What about Dr. Pillsbury?

794

1      A      I think I might have mentioned I was hanging

2    around a used car dealership.

3      Q      Did you tell any of them that you hung out at

4    your brother's store?

5      A      Dr. Pillsbury knew I hung around my brother's

6    store.  I don't think I ever talked about it with

7    Dr. Murray.

8      Q      Now, you heard the audiotapes of undercovers.

9    There are indications told that we don't work on

10   commissions.  We all get paid the same.  You said those

11   things?

12     A      Yes, I did.

13     Q      Why did you say those things?

14     A      Because I did get paid the same.  Nothing.

15   Whether I sold a Mercedes.  Because I never sold anything.

16   I got paid the same, nothing.

17     Q      Did you know how Paul was paid for his work?

18     A      No, I did not.

19     Q      Did you know how Mark was paid for his work?

20     A      No clue.

21     Q      Did you know whether either of them received

22   commissions?

23     A      No, I did not.

24     Q      When you say we don't work on commissions, what

25   did you mean?

796

1   lot.  I wanted the customers to feel comfortable with

2   him.

3        Q    Were you working at International Motor Cars

4   eight to ten hours a day six days a week?

5        A    No.

6        Q    Were you working at International Motors at

7   all?

8        A    No.  I never worked there.

9        Q    Now, were there other people that would come by

10  and hang out at International Motor Cars?

11       A    Quite a few.

12       Q    Can you tell us some of those people?

13       A    Mark from Connecticut Auto, DJ, which is a

14  friend of Jimmy's.  He's a personal trainer.  He would

15  hang around and go on test drives.  My son Ryan would go

16  out on test drives when he was home.  He used to go with

17  Jimmy and look at cars and buy cars before I did.  Paul's

18  father would go with customers and test drive cars.

19  Jimmy's father would go out with customers and test drive

20  cars.

21       Q    This is a place of business?

22       A    Yes.

23       Q    How would you describe the atmosphere?

24       A    Like a little clubhouse.  We had a lot of fun.

25  We teased each other a lot.  Our biggest thing of the day

903

1    Q    -- who he had with him?

2    A    No, I don't.

3    Q    It is possible he had somebody, you just don't

4    remember?

5    A    It is possible.  I just don't recall.  I

6    remember he gave me his card.

7    Q    Do you remember telling the agents that during

8    the follow-up evaluations, Mr. Agnew stated that he was in

9    a lot of pain and that he used a cane when he was away

10   from home after the total knee replacement that you did?

11   Do you remember telling them that?

12   A    I don't remember specifically telling them that,

13   but it was my impression when I saw Mr. Agnew a lot of

14   times he would be using the cane.  I can't say for sure

15   every time he came to the office.

16   Q    A lot of the times he was using a cane?

17   A    Yes.

18   Q    And based on -- and you told them, didn't you,

19   that based on Mr. Agnew's statements, you continued to

20   totally disable him from working at the post office,

21   right?

22   A    Yes.

23   Q    And did you tell the agents that you didn't know

24   that Mr. Agnew was working at a used car dealership?

25   A    No.  I had no idea that he was working in a used

904

1    car dealership.

2         Q    He never told you that?

3         A    I have no recollection that he ever told me

4    that.

5         Q    Would that have been something that you would

6    have noted in your records if he told you?

7         A    I think I probably would.  I think I would have

8    recorded that.

9         Q    If, for example, he said I hang out at a car

10   dealership Monday through Friday, I usually get there

11   around 8:00, I open the business, and sometimes I stay

12   until 6, I close the business, I show people cars, I take

13   them for test drives, would that have been something you

14   would have noted?

15        A    I think that would have been an indication of

16   what his level of daily activity.  I think most of the

17   time my impression was he was having trouble just daily

18   activities.  Things that one would normally do to get

19   through the day.

20        Q    You didn't know that he was opening a business

21   at 8 in the morning?

22        A    No.

23        Q    Did you know, for example, that when opening the

24   business, he would remove a cable and lift a bar or a

25   metal rod on one hand?

905

1       MS. HEFFERNAN:  I'm going to object.

2   There's no documentation that occurred during the time

3   period Dr. Pillsbury was treating the witness.

4       THE COURT:  The treatment ends with

5   Dr. Pillsbury in November of '01.

6       MS. HEFFERNAN:  Before any videotaping.

7       THE COURT:  Objection sustained.

8   Q    Well, let me direct you to -- if you look at

9   your report Dr. Pillsbury, Defendant's Exhibit 00.  The

10  visit on 11-16-01.  I don't believe you were asked about

11  that.  You were asked generally about those last two

12  visits, if you would focus on that report.

13  A    I think that was a last time -- is that the last

14  time I saw Mr. Agnew?

15  Q    I believe it was, Doctor.

16  A    Yup.  Do you want me to review the contents?

17  Q    Let me ask you the question.  Did he say in the

18  second sentence he's kept his activity level low and that

19  he uses the cane when he's out of the house?  Did he tell

20  you that at that visit?

21  A    I normally put down what people tell me in terms

22  of activity level.  He states.  That's what he said.

23  Q    And then you note that he's still not able to

24  return to his post office job, correct?

25  A    Yes.

1      Q     Did you know, for example, that he was running

2  errands for International Motor Cars?  Did he tell you

3  that?

4      A     No.  He didn't tell me that.

5      Q     Did he tell you that he was picking up filing

6  cabinets for the business?

7      A     Nope.

8      Q     Did he tell you that he was picking up vacuum

9  cleaners and power tools?

10     A     No.

11     Q     How about blinds and microwaves, did he ever

12 tell you that?

13     A     I don't think we had any discussion about any

14 outside business whatsoever.

15     Q     Did he ever invite you to the lot to show you

16 cars?

17     A     No.  I wasn't in the market for one.  No, he

18 never invited me to look at the car.

19     Q     Did he ever tell you that he was opening hoods

20 and showing cars and taking people for test drives?

21     A     No.

22     Q     Did he ever tell you that he had to do this

23 because he was going out of his mind, he was bored at home

24 and that he was going out to hang out at a dealership.  He

25 never mentioned that?

1    A    No.    I don't think that ever came up.

2    Q    And if you would look at your Exhibit LL, which

3    is your office visit of 9-21-01.

4    A    Yes.

5    Q    He says -- you note in your records, don't you,

6    that his pain level has not improved considerably.  I've

7    noticed that he's walking without slight use of the cane

8    today, but he states that he uses it most of the time.  Is

9    that what he told you?

10    A    That might be a typo.  I'm not sure.  I saw that

11    before.  I'm trying to think of what slight use of the cane

12    would be.  I guess he was walking without use of the cane

13    today.

14    Q    Is it fair to say that most of the time he went

15    to your office he used a cane?

16    A    My recollection -- again, this is from awhile

17    back.  A lot of time I saw him in the office he was using

18    the cane.

19    Q    You testified during that time period after you

20    performed the surgery in February to about, well, November

21    when he finally went and saw Dr. Murray that he

22    consistently complained of pain, right?

23    A    Yes.  Some times were worse than others.

24    Sometimes there were times it looks like things were

25    getting better and I was encouraged and another time it