# EXHIBIT B

No. 02-1632

# In the Supreme Court of the United States

RALPH HOWARD BLAKELY, JR., PETITIONER

*v.*

STATE OF WASHINGTON

*ON WRIT OF CERTIORARI*
*TO THE WASHINGTON COURT OF APPEALS*

**BRIEF FOR THE UNITED STATES**
**AS AMICUS CURIAE SUPPORTING RESPONDENT**

THEODORE B. OLSON
  *Solicitor General*
    *Counsel of Record*
CHRISTOPHER A. WRAY
  *Assistant Attorney General*
MICHAEL R. DREEBEN
  *Deputy Solicitor General*
MATTHEW D. ROBERTS
  *Assistant to the Solicitor*
  *General*
NINA GOODMAN
  *Attorney*
  *Department of Justice*
  *Washington, D.C. 20530-0001*
  *(202) 514-2217*

## QUESTION PRESENTED

Whether a fact (other than a prior conviction) that justifies an upward departure from a state statutory sentencing guidelines range must be found in accordance with the procedures required by *Apprendi* v. *New Jersey*, 530 U.S. 466 (2000).

(I)

TABLE OF CONTENTS

|  | Page |
|---|---|
| Interest of the United States ....................................................... | 1 |
| Statement ..................................................................................... | 1 |
| A.   The Washington sentencing guidelines .................... | 1 |
| B .  The present controversy ........................................... | 3 |
| Summary of argument ................................................................ | 6 |
| Argument: |  |
| A sentencing court may constitutionally make an upward departure decision under the Washington sentencing guidelines ............................................................ | 10 |
| A.   *Apprendi* v. *New Jersey* applies only when a defendant's exposure to increased punishment depends on the finding of a fact specified by the legislature ....................................................................... | 11 |
| 1.  The sentencing court has broad authority to find facts and make judgments bearing on an appropriate punishment ............................... | 11 |
| 2.  Constitutional limits on sentencing exist to preclude circumvention of Fifth and Sixth Amendment guarantees .......................................... | 12 |
| 3.  *Apprendi* is limited to statutorily required factual determinations ............................................ | 14 |
| B.   *Apprendi* does not apply to upward departure determinations under the Washington guidelines system ...................................................................... | 15 |
| 1.  A defendant's exposure to a sentence above the presumptive range is not contingent on the court's finding of legislatively specified facts ................................................................................ | 15 |
| 2.  Upward departure determinations are fundamentally different from the factual findings at issue in *Ring* ....................................................... | 20 |

(III)

IV

Table of Contents—Continued:                                    Page

      3. Upward departure determinations closely
         resemble the traditional role of judges in
         sentencing ....................................................... 21
      4. Allowing judges to make departure deter-
         minations based on their own fact-finding
         does not undermine the constitutional values
         protected by *Apprendi* ........................................ 22
  C. Applying *Apprendi* to upward departures
     under the Washington system would raise
     questions about the extent to which *Apprendi*
     applies to other guidelines systems ......................... 25
      1. The federal sentencing guidelines operate
         differently from the Washington system ............ 26
      2. A decision invalidating Washington's depar-
         ture mechanism would raise questions about
         the federal sentencing guidelines' constitu-
         tionality ....................................................... 29
  D. Application of *Apprendi* to guidelines deter-
     minations would undermine sentencing reform
     efforts ............................................................... 30
      1. Applying *Apprendi* to guidelines sentencing
         would create significant problems ...................... 31
      2. The undermining of guidelines systems
         would have substantial costs for sentencing
         reform ......................................................... 33
Conclusion ................................................................ 35

## TABLE OF AUTHORITIES

Cases:

  *Apprendi* v. *New Jersey,* 530 U.S. 466 (2000) .............. *passim*
  *Harris* v. *United States,* 536 U.S. 545 (2002) ................ 14, 23
  *Jackson* v. *Virginia,* 443 U.S. 307 (1979) ...................... 32-33
  *Jones* v. *United States,* 526 U.S. 227 (1999) ................... 12, 15

V

Cases—Continued:                                                        Page

*Koon* v. *United States,* 518 U.S. 81 (1996) ........................ 21
*McMillan* v. *Pennsylvania,* 447 U.S. 79 (1986) ................ 12
*Mistretta* v. *United States,* 488 U.S. 361
  (1989) .......................................................................... 26, 27, 30
*Monge* v. *California,* 524 U.S. 721 (1998) .......................... 32
*Nichols* v. *United States,* 511 U.S. 738 (1994) .............. 12, 27
*North Carolina* v. *Alford,* 400 U.S. 25 (1970) .................. 4
*Pennsylvania ex rel. Sullivan* v. *Ashe,* 302 U.S. 51
  (1937) .......................................................................... 34
*Ring* v. *Arizona,* 536 U.S. 584 (2002) ........................ 7, 13, 21
*Sattazahn* v. *Pennslyvania,* 537 U.S. 101 (2003) .......... 21, 33
*State* v. *Armstrong,* 723 P.2d 1111 (Wash. 1986) .......... 19-20
*State* v. *Fisher,* 739 P.2d 683 (Wash. 1987) .............. 3, 17, 18
*State* v. *Gore,* 21 P.3d 262 (Wash. 2001) ........................ 3, 6, 19
*State* v. *Nordby,* 723 P.2d 1117 (Wash. 1986) .............. 16, 19
*State* v. *Perez,* 847 P.2d 532 (Wash. Ct. App.),
  review denied, 863 P.2d 74 (Wash. 1993) .............. 19, 20, 21
*Stinson* v. *Uinted States,* 508 U.S. 36 (1993) .................... 30
*United States* v. *Cotton,* 535 U.S. 625 (2002) .................... 31
*United States* v. *DiFrancesco,* 449 U.S. 117 (1980) ......... 32
*United States* v. *Gaudin,* 515 U.S. 506 (1995) .................... 12
*United States* v. *Grayson,* 438 U.S. 41 (1978) .................... 12
*United States* v. *Tucker,* 404 U.S. 443 (1972) .................... 12
*United States* v. *Watts,* 519 U.S. 148 (1997) .............. 12, 29
*Williams* v. *New York,* 337 U.S. 241 (1949) .............. 6, 11, 29
*Wisconsin* v. *Mitchell,* 508 U.S. 476 (1993) ........................ 12
*Witte* v. *United States,* 515 U.S. 389 (1995) ............. 12, 14, 29

Statutes and rules:

PROTECT Act, Pub. L. No. 108-21, 117 Stat. 650:
  § 401(b), 117 Stat. 668 ............................................... 30
  § 401(g), 117 Stat. 671 ............................................... 30
  § 401(i), 117 Stat. 672 ............................................... 30
18 U.S.C. 3553(b)(1) (as amended Apr. 30, 2003) ................ 25
28 U.S.C. 991(a) ............................................................ 26

VI

Statutes and rules—Continued:                                    Page

Sentencing Reform Act of 1981, Wash. Rev. Code
  §§ 9.94A.010 *et seq.* (1997) ......................................................... 1-2
    § 9.94A.010 ........................................................................ 2, 10
    § 9.94A.120(1) ............................................................................ 3
    § 9.94A.120(2) ..................................................... 3, 8, 10, 16, 19
    § 9.94A.120(13) ...................................................................... 16
    § 9.94A.125 ............................................................................... 2
    § 9.94A.210(4)(b) ................................................................... 19
    § 9.94A.310(1) ........................................................................... 2
    § 9.94A.320 .......................................................................... 2, 27
    § 9.94A.350 ............................................................................... 2
    § 9.94A.360 ............................................................................... 2
    § 9.94A.370 ............................................................................... 2
    § 9.94A.370(2) ................................................................. 3, 5, 17
    § 9.94A.390 .................................................................. 3, 8, 17, 19
    § 9.94A.390(1)(e) ...................................................................... 6
    § 9.94A.390(2)(a) ...................................................................... 5
    § 9.94A.390(2)(h) ...................................................................... 5
    § 9.94A.420 ............................................................................... 2
Washington Criminal Code, Wash. Rev. Code:
    § 9A.20.021 ............................................................................... 4
    § 9A.20.021(1) ........................................................................... 2
    § 9A.36.021 ............................................................................... 4
    § 9A.40.030 ............................................................................... 4
United States Sentencing Guidelines:
    § 1B1.1(a) ................................................................................. 27
    § 1B1.2(a) ................................................................................. 27
    § 1B1.3(a) ................................................................................. 28
    § 1B1.3(a)(1) ............................................................................ 28
    § 1B1.3(a)(2) ............................................................................ 28
    § 2B2.1 .................................................................................... 31
    § 2D1.1(b)(1) ........................................................................... 27
    § 5K2.0(a)(2) (as amended Oct. 27, 2003) ........................... 25
    Ch. 1, Pt. A, intro. comment 4(a) ...................................... 28, 29
    Ch. 3 ....................................................................................... 28
    Ch. 3, Pt. A ............................................................................ 31

VII

Rules—Continued:                                                    Page

    Ch. 3, Pt. B ......................................................................... 32
    Ch. 3, Pt. C ......................................................................... 32
State of Wash. Sentencing Guidelines Comm'n,
    *Adult Sentencing Guidelines Manual* (1997) .................. 16
      § 9.94A.320, comment ...................................................... 27
      § 9.94A.390, comment ...................................................... 16, 19

Miscellaneous:

American Law Institute, Model Penal Code: Sentencing
    Report (2003) (available at <www.ali.org>) .......... 25, 33, 34
Arthur W. Campbell, *Law of Sentencing* (2d ed.
    1991) ..................................................................................... 33
United States Sentencing Commission, *Supplementary
Report on the Initial Sentencing Guidelines and
Policy Statement* (1987) ...................................................... 29

# In the Supreme Court of the United States

No. 02-1632

RALPH HOWARD BLAKELY, JR., PETITIONER

*v.*

STATE OF WASHINGTON

*ON WRIT OF CERTIORARI*
*TO THE WASHINGTON COURT OF APPEALS*

**BRIEF FOR THE UNITED STATES**
**AS AMICUS CURIAE SUPPORTING RESPONDENT**

## INTEREST OF THE UNITED STATES

This case presents the question whether a fact (other than a prior conviction) that justifies an upward departure from a state statutory sentencing guidelines range must be found in accordance with the procedures required by *Apprendi* v. *New Jersey*, 530 U.S. 466 (2000). Although the Washington sentencing guidelines system differs in significant respects from the United States Sentencing Guidelines, a decision invalidating judicial departure authority here could call into question the constitutionality of the federal Guidelines. The United States therefore has a substantial interest in the outcome of this case.

## STATEMENT

### A. The Washington Sentencing Guidelines

In 1981, the State of Washington became one of the first States in the nation to enact a sentencing guidelines system for the sentencing of felony offenders. See Sentencing Reform Act (Act) of 1981, Wash. Rev. Code §§ 9.94A.010 *et seq.*

(1)

The determinations made by sentencing judges under the Washington guidelines system differ from the *Williams* paradigm in certain respects. The legislature has to some degree constrained the judge's exercise of his judgment about what level of punishment is appropriate. The legislature has identified a narrower range within the broad range otherwise allowed by law that the judge must use as a starting point in selecting the appropriate sentence. And the legislature has required the judge to stay within that range unless he makes a judgment that substantial and compelling reasons make the case atypical enough to justify departure from that range. But not every limitation on the discretion of the sentencing court triggers the procedural requirements of *Apprendi*. *Apprendi*'s requirements apply only when the legislature has specified that one or more identified facts are necessary to authorize the judge to impose a higher punishment. See pp. 14-15, *supra*. *Apprendi*'s requirements do not apply when, as in this case, the legislature has left the judgment about which facts justify a more serious punishment with the sentencing judge, where that judgment has traditionally rested.

### 4. *Allowing judges to make departure determinations based on their own fact-finding does not undermine the constitutional values protected by* Apprendi

Petitioner makes three policy arguments to justify applying *Apprendi*'s procedures to upward departure determinations, but each of those arguments is mistaken. First, petitioner incorrectly contends that *Apprendi* requires that legislatures "treat every fact they deem essential to a given prison term with equal gravity." Br. 21. *Apprendi* does not impose a requirement of that breadth. The legislature may specify many effects that a certain fact shall have on punishment without triggering *Apprendi*'s requirements. Under *Harris*, the legislature may constitutionally assign to the

23

sentencing judge a factual finding that requires the judge to impose a certain minimum punishment. See 536 U.S. at 568-569. If the legislature prescribes that the minimum punishment triggered by the factual finding is the maximum punishment allowed by law, then that factual finding, made by the sentencing judge by a preponderance of the evidence, will dictate the precise extent of the defendant's punishment. And *Apprendi* itself indicates that the legislature may require that a certain fact mitigate the available punishment to a specified degree without providing a jury determination of that fact. See 530 U.S. at 491 n.16.

More fundamentally, the Washington legislature did not deem the facts that supported the departure decision here to be "essential" to the level of the defendant's punishment. The sentencing judge could have determined that a departure was justified without finding those facts or any other legislatively specified facts—the judge was free to rely on his own discretion in deciding which facts were decisive on the departure issue. And the factual findings alone were not sufficient to authorize the departure; what authorized the departure was the sentencing court's judgment that those facts—considered in light of all the circumstances, the presumptive sentencing range, and the purposes of the Sentencing Reform Act—provided substantial and compelling reasons justifying an exceptional sentence.

Second, petitioner contends that *Apprendi* is "designed to ensure that any finding that subjects a defendant to an additional loss of liberty must be made beyond a reasonable doubt." Br. 11. That contention too is mistaken. Factual findings made by the sentencing judge by a preponderance of the evidence, while exercising his discretion to impose sentence within the range specified by statute, can subject a defendant to a significantly greater loss of liberty than the defendant would have suffered absent those findings. Fac-

24

tual findings that trigger a mandatory minimum sentence can have the same effect.

To the extent that petitioner means that any factual finding must be made by a jury beyond a reasonable doubt if, by legislative mandate, the finding increases a defendant's maximum exposure, see *Apprendi*, 530 U.S. at 490, 494, that principle is honored in Washington's system. The findings that by law are necessary and sufficient to expose the defendant to the prescribed statutory maximum are the elements of the offense. The responsibility for finding the defendant guilty of those elements, and thus of the offense whose grade determines the sentencing range, rests with the jury.

Third, petitioner contends (Br. 25) that *Apprendi* is designed to guarantee that someone accused of a crime be able to predict with certainty the maximum punishment to which he is exposed by pleading guilty. That too is not really what *Apprendi* is about. Even when a sentencing judge may make a factual finding that authorizes increased punishment, the law puts the defendant on notice that he will be exposed to the higher punishment if the judge makes the required finding, and the standard guilty plea colloquy makes that consequence explicit. Petitioner, in particular, can make no claim that he was blindsided about the available punishment in this case. Both the plea agreement and the judge at the plea hearing informed petitioner that he could receive a sentence above the presumptive range if the sentencing judge found that compelling reasons justified an exceptional sentence. And, because of the nature of the departure authority, petitioner could not expect that the absence of any particular fact would insulate him from that higher punishment. He thus occupied the same position as a defendant who pleads guilty to a kidnapping offense carrying a maximum sentence of ten years of imprisonment and is aware that in the ordinary case the judge imposes sentences in the middle of that range, but in factually egregious cases the judge

25

imposes sentences at or near the maximum term. In that regime, as in the Washington system, the defendant is on notice at the time of his plea that the judge's authority to find facts and exercise discretion will determine how close to the maximum the sentence ultimately will be.

## C. Applying *Apprendi* To Upward Departures Under The Washington System Would Raise Questions About The Extent To Which *Apprendi* Applies To Other Guidelines Systems

Many guidelines systems have upward departure provisions similar to those in the Washington system. See American Law Institute, Model Penal Code: Sentencing Report 52, 55-56 (2003) (*ALI Report*) (available at *www.ali.org* under ALI Projects Online). For example, under the United States Sentencing Guidelines (Guidelines), a sentencing judge may impose a sentence above the guidelines range if the judge finds "that there exists an aggravating * * * circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C. 3553(b)(1) (as amended Apr. 30, 2003). Like the Washington system, the Guidelines provide a list of factors that may warrant departure from the presumptive sentencing range but also expressly authorize the court to depart upward based on "a circumstance that the Commission has not identified in the Guidelines." Guidelines § 5K2.0(a)(2) (as amended Oct. 27, 2003).

A holding that *Apprendi* applies to the departure determination in this case would raise the question whether *Apprendi* also applies to departure determinations in other guidelines systems. Even more substantial questions would arise if the Court rules that *Apprendi* applies here based on petitioner's theory that the statutory maximum for purposes of *Apprendi* is the punishment that would be imposed

26

without any findings of fact other than the "'facts reflected in the jury verdict alone' or the guilty plea alone." Br. 17 (quoting *Apprendi*, 530 U.S. at 483). If the "facts reflected in the jury verdict alone" are the elements of the offense, petitioner's theory would mandate the application of *Apprendi* to any facts, other than the offense elements, that increase the defendant's punishment.

Such a rule would have profound consequences for the federal Guidelines. As explained more fully below, facts other than the elements of the offense enter into almost all of the calculations under the Guidelines, beginning with the most basic calculations for determining the offender's presumptive sentencing range. A decision in favor of petitioner could thus raise a serious question about whether *Apprendi* applies to myriad factual determinations under the Guidelines.

### 1. *The federal Sentencing Guidelines operate differently from the Washington system*

There are significant distinctions between the Washington system and the federal Guidelines that might justify treating them differently for purposes of *Apprendi*.

Most obviously, unlike the Washington system, the federal Guidelines are not enacted by a legislature but are promulgated by the Sentencing Commission, "an independent commission in the judicial branch of the United States." 28 U.S.C. 991(a); see *Mistretta* v. *United States*, 488 U.S. 361, 385 (1989). The Guidelines are thus not statutes but sentencing rules, the unique product of a special and limited delegation of authority to the Commission. "Congress granted the Commission substantial discretion in formulating guidelines." *Id.* at 377. Because Congress entrusted to the Commission the specification of the numerous facts that authorize differing punishments under the Guidelines, there is a strong argument that the Guidelines do not implicate the

27

concerns addressed by *Apprendi*. As described above, those concerns arise only when the legislature itself dictates the facts that control a defendant's increased exposure to punishment, thereby effectively creating enhanced crimes. See pp. 14-15, *supra*. There is thus good reason to conclude that the Guidelines "do not * * * establish[] minimum and maximum penalties" for crimes. *Mistretta*, 488 U.S. at 396.

Another significant difference between the Washington system and the federal Guidelines also suggests that the federal Guidelines do not establish statutory maxima for criminal offenses. The Washington system sets standard sentencing ranges based on the "actual crime of conviction" (and the defendant's criminal history). See *Wash. Guidelines Manual* § 9.94A.320 and comment. In the federal system, in contrast, the offense of conviction does not dictate a defendant's sentencing range. Instead, the district judge makes a wide variety of factual determinations taking into account not only the conduct that constitutes the offense but all of the defendant's conduct relevant to the offense. Those determinations result in an offense level, which, along with the defendant's criminal history score, produces the presumptive sentencing range. See *Nichols* v. *United States*, 511 U.S. 738, 740 n.3 (1994).

Although a defendant's offense of conviction determines the offense guideline that a court must initially consult, see Guidelines §§ 1B1.1(a) and 1B1.2(a), a cross-reference may require use of a different offense guideline if the underlying conduct so justifies. *E.g.*, *id.* § 2B3.1(c). The applicable guideline then prescribes a base offense level, which is adjusted up or down by specific offense characteristics, relating to the way in which the offense was carried out (*e.g.*, whether a weapon was used during a drug offense (*id.* § 2D1.1.(b)(1))). The offense level may be further modified based on the nature of the victim, the defendant's role in the

28

offense, and whether the defendant obstructed justice. *Id.* Ch. 3.

In making all of those adjustments to the offense level, the Guidelines require the sentencing court to consider conduct that is part of the "real" offense (*i.e.*, the defendant's actual conduct), even if not part of the charged offense of conviction. See Guidelines Ch. 1, Pt. A, intro. comment. 4(a) (Guidelines embody a "charge offense system" with a "significant number of real offense elements"). The "relevant conduct" guideline provides that, in determining a defendant's guidelines range, the court must consider "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant" and "all reasonably foreseeable acts and omissions" of his confederates "that occurred * * * in preparation for [the] offense, or in the course of attempting to avoid detection or responsibility for that offense." *Id.* § 1B1.3(a)(1). In addition, for offenses for which the Guidelines "require grouping of multiple counts"—drug offenses, for example— "relevant conduct" includes all acts for which the defendant could be held responsible "that were part of the same course of conduct or common scheme or plan as the offense of conviction." *Id.* § 1B1.3(a)(2). Relevant conduct enters into the calculation of the offense level from the earliest stage —even the base offense level may vary depending on facts about how the offense was committed that are not elements of the offense. See *id.* § 1B1.3(a).

Thus, the presumptive sentencing range under the Guidelines is not derived from the offense of conviction; rather, it flows from a multitude of factors that have typically been considered in sentencing, such as the defendant's "role in the offense, the presence of a gun, or the amount of money actually taken." Guidelines Ch. 1, Pt. A, intro. comment. 4(a). Because the sentencing range under the Guidelines does not follow from the offense of conviction, the top of the

range does not function as a "statutory maximum" for the offense.

Rather than set statutory maxima, the Guidelines seek to channel sentencing judges' exercise of discretion within the statutory maxima prescribed by Congress in the United States Code. The Guidelines "do no more than fetter the discretion of sentencing judges to do what they have done for generations—impose sentences within the broad limits established by Congress." *Mistretta*, 488 U.S. at 396. The Guidelines direct judges to consider factors that sentencing judges have always had discretion to consider and establish presumptive sentencing ranges based on those factors. See *Watts*, 519 U.S. at 152; *Witte*, 515 U.S. at 402. Indeed, in formulating the Guidelines, the Sentencing Commission canvassed prior sentencing practice and attempted to identify and to assign weights to all the factors that judges traditionally used in determining appropriate sentences. See United States Sentencing Commission, *Supplementary Report on the Initial Sentencing Guidelines and Policy Statements* 16-17 (1987). Because it was not possible to identify and include in the Guidelines all the factors that might appropriately bear on sentencing in a particular case, the Commission also included a flexible departure authority. *Id.* at 17; Guidelines Ch. 1, Pt. A, intro. comment. 4(b). There is good reason to conclude that the Guidelines are not subject to *Apprendi*, in which the Court reaffirmed the authority of "judges to exercise discretion—taking into consideration various factors relating both to offense and offender—in imposing a judgment *within the range* prescribed by statute." 530 U.S. at 481 (citing *Williams*, 337 U.S. at 246).

2. *A decision invalidating Washington's departure mechanism would raise questions about the federal Sentencing Guidelines' constitutionality*

It is nonetheless not certain that this Court would ultimately conclude that the differences between the Washing-

30

ton system and the federal Guidelines are of constitutional magnitude. The Sentencing Commission "is fully accountable to Congress, which can revoke or amend any or all of the Guidelines as it sees fit." *Mistretta*, 488 U.S. at 393-394. Congress has in fact exercised its authority to amend the Guidelines. See PROTECT Act, Pub. L. No. 108-21, § 401(b), (g), and (*i*), 117 Stat. 668-669, 671-673 (Apr. 30, 2003). Moreover, the Sentencing Commission exercises authority delegated by Congress, and the Guidelines are binding legislative rules. See *Stinson* v. *United States*, 508 U.S. 36, 42, 44-45 (1993). Thus, it is not entirely clear that the administrative nature of the Guidelines will insulate them from *Apprendi*.

In addition, although Guidelines sentencing ranges cannot be viewed as establishing statutory maxima, it is possible to identify the maximum punishment that would be permitted under the Guidelines if one could consider only those facts constituting the elements of a particular offense (and the defendant's criminal history). To do so would involve ignoring most of the Guidelines' provisions and applying the Guidelines differently from the way they were intended to work. But that artificially constructed sentencing range could theoretically be treated as establishing a statutory maximum for purposes of *Apprendi*. If this Court pursued that approach, however, almost all the factual findings required to apply the Guidelines according to their terms would be covered by *Apprendi*. As explained more fully below, that would create enormous practical problems for application of the Guidelines and could lead to their abandonment.

### D. Application Of *Apprendi* To Guidelines Determinations Would Undermine Sentencing Reform Efforts

If this Court were to hold that *Apprendi* applies to the many factual determinations made under sentencing guidelines systems, the use of such systems would become cum-

31

bersome and potentially harmful to criminal defendants. Guidelines systems might well prove to be unworkable. Legislatures would then be forced to return either to determinate sentences that do not allow room for individualization of punishment or to indeterminate sentencing systems, which have serious shortcomings, including unjustified disparities in the treatment of similarly situated offenders.

### 1. *Applying* Apprendi *to guidelines sentencing would create significant problems*

There would be significant administrative difficulties if the myriad facts that enter into guidelines calculations had to be found by juries beyond a reasonable doubt (and, in federal cases, charged in indictments, see *United States* v. *Cotton*, 535 U.S. 625, 627 (2002)). Prosecutors would have to anticipate most guidelines adjustments and investigate the facts relevant to them before indicting, and juries would have to work through complex special verdict forms covering multiple issues.

The number of special findings that might be required would be enormous. For example, the basic federal sentencing guideline for robbery requires more than a dozen different factual determinations about the details of the offense, such as whether the property of a financial institution or post office was involved; whether a firearm was possessed, used, or discharged; whether people were injured and to what degree; and how great a financial loss was involved. See Guidelines § 2B3.1. After those factual findings are made, the Guidelines require a half dozen or more determinations about the victim, such as whether the defendant knew or should have known that the victim was vulnerable. See *id.* Ch. 3, Pt. A. The Guidelines then require another half dozen or so determinations about the defendant's role in the offense, such as whether he played a supervisory or leadership role, and, if so, to what degree, and whether the

defendant abused a position or trust or used a special skill in committing or concealing the offense. *Id.* Ch. 3, Pt. B. Further factual determinations are also required, such as whether the defendant obstructed justice and whether he recklessly endangered someone in seeking to avoid arrest. *Id.* Ch. 3, Pt. C.

Some of those findings would have to be made at a sentencing proceeding separate from the underlying trial because they involve conduct occurring at or after trial, such as perjury. Indeed, in the federal system, reliance on post-indictment conduct might have to be abandoned altogether since it is difficult to see how that conduct could be charged in the indictment. Even when bifurcated proceedings were not required by the nature of the facts involved, bifurcation might be thought advisable (even if not constitutionally required) out of fairness to the defendant. Otherwise, the jury's decision on guilt might be skewed by consideration of facts that bear only on the appropriate punishment. As this Court has noted, "[a] defendant might not, for example, wish to simultaneously profess his innocence of a drug offense and dispute the amount of drugs allegedly involved." *Monge* v. *California*, 524 U.S. 721, 729 (1998). But the proliferation of bifurcated proceedings would impede the efficient use of judicial resources.

Other problems would also arise. Jurors might engage in compromise verdicts or nullification in an effort to control the sentence, even if they were not told of the sentencing consequences of their actions. And appellate review of guidelines determinations would be sharply restricted, thus depriving the system of the "greater degree of consistency in sentencing" that appeals can produce. See *United States* v. *DiFrancesco*, 449 U.S. 117, 143 (1980).[4]

---

[4] Appeals by the defendant would probably be limited to the deferential review given to the jury's finding of guilt in criminal cases. See *Jackson* v. *Virginia*, 443 U.S. 307, 319 (1979) (inquiry is whether, "after

## 2. *The undermining of guidelines systems would have substantial costs for sentencing reform*

The overall burdens on the judicial system of applying *Apprendi* would likely push guidelines systems past the breaking point. If so, legislatures would be forced to abandon guidelines as a sentencing option. That would be an extremely unfortunate and unwarranted result.

Guidelines systems were developed in the 1980s and 1990s in response to problems with the indeterminate sentencing regimes that dominated sentencing in the United States for most of the twentieth century. One of the most serious criticisms of indeterminate sentencing was that it resulted in significant disparities in the sentences imposed on similarly situated defendants, including disparities based on race, ethnicity, and gender. See Arthur W. Campbell, *Law of Sentencing* § 1:3, at 9-10 (2d ed. 1991). Critics not only assailed the lawlessness of indeterminate sentencing, but noted that it obscured the actual punishments being imposed, provided no mechanism to implement a systemic sentencing policy, and did not allow legislatures to control the need for prison resources. See *id.* at 10-12; *ALI Report* 64-65, 66-68, 72 & n.90, 74-75.

Indeterminate sentencing had once represented a valuable reform in response to the determinate sentences mandated for felony offenses early in the nation's history. Determinate sentencing does not allow for any individualization of punishment, despite major differences in the way crimes are committed. The nation's experience with determinate sentences showed that, in sentencing, "justice gen-

---

viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt"). Appeals by the government of jury "acquittals" on guidelines factors would probably be barred by double jeopardy principles. Cf. *Sattazahn* v. *Pennsylvania*, 537 U.S. 101, 111-112 (2003) (plurality opinion).

erally requires consideration of more than the particular acts by which the crime was committed and that there be taken into account the circumstances of the offense together with the character and propensities of the offender." *Pennsylvania ex rel. Sullivan* v. *Ashe*, 302 U.S. 51, 55 (1937). Guidelines systems offer a mechanism for minimizing the disparities and discrimination inherent in indeterminate sentencing while providing the proportionality lacking in determinate sentencing.

Although guidelines systems have generated some criticism, most of that criticism has been directed at the federal guidelines and their particular characteristics; state guidelines systems have generally been favorably received. See *ALI Report* 47-48, 115. And guidelines systems (particularly those, like Washington's, based on the model developed in Minnesota in 1980, *id.* at 52) have been recognized as the most promising means to eliminate the problems associated with indeterminate sentencing without sacrificing individualized punishment. See *id.* at 46-48.

In addition to the federal government, fifteen States have adopted guidelines systems, and several more States are considering such systems. *ALI Report* 47. The guidelines approach has been endorsed by the American Bar Association and the Bureau of Justice Assistance of the United States Department of Justice. See *id.* at 47 n.59. A guidelines system is also the leading contender for the centerpiece of the ALI's planned revision to the sentencing provisions of the Model Penal Code. See *id.* at 4. Guidelines systems are thus a prominent and expanding component of legislative efforts to achieve order and fairness in sentencing. Protection of the constitutional values underlying *Apprendi* does not require the Court to call into doubt the constitutionality of that promising sentencing reform.

35

## CONCLUSION

The judgment of the Washington Court of Appeals should be affirmed.

Respectfully submitted.

THEODORE B. OLSON
  *Solicitor General*
CHRISTOPHER A. WRAY
  *Assistant Attorney General*
MICHAEL R. DREEBEN
  *Deputy Solicitor General*
MATTHEW D. ROBERTS
  *Assistant to the Solicitor
    General*
NINA GOODMAN
  *Attorney*

JANUARY 2004

# EXHIBIT C

EXHIBIT B

(Partial Transcript of Sentencing Hearing held June 28th,

2004, USA v. Ducan Fanfan, Docket 03-47-P-H.)

THE COURT:  The non lawyers in the courtroom

probably have wondered what the lawyers and I have been

talking about with recurring reference to <u>Blakely</u>.

Last week on Thursday, the United States Supreme Court

handed down a decision called <u>Blakely v. Washington</u> in which

they, the majority, the court, that is, basically

invalidated the state of Washington's sentencing procedures.

And ever since Thursday morning, Judges and lawyers and law

professors and newspapers and other commentators have been

debating what it means for sentencing generally in the

United States in a variety of state courts as well as what

it means for the Federal Sentencing Guidelines.  And that's

why we have continually referred to it and what its impact

might be.

I am not going to await further briefing, it would be I

think unfair to this defendant at this point to continue to

delay his sentence.  He has been convicted now since early

last October.  I'm aware as I may have said earlier that

being confined in a temporary state institution is not the

best position even for someone who has been convicted, but

rather, there's a desire to get a final assignment to the

federal system where there are programs that can be of an

1    advantage rather than simply being housed temporarily in

2    what's basically a rented space that the Marshal Service

3    obtains from our local facilities without a lot of programs

4    available.

5        The lawyers and Judges have had the decision since

6    Thursday, so we've had time to deliberate upon it.  I'm not

7    suggesting that more sophisticated arguments can't be

8    provided over the weeks and months ahead, undoubtedly there

9    will be, but they can be addressed in the Court of Appeals.

10        I think that as the trial Judge, sentencing Judge, my

11    obligation is to go ahead and do the best I can with the

12    Supreme Court decision.  This case itself has already had at

13    least a couple of rounds of sentencing briefing, and I think

14    it would not be appropriate to delay further.  So I'm going

15    to go ahead and rule based upon my understanding of what the

16    _Blakely_ decision means.

17        As Ms. Kazanjian pointed out, _Blakely_ does not deal

18    directly with the federal guidelines.  It dealt with the

19    Washington state system.  And according to Footnote 9 of the

20    majority opinion, the court said that "Federal Guidelines

21    are not before us, and we express no opinion on them."

22    That's a direct quote.

23        Of course as a subordinate federal Judge, I must

24    faithfully follow the logic and principle of the Supreme

25    Court, and since this is its most recent pronouncement, if

1    it's contrary to earlier First Circuit decisions or even

2    earlier Supreme Court decisions, I must follow it in

3    preference to those earlier statements.  So I have to

4    examine carefully what it is that Blakely tells us.

5          According to Blakely, and I'm quoting directly here

6    now, '"Our precedents make clear, however, that the

7    'statutory maximum' for Apprendi purposes is the maximum

8    sentence a judge may impose solely on the basis of the facts

9    reflected in the jury verdict or admitted by the defendant."

10         "In other words, the relevant 'statutory maximum' is

11   not the maximum sentence a judge may impose after finding

12   additional facts, but the maximum he may impose without any

13   additional findings.  When a judge inflicts punishment that

14   the jury's verdict alone does not allow, the jury has not

15   found all the facts 'which the law makes essential to the

16   punishment,' and the judge exceeds his proper authority."

17         That's the end of the quotation, I've admitted -- I've

18   omitted the various citations.

19         Moreover, the Blakely court in adhering to the

20   principles of its earlier Apprendi decision states at

21   another point, and I quote, "Apprendi carries out this

22   design by ensuring that the judge's authority to sentence

23   derives wholly from the jury's verdict.  Without that

24   restriction, the jury would not exercise the control that

25   the Framers intended."  That's the end of that quotation.

1    And one other quotation near the end of the opinion,

2    "As Apprendi held, every defendant has the right to insist

3    that the prosecutor prove to a jury all facts legally

4    essential to the punishment."

5    Now if that reasoning of Blakely applies here, all the

6    jury verdict permits us to conclude in this case is that

7    Mr. Fanfan was guilty of a conspiracy and that it involved

8    at least 500 grams of cocaine powder.

9    The verdict from the jury permits no conclusion as to

10   how much above the 500 grams the conspiracy involved.  The

11   jury verdict does not permit us to reach a conclusion about

12   crack cocaine.  Crack cocaine was not even charged in the

13   indictment.  And the verdict does not permit us any

14   conclusion as to this defendant's leadership role in the

15   conspiracy.

16   I certainly have views on those subjects, and I've made

17   my findings earlier this morning.  After all, I sat through

18   the trial, I heard the testimony.  I've read the presentence

19   report.  I heard the testimony at the sentencing hearing

20   today as well as at trial.

21   And I do have views about that which I've expressed in

22   my guideline findings, but if I take solely what I can infer

23   or deduce from the jury verdict, instead of the guideline

24   prison range of 188 to 235 months, based on a total offense

25   level of 36, and a Criminal History Category of I, I would

1    take solely the 500 grams of cocaine, which is a base

2    offense level of 26.  I would not be able to make any

3    enhancements available if I looked only at the jury verdict.

4    So with a total offense level of 26, and a Criminal History

5    Category of I, the prison range would be 63 to 78 months.

6    In other words, five or six years instead of 15 or 16 years.

7        So what does Blakely require me as a sentencing Judge

8    to do.

9        The dissenting Justices in Blakely, those who disagreed

10   with the court's holding, as I say disagreed with the

11   holding, but they certainly agreed with the majority on the

12   consequences.  According to Justice O'Connor, I'm quoting,

13   "Under the majority's approach," that's the court's

14   approach, "any fact that increases the upper bound on a

15   judge's sentencing discretion is an element of the offense.

16   Thus, facts that historically have been taken into account

17   by sentencing judges to assess a sentence within a broad

18   range -- such as drug quantity, role in the offense, risk of

19   bodily harm -- all must now be charged in an indictment and

20   submitted to a jury."  End of quote.

21       According to Justice Breyer, who wrote a separate

22   dissent, I'm quoting, "Thus, a jury must find, not only the

23   facts that make up the crime of which the offender is

24   charged, but also all (punishment-increasing) facts about

25   the way in which the offender carried out that crime."  End

1  of quote.

2      I conclude that without those jury findings here, in

3  other words, beyond the conspiracy and the 500 grams of

4  powder, I may not increase the sentence above the 63 to 78

5  month range to the guideline range I found earlier of 188 to

6  235 months.

7      I point out that that conclusion, although perhaps

8  surprising to those of us who have been laboring under

9  guideline sentencing for these many years, that conclusion

10 would not bother the Blakely court.

11     I quote again from the majority opinion, "The Framers

12 would not have thought it too much to demand that, before

13 depriving a man of three more years of his liberty, the

14 State should suffer the modest inconvenience of submitting

15 its accusation to 'the unanimous suffrage of twelve of his

16 equals and neighbours,' rather than a lone employee," that's

17 me, the Judge, "of the State."  End of quote.

18     And of course, here we're talking about much more than

19 three years.

20     I have considered this matter at great length, and I

21 see no basis upon which to avoid the reasoning of Blakely

22 just because I'm applying federal guidelines, rather than

23 Washington state guidelines.

24     Indeed, I note that the Solicitor General of the United

25 States, the top government lawyer for the Supreme Court,

pressed his concern to the Supreme Court that a holding

uch as the court came up with in _Blakely_ would jeopardize

the Federal Sentencing Guidelines.

In Footnote 9 of the opinion, the very footnote where

the court said it was not making a ruling one way or the

other on the guidelines, the court pointed out, "The United

States, as amicus curiae, urges us to affirm.  It notes

differences between Washington's sentencing regime and the

_Federal Sentencing Guidelines but questions whether those_

10    _differences are constitutionally significant._"

11        And I proceeded to look at the Solicitor General's

12    brief over the weekend, and I discovered that in the brief,

13    he stated "If the 'facts reflected in the jury verdict

14    alone' are the elements of the offense, petitioner's theory

15    would mandate the application of _Apprendi_ to any facts,

16    other than the offense elements, that increase the

17    defendant's punishment."  And of course that's precisely

18    what the court did in _Blakely_.

19        Returning back to the quotation from the brief, "Such a

20    rule would have profound consequences for the federal

21    Guidelines.  As explained more fully below, facts other than

22    the elements of the offense enter into almost all of the

23    calculations under the Guidelines, beginning with the most

24    basic calculations for determining the offender's

25    presumptive sentencing range.  A decision in favor of

1    petitioner," Solicitor General goes on, of course that's

2    exactly what Blakely did, he says "could thus raise a

3    serious question about whether Apprendi applies to myriad

4    factual determinations under the Guidelines." End of

5    quotation.

6        And later in the brief he said that despite some

7    differences between the federal scheme and the Washington

8    scheme, such as the ones that Ms. Kazanjian has properly

9    referred to, the location of the Commission, the third

10   branch, its composition, its role, he went on to say, and I

11   quote, "The Commission is fully accountable to Congress,

12   which can revoke or amend any or all of the Guidelines as it

13   sees fit.  Congress has in fact exercised its authority to

14   amend the Guidelines.  Moreover, the Sentencing Commission

15   exercises authority delegated by Congress, and the

16   Guidelines are binding legislative rules.  Thus, it is not

17   entirely clear that the administrative nature of the

18   Guidelines will insulate them from Apprendi." End of quote.

19       So although the Blakely court did not address the

20   federal guidelines, I do conclude that the Solicitor General

21   was exactly correct in his briefing that a decision like

22   Blakely applies to the Federal Guidelines.

23       The Supreme Court said in Mistretta, the very first

24   decision handed down under the guidelines where the attack

25   was on separation of powers and unconstitutional delegation,

1    the court in Mistretta said, and I quote, "Although Congress
2    granted the Commission substantial discretion in formulating
3    guidelines, in actuality, it legislated a full hierarchy of
4    punishment -- from mere maximum imprisonment, to substantial
5    imprisonment, to some imprisonment, to alternatives -- and
6    stipulated the most important offense and offender
7    characteristics to place defendants within these
8    categories." End of quote.

9    It seems to me that makes the Federal Guidelines
10    exactly comparable to the Washington state scheme in all
11    respects material to the Blakely decision.

12    And finally, although the Blakely court said in the
13    footnote I've talked about a number of times now that it was
14    not ruling on the federal guidelines, Justices O'Connor,
15    Breyer, Kennedy, and Chief Justice Rehnquist all agreed that
16    the Federal Guidelines cannot be distinguished.

17    First I'll quote from Justice O'Connor, she says, "The
18    fact that the Federal Sentencing Guidelines," this is a
19    direct quote, "are promulgated by an administrative agency
20    nominally located in the Judicial Branch is irrelevant to
21    the majority's reasoning.  The Guidelines have the force of
22    law, and Congress has unfettered control to reject or accept
23    any particular guideline."

24    "The structure of the Federal Guidelines likewise does
25    not provide any grounds for distinction.  If anything, the

1    structural differences that do exist make the Federal

2    Guidelines more vulnerable to attack." End of quote.

3         She goes on to talk about the majority's treatment of

4    the state of Washington's guidelines. She says, quote,

5    "suggests that the hard constraints found throughout

6    chapters 2 and 3 of the Federal Sentencing Guidelines, which

7    require an increase in the sentencing range upon specified

8    actual findings -- excuse me, "specified factual findings,

9    will meet the same fate." End of quote.

10        According to Justice Breyer, I quote, "Perhaps the

11   Court will distinguish the Federal Sentencing Guidelines,

12   but I am uncertain how." End of quote.

13        And indeed, I conclude that perhaps the Supreme Court

14   can find a way to explain away Blakely in its language and

15   its reasoning, but as a trial Judge and a sentencing Judge,

16   I cannot. I must take it as it is written. I will leave it

17   to higher courts to tell me it does not mean exactly what it

18   says.

19        Accordingly, following Blakely, I conclude that it is

20   unconstitutional for me to apply the federal guideline

21   enhancements in the sentence of Ducan Fanfan, which is to

22   say, an increase in the drug quantity beyond that found by

23   the jury, or any role enhancement. To do so would

24   unconstitutionally impinge upon Mr. Fanfan's Sixth Amendment

25   right to a jury trial as explained by Blakely.

1    I therefore cannot follow the federal sentencing

2    guidelines in those respects which involve drug quantity and

3    role enhancement.  Instead, I'm going to sentence the

4    defendant based solely upon the jury verdict in this case.

5    I point out I'm not making any blanket decision about

6    the federal guidelines.  I'm dealing solely with drug

7    quantity and with role enhancement in the context of the

8    case that went to a jury verdict before a jury trial.

9    Now there is one other issue here under the Colon-Solis

10    case that I referred to with the lawyers where the First

11    Circuit has said that in the pre Blakely environment,

12    following a jury verdict as to the scope of a conspiracy,

13    it's still incumbent on the sentencing Judge to decide how

14    much the individual defendant being sentenced is responsible

15    for under the relevant conduct guidelines.

16    Here, the jury was asked to define -- to find the scope

17    of the conspiracy by way of drug quantity, it was not asked

18    that precise question, but I find that there is no other way

19    to interpret its verdict given the facts, testimony, the

20    evidence that was presented to the jury.

21    The whole case against this defendant that the jury

22    heard was that he was the sole source of all of the drugs.

23    And so this is not an instance where the jury could have

24    assigned responsibility to this defendant for amounts some

25    other member of the conspiracy had been involved in he had

1    not, instead, the drugs all originated with him.

2        So if there is a <u>Colon-Solis</u> issue here in this post

3    <u>Blakely</u> environment such that the juries now in the future

4    will have to be asked to make that decision, I find any

5    error is harmless, that the jury beyond any doubt would have

6    found that this 500 grams of powder was attributable

7    directly to this defendant.

8        So the guideline range that I will use as I say is the

9    63 to 78 months.

10        The fine range for that offense level is 12,500 to

11    $125,000.

12        The supervised release is four to five years.

13        I'm going to impose a modest fine below the guideline

14    level because I find he cannot pay the guideline fine, but

15    he can pay a small fine.

16        I'm going to impose the maximum sentence.  He was the

17    ring leader of a significant drug conspiracy.  And I'm going

18    to impose the maximum term of supervised release.

19        And at this time, the defendant will stand for

20    sentencing.

21

22

23

24

25