# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA,<br>　　　Plaintiff,<br><br>-v-<br><br>GARY R. AGNEW,<br>　　　Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Crim. No. 3:03CR241 (JCH)<br><br><br>July 29, 2005 |

## DEFENDANT AGNEW'S MOTION FOR RELEASE PENDING APPEAL

I.　　**INTRODUCTION**

　　　Pursuant to 18 U.S.C. §3143(b), the defendant, Gary R. Agnew, respectfully moves

the Court for an Order allowing him to remain free on bond pending his appeal of his

conviction and sentence.[1]  Mr. Agnew was sentenced to a term of 21 months imprisonment.

As set forth below, putting aside appellate issues relating to his trial, Mr. Agnew will raise on

appeal sentencing issues that, if successful, would reduce his sentencing guideline range from

the range found by the Court (21-27 months) to 15-21 months (if Second Circuit were to rule

that an obstruction of justice enhancement was not warranted here), and then lower to (at least)

12-18 months and possibly lower (if the Second Circuit agrees that loss was improperly

calculated or otherwise inflated).

　　　Thus, putting aside issues relating to his conviction, (which counsel is still

---

[1] Mr. Agnew would consent to house arrest, or other restrictive conditions of release.

investigating), a successful appeal would reduce Mr. Agnew's sentencing guideline range, and resulting sentence, to a level that, at the very least, would be on par with the amount of time that it will now take him to appeal his conviction and sentence, or that may be less than the "expected duration of the appeal process." 18 U.S.C. §3143(b)(1)(B)(iv). In fact, according to statistics from the Second Circuit, the median time from notice of appeal to final disposition in a criminal case was 12.3 months for the year ended September 30, 2003. http://www.ca2.uscourts.gov (Annual Reports, 2003). With the Second Circuit's ever expanding caseload, this time frame is likely to be even longer. Disposition of Mr. Agnew's appeal may take longer if a further record needs to be developed to support the claim of ineffective assistance of counsel set forth below, or other such claims. Under these circumstances, and for the reasons set forth below, Mr. Agnew requests that this Court grant this motion.

Because Mr. Agnew is currently required to surrender to begin service of his sentence on August 15, 2005, he respectfully requests an expedited hearing on this motion. Undersigned counsel had previously alerted the government to the fact that Mr. Agnew will be filing a motion for bond pending appeal, and has faxed a copy to government counsel today. The government has previously indicated that it opposes the relief sought herein.[2]

---

[2] Because undersigned counsel was not trial counsel, I have had to review the entire trial record on a fast track in order to make a timely motion for bond pending appeal. Although the review of the trial record process is not yet complete, a decision was made to file this motion now to present those issues so far unearthed to the Court. Counsel anticipates that there may be other issues relevant to this motion, such as the introduction of Rule 404(b) evidence, that will have to be raised with the Court.

JWM/33025/2/70224v2
07/29/05-SPT/

## II.    THE STANDARD FOR RELEASE PURSUANT TO 18 U.S.C. § 3143 (b)

18 U.S.C. § 3143(b)(1) sets forth the authority for the release of a defendant who has

filed an appeal after being found guilty of an offense and sentenced to a term of imprisonment.

As relevant here, this section provides that

> the judicial officer shall order that a person who has been found
> guilty of an offense and sentenced to a term of imprisonment, and
> who has filed an appeal or a petition for a writ of certiorari, be
> detained, unless the judicial officer finds-
>
> > (A) by clear and convincing evidence that the person
> > is not likely to flee or pose a danger to the safety
> > of any other person or the community if released
> > under section 3142(b) or (c) of this tile; and
> > (B) that the appeal is not for the purpose of delay and
> > raises a substantial question of law or fact likely to
> > result in-
> >
> > > (i)   reversal,
> > > (ii)  an order for a new trial,
> > > (iii) a sentence that does not include a term of
> > > imprisonment, or
> > > (iv)  a reduced sentence to a term of
> > > imprisonment less
> > > than the total time already served plus the
> > > expected duration of the appeal process.
>
> If the judicial officer makes such findings, such judicial officer
> shall order the release of the person in accordance with section
> 3142(b) or (c) of this title, except that in the circumstance
> described in (B)(iv) of this paragraph, the judicial officer shall
> order the detention terminated at the expiration of the likely
> reduced sentence.

18 U.S.C. § 3143(b)(1).

The burden for showing that a release is proper pending an appeal is on the defendant.

The standard of proof for provision (A) of section 3143(b)(1) is a clear and convincing

standard, while the standard for proving the elements of provision (B) is a preponderance of

evidence standard.  United States v. Delanoy, 867 F. Supp. 114, 115-16 (N.D.N.Y. 1994)

(holding that "there is no question that the clear and convincing evidence standard [of section

3143(b)] only applies to defendants' requirement to prove that they are not

a risk of flight or a danger to the community"); United States v. Butler, 704 F. Supp. 1351,

1352 (E.D.Va. 1989).

The Second Circuit in United States v. Randell, 761 F.2d 122 (2d Cir. 1985), cert.

denied, 474 U.S. 1008 (1985), set forth a four-step analysis for granting bail pending an appeal

under Section 3143.  Specifically, the Court held that a district court must find the following:

(1)    that the defendant is not likely to flee or pose a danger to the safety of
any other person or the community if released;
(2)    that the appeal is not for purpose of delay;
(3)    that the appeal raises a substantial question of law or fact; and
(4)    that if that substantial question is determined favorably to defendant on
appeal, that decision is likely to result in reversal or an order for a new
trial on all counts on which imprisonment has been imposed.

Id. at 125.

In determining whether a defendant is a risk of flight and danger to the community,

courts have considered a broad array of factors.  Such factors include whether the defendant's

bail has been continued after conviction and sentencing, and if the defendant has made all

required appearances.  United States v. Hart, 906 F. Supp. 102, 105 (N.D.N.Y. 1995) (where

bail pending appeal was granted for a defendant who had these characteristics).  Other factors

include the defendant's prior criminal history; the nature of his offense, i.e., whether the

defendant was convicted of a violent crime, or a crime with which violence is commonly

associated; as well as his ties to the community and his family.  Id. at 105 (where a defendant

who was convicted of bank fraud and had strong family and community ties was granted bail

pending appeal); United States v. Harrison, 405 F.2d 355 (D.D.C. 1968) (where a defendant who was found to have strong family and community ties was granted bail pending appeal); United States v. Hearst, 424 F. Supp. 318 (N.D.Cal. 1976) (where a defendant convicted of armed bank robbery was granted bail pending appeal when it was found that he had strong family and community ties and did not have a prior criminal record).

In determining whether an appeal is being filed for the purpose of delay, courts have looked to whether there was a "pattern of dilatory defense tactics during the conduct of the litigation or other extrinsic evidence of an intent to delay." United States v. Hart, 906 F. Supp. at 105. In the absence of any such evidence, courts have considered whether the defendant has maintained a good faith belief in his innocence and never admitted to any guilt. Id.

With regard to whether a defendant's appeal raises a "substantial question", the Second Circuit has defined such a question as "one of more substance than would be necessary to a finding that it was not frivolous. It is a 'close' question or one that very well could be decided another way.'" United States v. Randell, 761 F.2d at 126, quoting, United States v. Giancola, 754 F.2d 898, 901 (11th Cir. 1985). The Second Circuit has also approved as possible definitions, "fairly debatable" and "one which is either novel, which has not been decided by controlling precedent, or which is fairly doubtful." United States v. Randell, 761 F.2d at 125, quoting, United States v. Handy, 761 F.2d 1279, 1281 (9th Cir. 1985); United States v. Miller, 754 F.2d 19, 23 (3d Cir. 1985).

Finally, in determining whether a substantial question is "likely to result in" a reversal or new trial order, the Second Circuit has held that it does not require that bail be conditioned

"upon a district court's finding that its own judgment is likely to be reversed on appeal."

United States v. Randell, 761 F.2d at 124. Rather, the correct inquiry is whether a new trial

or reversal would likely result, if the appellate court were to rule in the defendant's favor. Id.

at 125; United States v. Bayko, 774 F.2d 516, 522 (1st Cir. 1985); United States v. Hart, 906

F. Supp. at 106-07. That is, the applicable inquiry is whether a reversal or a new trial be

ordered if the Second Circuit were to agree with the issues and/or facts raised by the

defendant's appeal. United Stated v. Hart, 906 F.Supp. at 106-07.

## III.    ARGUMENT

### A.    Mr. Agnew is Not a Flight Risk

There is no doubt that Mr. Agnew is not likely to flee, and all agree that he poses no

danger to the safety of any other person or the community. In fact, the Court has made such a

finding. Tr. 12/6/04 at 113.[3] Moreover, Mr. Agnew is currently on bail even after his

conviction and sentencing; has no criminal history; is not convicted of a violent crime, or with

which violence is commonly associated; and has strong family ties with his mother, wife, two

children, and siblings (See Presentence Report at 5-8)- characteristics that are attributed to

defendants that are neither flights risks nor dangers to the community. See e.g. United States

v. Harrison, 405 F.2d 355 (D.D.C. 1968) (where a defendant who was found to have strong

family and community ties was granted bail pending appeal); United States v. Hearst, 424 F.

Supp. 318 (N.D.Cal. 1976) (where a defendant convicted of armed bank robbery was granted

---

[3] "Tr. at __" refers to pages of the trial transcript. References to the sentencing transcript are by the date of sentencing and page of transcript, thus "12/6/04 at __."

bail pending appeal when it was found that he had strong family and community ties and did not have a prior criminal record).

      B.    <u>Mr. Agnew's Appeal Is Not For The Purpose of Delay</u>

      Mr. Agnew's appeal is clearly not being filed for the purpose of any delay. Throughout the litigation of his case there has been absolutely no evidence of any "pattern of dilatory defense tactics." <u>United States v. Hart</u>, 906 F.Supp. at 105. Moreover, as set forth herein, the claims raised in Mr. Agnew's appeal unequivocally show substantial issues- further showing that Mr. Agnew is not merely trying to put off his sentencing. <u>United States v. Hart</u>, 906 F.Supp. at 105.

      C.    <u>Mr. Agnew's Appeal Raises Substantial Sentencing Issues</u>

      The record from the sentencing proceeding raises at least two substantial appellate issues relating to (1) the Court's increase of Mr. Agnew's sentencing guideline range by two levels for obstruction of justice pursuant to U.S.S.G. §3C1.1, and (2) eight levels for the amount of loss pursuant to U.S.S.G. §2B1.1(b)(1)(E). For the reasons set forth below, Mr. Agnew submits that there is a substantial appellate issue with respect to the Court's obstruction enhancement, which, if successful, would reduce his guideline range to 15-21 months (intersection of Offense Level 14 and CHC I). Moreover, there is a substantial issue concerning loss, which, if successful by reducing the loss increase by even one level to 7 (we submit the reduction should be more than one level), would result in a guideline range of 12-18 months (13/CHC I). These are substantial issues resulting in substantial swings in punishment ranges, all of which warrant an Order allowing Mr. Agnew to remain free on bond pending appeal.

-7-

1.   <u>Enhancement Based On Obstruction of Justice</u>

The District Court determined that Mr. Agnew deserved a two level increase for

"obstruction of justice" pursuant to U.S.S.G. §3C1.1 based on Mr. Agnew's trial testimony.

The District Court based its obstruction of justice enhancement on two findings.  First, the

Court found that contrary to Mr. Agnew's testimony that he did not conceal his activities at

IMC from his doctors, the doctors' reports did not contain "any suggestion or reference to his

activities at International Motors." Tr. 12/6/04 at 81.  The Court concluded that the record

contained "a denial by Mr. Agnew to the jury with the intent . . . to persuade them to find him

not guilty." <u>Id.</u>  Second, the court found that Mr. Agnew obstructed justice when, in light of

the evidence of his activities at IMC, he attempted to persuade the jury that he did not make a

false statement on his compensation forms because he did not consider what he did at IMC to

be "work." <u>Id.</u> at 83-84.  For the reasons set forth below, there is a substantial appellate issue

with respect to the enhancement made on these grounds.

Section 3C1.1 authorizes a two-level upward adjustment for "Obstructing or Impeding

the Administration of Justice" and states as follows:

> If (A) the defendant willfully obstructed or impeded, or attempted
> to obstruct or impede, the administration of justice during the
> course of the investigation, prosecution, or sentencing of the
> instant offense of conviction, and (B) the obstructive conduct
> related to (i) the defendant's offense of conviction and any
> relevant conduct; or (ii) a closely related offense, increase the
> offense level by 2 levels.

U.S.S.G. § 3.C1.1.

The Supreme Court has explained that an enhancement under this section is appropriate

when a defendant "gives false testimony concerning a material matter with the willful intent to

provide false testimony, rather than as a result of confusion, mistake or faulty memory."
United States v. Dunnigan, 507 U.S. 87, 94 (1993). Accordingly, the Second Circuit has held
that in order to apply an obstruction enhancement based on providing perjured testimony, the
sentencing court must find "that the defendant 1) willfully 2) and materially 3) committed
perjury, which is (a) the intentional (b) giving of false testimony (c) as to a material matter."
United States v. Agudelo, 2005 U.S. App. LEXIS 14097, *8 (2d Cir. July 13, 2005); quoting,
United States v. Zagari, 111 F.3d 307, 329 (2d Cir. 1997). That is, "before imposing the
adjustment, the district court must find that the defendant 'consciously acted with the purpose
of obstructing justice.'" United States v. Lincecum, 220 F.3d 77, 80 (2d. Cir. 2000).

Thus, there must be a finding that the defendant had the *specific intent* to obstruct
justice to warrant an upward enhancement. United States v. Khedr, 343 F.3d 96, 102 (2d Cir.
2003). In determining whether there is such "specific intent," the Second Circuit has held that
a district court is to rely on "all reasonable inferences that may be drawn from all of the
evidence." United States v. Yarbrough, 131 Fed. Appx. 1, 3 (2d Cir. 2005); quoting, United
States v. Khedr, 343 F.3d at 102. Accordingly, when there is ambiguity in the context of a
defendant's statement, or other plausible explanations for conduct that is being alleged as an
"obstruction of justice", an enhancement under this section would be improper. See, e.g.,
United States v. Agudelo, 2005 U.S. App. LEXIS 14097, *10-13 (2d Cir. July 13, 2005)
(where the Court held that a defendant's affidavit that contained vague statements as opposed
to specific detailed statements that "reek[] of fabrication", which are rebutted by other
evidence, was not necessarily perjury); United States v. Khedr, 343 F.3d 96 (2d Cir. 2003)

(where the Court held that there were alternative explanations to the alleged suspicious activity of the defendant that did not show any specific intent to obstruct justice).

In imposing the obstruction increase on the first ground, the Court contrasted Mr. Agnew's testimony that he did not hide from his doctors the fact that he was "hanging out" at IMC with the reports of the doctors themselves, which the Court found contained no reference to these activities. Because these reports made no reference to IMC, the Court concluded that Mr. Agnew lied on the stand when he said that he did not conceal these activities from his doctor. With respect to this conclusion, there will be a substantial appellate issue concerning whether Mr. Agnew "concealed" anything from his doctors, whether an obstruction enhancement can be based on documents, (the doctors' reports) whose contents are completely within the control of a person other than Mr. Agnew, whether in light of what his doctors already knew about Mr. Agnew's activities specific statements about IMC were material, and whether in light of this record Mr. Agnew had a specific intent to defraud the jury.

In the first place, the record is insufficient to conclude that Mr. Agnew "concealed" anything from his doctors. According to Webster's New Collegiate Dictionary, to "conceal" means "to prevent disclosure or recognition of," or "to place out of sight." Here, Mr. Agnew did not "conceal" anything from his doctors. The trial record reflects that the doctors were asked at trial whether Mr. Agnew told them certain things, not whether they asked Mr. Agnew about IMC. E.g. Tr. 386-387. That is, there is no indication that either Dr. Murray or Dr. Pillsbury asked Mr. Agnew whether he was working somewhere else, or at IMC, and that Mr. Agnew affirmatively concealed that information from them by making a false or evasive response. Thus, while the Court may have concluded that the absence of references to IMC in

-10-

the doctors' reports meant that Mr. Agnew did not affirmatively tell the doctors about IMC, it does not establish that Mr. Agnew took steps to hide that fact from them. Indeed, as shown below, the doctors were aware of Mr. Agnew's activities, which is far more significant than whether they were made aware of an entity known as IMC.

Moreover, with respect to Dr. Murray, it was clear that he was not misled by anything that Mr. Agnew told him or did not tell him. When asked about the video tape that he was shown by the agents in April, 2003, and whether the activities of Mr. Agnew depicted on that video tape led him to opine about whether Mr. Agnew "was able to return to his work at the post office," Dr. Murray testified:

> On the video tape . . . I saw him walking to and from cars. I saw him driving. That's really the only activity I saw him doing in those tapes. **And even prior to the video tapes, I assumed he could do that anyways, walk to a car, drive a car, get out of a car.**

Tr. 392 (emphasis added). So, nothing of significance was concealed from Dr. Murray. And, in this context, where Dr. Murray knew what Mr. Agnew could and could not do, information about IMC or his activities there were simply immaterial.

Similarly, Dr. Pillsbury was also aware of Mr. Agnew's activities. In a memorandum of an office visit on November 2, 2001, Dr. Pillsbury wrote that Mr. Agnew stated that "he has some significant traveling to do later today." DX NN. Although there is no reference to "IMC" in this memorandum, there is a clear notation that establishes that Dr. Pillsbury was aware of the nature of Mr. Agnew's activities.

Further, the Court's reliance on the absence of a specific notation about IMC in the doctors' reports raises a substantial issue regarding the obstruction increase, and whether the

-11-

absence of such a notation in a document controlled by another person is a sufficient basis upon which to conclude that Mr. Agnew lied when he told the jury that he did not conceal from his doctors his activities at IMC.   Mr. Agnew cannot be charged with the accuracy of the reports prepared by the doctors.  As stated, it may have been that the doctors did not ask him about IMC; in fact, Dr. Murray testified that he did not know if he even asked Mr. Agnew what his position was at the Post Office, and never asked him specifically what he was required to do at the Post Office.  Tr. 383, 393-94.   Moreover, Dr. Murray sees about 100 patients a week, Tr. 393, and his reports of these encounters cannot be expected to contain every medical and non-medical detail.  To the extent that they do not contain every detail and omit immaterial or medically unnecessary information, is not Mr. Agnew's fault, and that cannot be the basis to increase his sentence.

Further, Dr. Pillsbury stopped seeing Mr. Agnew in November, 2001, before any evidence of Mr. Agnew's activities at IMC, which were first documented by the government in December, 2001.  Tr. 905.  Thus, it makes perfect sense that Dr. Pillsbury's report would not reflect any mention of IMC.   Indeed, it appears that when the agents confronted Dr. Pillsbury, they asked him about activities that occurred in 2002, after his treatment of Mr. Agnew had ended, and after Dr. Pillsbury would have made any reports of office visits with Mr. Agnew. Tr. 911.

There is also at least an open question whether Mr. Agnew told the doctors about his activities, and whether they chose to record them in their own way, or not at all.  For example, Mr. Agnew testified that he told Dr. Murray about cars in the lot at IMC.  Tr. 793.  Because there would be no reason for this information of a non-medical nature to be reflected in Dr.

-12-

Murray's medical reports, its absence from his report is not probative of an intent to defraud. Moreover, Dr. Pillsbury's report reflects that Mr. Agnew told Dr. Pillsbury about his "significant traveling." The fact that there is no reference to IMC in the report, or a verbatim recital of what Mr. Agnew told Dr. Pillsbury, is not a valid basis to conclude that Mr. Agnew lied when he told the jury that he did not conceal from Dr. Pillsbury that he "hung out" at a car dealership. Put another way, there would be no medical need for Dr. Pillsbury to record that information; rather, the only item of medical significance would have been the nature of Mr. Agnew's activities, as described to Dr. Pillsbury by Mr. Agnew. Here, those activities were "significant traveling."

In light of these examples, there is a substantial issue whether the Court had before it the specific detailed statements that "reek[] of fabrication." United States v. Agudelo, 2005 U.S. App. LEXIS 14097 at *10-13. Accordingly, they do not provide the requisite specific intent to "obstruct justice."

There is also a substantial question with respect to the second ground for the obstruction increase. When Mr. Agnew told the jury that he did not disclose IMC on his government forms because he did not consider it "work," he was not acting with a specific intent to obstruct justice. In fact, the best proof of his state of mind is what he did disclose. Mr. Agnew disclosed his union job on his Forms CA-7 and CA-1032 because he received regular, monthly compensation for this job. To Mr. Agnew, that was "work," and the sort of information that OWCP required to determine whether his compensation needed to be adjusted. Because Mr. Agnew did not receive similar compensation at IMC, his explanation to the jury for his failure to disclose IMC makes complete sense. Even on his second Form CA-1032

-13-

filed on May 9, 2003, after he learned of the criminal case against him, Mr. Agnew indicated that he received no actual earnings from IMC, just "expense reimbursement and occasional gifts including money total approx. $4,000 use of cell phone." GX 10. Because he didn't get paid, these activities at IMC, unlike his union job, were not, in his mind, matters requiring disclosure on his government forms.

Simply put, there is a valid basis for an alternative explanation, which is supported by the record. At the very least, Mr. Agnew was mistaken as to his understanding of what constituted "work" and what needed to be included in the forms he submitted to the Department of Labor. Again, this evidence lacks the requisite specific intent for an upward enhancement. Mr. Agnew's misunderstanding of what needed to be included in these forms is not a "conscious act" to obstruct justice.

2.    The Loss Amount Was Not Properly Calculated

The Indictment in this case charged Mr. Agnew with receiving $32,272.33 in disability payments during the period August, 2001 to November 30, 2002. Indictment ¶16. However, in calculating the loss for purposes of the Sentencing Guidelines, the Presentence Report used the total disability payments made by the government from February, 2001 (the start date in the Indictment) to March, 2004 (the date of Mr. Agnew's conviction), or a total of $89,704.44. PSR ¶12. The Probation Officer concluded that because Mr. Agnew "worked on a full time basis at IMC," he "was not entitled to receive those disability payments." PSR ¶13. After making deductions for checks issued following Mr. Agnew's knee replacements, the Probation Officer concluded that the "total net amount of disability payments received by the defendant equal(s) $84,403.00." This was the loss number attributed to Mr. Agnew. PSR

-14-

¶13.  As a result, Mr. Agnew's base offense level was increased eight levels pursuant to U.S.S.G. §2B1.1(b)(1)(E).

At sentencing, the government asked that the Court calculate "loss" using the figure calculated by the Probation Officer, or $84,403.  Tr. 12/6/04 48 (government had no objection to para. 13).    The Court agreed.  Id. at 51, 57.  In so doing, the Court rejected the defense argument that the government has a duty to "mitigate" its damages.  Id. at 56-57.

However, no other arguments were made that the loss amount should have been lower. Specifically, no argument was presented to the Court that the loss amount should instead be a "net" amount representing the difference between what Mr. Agnew received and what he should have received had he disclosed his activities at IMC and any compensation.  See United States v. Futrell, 209 F.3d 1286, 1290 (11th Cir. 2000).  Nor was there any argument that the loss figure should be less, or that a downward departure from a guideline range should have been made, because the government engaged in conduct akin to "loss manipulation." See United States v. Gomez, 103 F.3d 249, 256 (2d Cir. 1996); United States v. Bala, 236 F.3d 87, 93 (2d Cir. 2000).  Either of these arguments, if successful on appeal, will result in a significant decrease in Mr. Agnew's sentencing guideline range.  Indeed, absent an increase for obstruction of justice, even a one level reduction in the increase for loss (i.e., a 7 level increase) would result in a significant reduction of Mr. Agnew's guideline range to 12-18 months.

 a.  The Loss Amount Should Have Been The Difference Between What Mr.
 Agnew Actually Received And What He Should Have Received

In United States v. Futrell, 209 F.3d 1286 (11th Cir. 2000), the Court was faced with the question of how to calculate loss for purposes of a restitution order under 18 U.S.C.

-15-

§3663A.  Like Mr. Agnew, Futrell was convicted of a committing a fraud relating to disability based on the government's evidence that he had worked driving a truck while collecting disability.  On the issue of loss, the court stated:

> To determine the amount of loss to the government caused by Futrell's fraud, the government must first ascertain the amount of disability that should have been paid to Mr. Futrell in the absence of fraud.  That amount is then subtracted from the amount actually paid to Mr. Futrell.  **This difference represents the amount of the government's loss.**

Id. at 1290.

This "net" amount was not calculated here.  Rather, based on the Probation Officer's conclusion that because Mr. Agnew "worked on a full time basis at IMC," he "was not entitled to receive those disability payments," PSR ¶13, the Court calculated loss using a gross figure, not a net figure.  In fact, other than deducting amounts paid to Mr. Agnew following his knee replacements, there was no attempt to compute a precise "net" difference between what Mr. Agnew should have received in disability and what he did in fact receive.  This was error.

There is no doubt that Mr. Agnew suffered from a serious injury and, at least, a total disability for an extended period of time.  Indeed, at trial, Mr. Agnew testified that to this day he could not perform the duties of his regular job.  Tr. 786.  Thus, Mr. Agnew was entitled to receive disability payments in some amount over some period of time.

To the extent that Mr. Agnew's "total disability" ended at some point in time because Mr. Agnew's ability to engage in activity increased, or because of his activities at IMC, or his payments should have been adjusted over time, a determination should have been made of the amount, if any, that Mr. Agnew should have received.  Put another way, unless the

-16-

government can establish that Mr. Agnew was never entitled to benefits, the loss figure must be calculated based on the difference between what he received and the lesser amount that he should have received had he disclosed that he was no longer totally disabled or was engaged in other paid employment.[4]

There was no attempt to test the Probation Officer's conclusion that Mr. Agnew's activities at IMC totally foreclosed him from ever receiving any benefits. Indeed, the compensation system is geared to function in the opposite manner, that is, reducing, not eliminating, benefits for outside activities. For example, the Forms CA-1032 provide that the information provided "will be used to decide whether you are entitled to continue receiving these benefits, or whether your benefits should be adjusted." GX 9. Moreover, a government witness testified that information about an employee's other employment is relevant because the government will "generally . . . adjust their compensation to reflect that fact." Tr. 142-143. The witness explained that pursuant to a "complicated formula," the government "will take the earnings of the employee and subtract the amount of compensation they are getting . . . and then multiply that result by their two-thirds or three-quarters and that's what the reduction that takes place." Tr. 143. Thus, if an individual discloses that he is working, the government will reduce his compensation. Tr. 143. The government's witness also testified that even if a person is doing volunteer or unpaid work, the government would adjust that person's compensation based on the value of that work on the "open market." Tr. 144-145.

---

[4] For example, one government witness testified that OWCP would terminate disability compensation if an employee earns an amount from employment that is equal to or higher than the wages paid that employee for the job held when the employee was injured. Tr. 787. Clearly, that was not the case with Mr. Agnew.

-17-

Thus, there must be some effort to determine what Mr. Agnew should have received based on his disability at various points in time, and also taking into account amounts received by Mr. Agnew as a union official or from other sources, including amounts that Mr. Agnew received from IMC for reimbursement or otherwise. Indeed, a government witness admitted that amounts received by Mr. Agnew from IMC would have had an impact on his compensation. Tr. 193.[5]

Thus, there is a substantial issue on appeal that once this analysis is done, it will be determined that the "net" loss to the government is much less that the $84,403 used by the Court, which will result in a lower sentence for Mr. Agnew.

### b. The Government Engaged in Conduct Akin to Loss Manipulation

At sentencing, an argument was made that the loss should be reduced because the government has an obligation to "mitigate" its damages. The Court rejected that argument. However, no argument was made that the government's conduct in this case – e.g. by allowing the investigation to drag out for an extended period of time, by failing to stop Mr. Agnew's benefits (a) once the criminal case was underway, (b) when evidence that Mr. Agnew was "working" at IMC had been gathered or (c) when the government received the Form CA-1032

---

[5] For some bureaucratic reason, this was not done with respect to Mr. Agnew's union salary. Starting with the very first Form CA-7 that Mr. Agnew filed, GX 1, Mr. Agnew disclosed that he was a salaried union official. Mr. Agnew disclosed that on his Form CA-7s, as well as the two Form CA-1032s that were at issue at trial. In fact, Mr. Agnew disclosed that his actual earnings in this position were $330 per month. GXs 9 and 10. However, the government determined this disclosure did not effect Mr. Agnew's compensation because "this is not really a job that's available on the open market . . . for that reason it really has no value on the open market and so [the government] wouldn't really consider it." Tr. 147. Thus, even though Mr. Agnew disclosed his work as a union official, the government still paid him for total disability. Tr. 148.

in May, 2002 that it could have concluded was false based on its investigation to date, by failing to return Mr. Agnew to work, and by calculating the loss to include payments made right up the time of conviction – constitutes conduct akin to "sentencing manipulation" or "loss manipulation" warranting a reduction in the loss figure through a downward departure or otherwise.

The government commenced its investigation of Mr. Agnew on December 18, 2001. Tr. 579. The investigation began after the agents received specific information that Mr. Agnew "was working at a car sales business on the Berlin Turnpike." Tr. 579. The goal of the investigation was to determine whether Mr. Agnew was indeed "working" while on disability, and, in order to continued to receive disability, concealed that fact from the government. Key to the government's case was evidence that Mr. Agnew "not only was able to work but, in fact, worked at International Motor Cars." Tr. 1108.

Shortly after it commenced its investigation, the government had the evidence to make its case. On the very first day of its investigation on December 18, 2001, Postal Inspector Millett observed Mr. Agnew at International Motor Cars walking in the car lot at IMC, assisting an individual and transferring items from one vehicle to another, placing dealer plates on a white panel van and locking up the business and driving that panel van off the lot at the end of the day. Tr. 579-581.

Then, when an undercover agent met with Mr. Agnew on January 10, 2002, Mr. Agnew gave the agent two business cards and a loan application. Tr. 211, 217. The agent testified that on the business card, Mr. Agnew wrote "Big G." Tr. 218. The agent testified further that Mr. Agnew took the agent for a test drive on this date. Tr. 220.

The next day, January 11, 2002, an undercover agent engaged Mr. Agnew in conversation, and testified at trial that Mr. Agnew stated that "four of us work here," Tr. 320, and that Mr. Agnew stated that "he's been doing this full time for a year now." Tr. 321. Additionally, on January 29, 2002, an undercover agent had a conversation with Mr. Agnew at IMC in which Mr. Agnew told the agent that "he took a drive to Jacksonville, Florida, that he had a large white van that he drove down to a church and . . . stayed down there and flew back." Tr. 304. The agent testified that they also engaged in other conversation, and took a test drive. Tr. 305. During the test drive, the agent testified that Mr. Agnew told him that he got "paid the same regardless of what type of car he sold [to the undercover]." Tr. 305.

However, despite this evidence, the government continued its investigation, allowing the "loss" in the form of disability payments to Mr. Agnew to grow. There was no reason for this continued investigation. After January, 2002, nothing new was learned from the undercover investigation. Unlike other investigations that continue with the express purpose of identifying coconspirators, for example, the government's investigation of Mr. Agnew for this additional one year period after January, 2002 seems to have served no particular law enforcement purpose. Mr. Agnew was not suspected of conspiring with others, and there seemingly was not any other criminal conduct under investigation.

Next, in May, 2002, Mr. Agnew submitted the Form CA-1032 that forms the basis for the charge in Count 16 of the Indictment. At that point, the government had evidence of Mr. Agnew's activities at IMC, and also evidence that he had not disclosed those activities on the Forms CA-7 that he had previously filed. Because the Form CA-1032 filed in May, 2002 asked about the **previous** 15 months (that is, reaching back to February, 2001, ten months

-20-

before the start of the investigation), the government had ample evidence in May, 2002 to charge Mr. Agnew with making a false statement on this form. However, instead of ending their investigation in May, 2002, the agents persisted in their investigation for an additional seven months, until January, 2003. Tr. 583. During that period, the agents made surveillance observations at IMC on 215 days, and conducted video surveillance on 71 days. Tr. 584. Additional undercover interactions with Mr. Agnew were also undertaken, with similar results.

Simply put, there is a substantial argument that once the government gathered its evidence of Mr. Agnew's activities in January, 2002, the only basis for continuing this investigation was to allow "loss" to accumulate. Indeed, according to the government's schedule (Exhibit C to its Version of the Offense), as of January, 2002, Mr. Agnew had received only $27,731.39 in benefits; however, by February 26, 2003, when the government ended its investigation, he had received a total of $54,722.20. And, by March, 2004, when the government finally decided to stop paying Mr. Agnew, he had received at least $81,646.

In the context of Mr. Agnew's sentencing, the effect of this continued government investigation, combined with the postal service's own failure to act to terminate Mr. Agnew's benefits[6], was to allow the "loss" attributed to his conduct to climb, from the $27,731.39 loss in early 2002 (which would carry only a four level increase under U.S.S.G. §3B1.1(b)(1)(C)),

---

[6] On August 26, 2003, the Grand Jury returned the Indictment in this case. On September 4, 2003, Dr. Murray, the second of Mr. Agnew's two orthopedic surgeons, concluded that Mr. Agnew was now capable of "sedentary" work. Even though Dr. Murray made this conclusion, no action was taken by the Postal Service. Tr. 119. That is, the Postal Service did not instruct Mr. Agnew to return to work, or take any other action regarding his compensation, either reducing or eliminating his benefits. Nor was Mr. Agnew sent for a medical evaluation. Tr. 121. In fact, no action was taken because of the existence of the criminal investigation. Tr. 119.

-21-

to the over $80,000 loss in March, 2004 (which gave rise to the eight level increase ordered by the Court). There should be a sanction for such conduct that has the detrimental effect of increasing a defendant's sentence. Specfically, there should be a reduction in the loss amount, or a downward departure for conduct that has been broadly described as "sentencing manipulation." United States v. Gomez, 103 F.3d 249, 256 (2d Cir. 1996); quoting, United States v. Okey, 47 F.3d 238, 240 (7th Cir. 1995); see also United States v. Bala, 236 F.3d 87, 93 (2d Cir. 2000). Although the status of this departure ground is unclear in the Second Circuit, the record is sufficient for such a claim to be made, even if it is somewhat novel under the law. Thus, Mr. Agnew's appeal raises substantial questions likely to result in a reversal or a reduced sentence.

      D.    Mr. Agnew's Appeal Raises Substantial Issues Related to His Conviction

In addition to these sentencing issues, a review of the record so far reveals that there are a number of appellate issues that, if successful, will affect the validity of Mr. Agnew's conviction.

      1.    Mr. Agnew Was Prejudiced By Counsel's Refusal to Move to Suppress the Testimony of the Postal Inspectors

Mr. Agnew was prejudiced by his counsel's conduct at trial. In order to establish an ineffective assistance of counsel claim, Mr. Agnew must prove that the performance of counsel was seriously deficient and that but for counsel's deficient performance there is a reasonable probability the result of the proceeding would have been different. Strickland v. Washington, 466 U.S. 668 (1984). Here, the record as it exists and as it may be subsequently developed, establishes not only that counsel was deficient, but that counsel's conduct prejudiced Mr. Agnew.

Most significantly, despite a request from Mr. Agnew to do so, trial counsel failed to move to suppress the statements that Mr. Agnew was claimed to have made to the Postal Inspectors on February 26, 2003 on the ground that these statements were taken in violation of Miranda v. Arizona, 384 U.S. 436 (1966).

Miranda requires that in any "custodial interrogation," an individual be informed of his or her constitutional rights. Miranda, 384 U.S. at 479. Here, no such advice was given. Tr. 373-374. Mr. Agnew also testified that the agents never advised him that he didn't have to talk to him. Tr. 744. And, there can be no doubt that the questioning amounted to interrogation. Moreover, had the record been developed prior to trial in the context of a motion to suppress, there would have been a factual basis for a claim that Mr. Agnew was in "custody" at the time he was questioned by the Postal Inspectors.[7]

The test for custody under Miranda is "whether there is a 'formal arrest or restraint on freedom on movement' of the degree associated with a formal arrest." California v. Beheler, 463 U.S. 1121, 1125 (1983) (per curiam); see also United States v. Newton, 369 F.3d 659, 670 (2d Cir. 2004). And, according to Inspector Feeney, "a custodial interview is basically when an individual feels that their right to leave or in any way their freedom is being withheld by investigators . . . ." Tr. 378.

Here, the record already reflects that while there was no "formal arrest," there certainly were restraints placed on Mr. Agnew's movement. The testimony is quite clear that

---

[7] There was testimony at trial from Inspector Feeney that he considered his interview of Mr. Agnew to be "non-custodial." Tr. 378. The witness's characterization of his encounter with Mr. Agnew is not determinative. Rather, whether Mr. Agnew was in "custody" for Miranda purposes is an issue that should have been presented to the Court for resolution prior to trial.

-23-

the Postal Inspectors brought Mr. Agnew into a room and closed the door to that room.  Tr.

607, 740.  Moreover, there will be testimony that not only did Postal Inspector Feeney sit in a

chair by the door, but he was also in an aisle in a position to block any attempt by Mr. Agnew

to leave.  Furthermore, the Postal Inspectors began their questioning of Mr. Agnew by asking

him about weapons, Tr. 740-742.  Mr. Agnew testified:

> [the first questions were] about . . . weapons.  Do you have a
> weapon on you.  No, I don't.  How many weapons do you own.
> I said five.  They asked me a few more questions, then came
> back.  We only have you down for four weapons.  Maybe my
> son's weapon is at my house.  I did only own four weapons at the
> time.  But when they asked me how many I had, I said five
> because there was five weapons in the house at the time.  Later
> on there was more questions about weapons as the thing went on.

Tr. 742.  These initial questions about weapons created the coercive atmosphere associated

with Miranda-type custodial interrogations.  At the very least, these facts provided a sufficient

basis for counsel to move to suppress the statements, especially given the importance of the

testimony of the Postal Inspectors to the trial in this case.

    The prejudice to Mr. Agnew resulting from counsel's failure to so move is quite clear.

Two Postal Inspectors testified at trial concerning statements they claim were made by Mr.

Agnew.  Inspector Feeney testified, without objection, that he and Inspector Millett asked Mr.

Agnew about weapons and, after advising Mr. Agnew that they had conducted a very extensive

investigation, Mr. Agnew stated that he "would work four to six hours a day Monday through

Friday and then reiterated that he just hangs around."  Tr. 362-363.  Inspector Feeney testified

that Mr. Agnew "acknowledged that he did open and close the business and did work some

Saturdays."  Tr. 363.  Inspector Feeney further testified that Mr. Agnew "stated that he

answered phones.  He would take vehicles to repair shops, he would pick up vehicles at other

various dealerships or car sales or auctions.  He would also take customers for test drives in these vehicles."  Tr. 363-364.  Inspector Feeney testified further that Mr. Agnew admitted that he received about $200 to $300 a month in expenses as compensation "for going to the store or other activities that he would perform there."  Tr. 364.  Finally, Inspector Feeney testified that they confronted Mr. Agnew "with the fact that he had been working at International Motor Cars," and "in fact on the compensation forms, he indicated monies he claimed for his union business but did not claim anything in International Motor Cars."  Tr. 365.  Inspector Feeney testified that Mr. Agnew replied, "Yeah I lied.  It was never a lot of money."  Tr. 365. Inspector Millett gave similar testimony.  Tr. 606-614.

Thus, not only was the government able to present testimony about this interview, they were able to do so two times over through the testimony of Inspectors Millet and Feeney.  This evidence included their testimony that Mr. Agnew admitted that he "lied," something that Mr. Agnew denied at trial.  Tr. 746.  In fact, the government told the jury in its closing argument that evidence regarding Mr. Agnew's claimed admissions was "perhaps the most powerful evidence that you [the jury] have."  Tr. 1124.  Moreover, when Mr. Agnew testified that the encounter with the Inspectors did not go as they testified, and that he did not tell them that he "lied," he subjected himself to a sentencing enhancement for perjury and a cross-examination by the government, all of which may have been completely unnecessary if the testimony concerning the February 26, 2003 interview had been suppressed.

JWM/33025/2/70224v2
07/29/05-SPT/

### 2.  The Jury Instructions

The trial court instructed the jury without objection by the defense.[8]  Tr. 1190.

Nevertheless, there are at least two issues that will be raised with the Second Circuit, both of

which have a substantial chance of affecting Mr. Agnew's conviction.

### a.  The Jury Instruction on Count 16 Violated Apprendi

Count 16 charged Mr. Agnew with failing to disclose on his OWCP Form CA-1032

"the fact that he worked at International Motor Cars in Berlin, Connecticut, in connection with

the application for and receipt of compensation and other benefits and payments exceeding

$1,000 under the Federal Employees' Compensation Act," in violation of 18 U.S.C. §1920.

Indictment ¶18.  This instruction violated the rule in Apprendi v. New Jersey, 530 U.S. 466

(2000).

Section 1920 provides, "whoever knowingly and willfully . . . makes a false, fictitious,

or fraudulent statement or representation . . . in connection with the application for or receipt

of compensation or other benefit or payment [under federal program] shall be guilty of

perjury."  The statute also contains a penalty provision, which provides

> On conviction thereof [the defendant] shall be punished by a fine
> under this title, or by imprisonment for not more than five years,
> or both; but if the amount of the benefits falsely obtained does not
> exceed $1,000, such person shall be punished by a fine under this
> title, or by imprisonment for not more than one year, or both.

18 U.S.C. §1920.  Thus, "the maximum sentence to which a Section 1920 defendant is subject

---

[8] The record contains references to the charge conference, but counsel has not yet been able to
obtain a copy of this proceeding.

JWM/33025/2/70224v2
07/29/05-SPT/

depends on the amount of benefits [he] 'falsely obtained.'"  United States v. Hurn, 368 F.3d 1359, 1361 (11th Cir. 2004).

Because of this sentencing enhancement, the rule in Apprendi v. New Jersey, 530 U.S. 466 (2000) is implicated.  In Apprendi v. New Jersey, the Supreme Court held that "other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Thus, for a defendant to be subject to the five year, rather than one year, maximum sentence under 18 U.S.C. §1920, the jury must conclude that the amount of benefits "falsely obtained" exceeded $1,000.  United States v. Hurn, 368 F.3d at 1362.

As the Court stated in United States v. Hurn, the plain meaning of 18 U.S.C. §1920 requires that the jury find a causal link between a false statement and the receipt of more than $1,000 in Workers Compensation benefits before a defendant is subject to the statutes enhanced penalty regime.

Here, however, the Court did not instruct the jury that it could not convict unless it found that the benefits falsely obtained by Mr. Agnew exceeded $1,000.  Tr. 1180-1181. Specifically, the Court charged the jury as follows:

> The government must prove beyond a reasonable doubt each of the following three elements.
>
> First, Mr. Agnew knowingly and willfully made a false statement or report to the Department of Labor, Office of Workers Compensation Programs, as charged.
>
> Two, that the false statement or report was made in connection with an application for, or receipt of, Federal Workers Compensation benefits and
>
> Three, that the false statement or report related to a material fact.

Tr. 1180-1181.  Thus, the jury instructions violated the <u>Apprendi</u> rule, and <u>Apprendi's</u> due process requirements.

The Court's failure to instruct the jury in this regard was not harmless. Mr. Agnew was convicted of a felony offense without the requisite jury finding that would insure that the jury found the facts necessary for the offense to be anything other than a misdemeanor.  Moreover, there is a distinct possibility that while the jury may have concluded that Mr. Agnew lied on this form, he was nevertheless entitled to benefits as compensation for what all concede are serious knee injuries and serious pain that had kept him out of work for the prior 15 month time period covered by this form, that is, February, 2001 to May, 2002. GX 9.

   b.  <u>The "Conscious Avoidance" Charge Was Erroneously Given</u>

The Court charged the jury on "conscious avoidance" in connection with the second element of the mail fraud charge, as follows:

> The government can also meet [] it[s] burden of showing that Mr. Agnew had knowledge of the falsity of the statements if it established beyond a reasonable doubt that he acted with deliberate disregard of whether the statements were true or false, or with a conscious purpose . . . to avoid learning the truth.  If the government establishes that Mr. Agnew acted with deliberate disregard for the truth, the knowledge requirement would be satisfied unless Mr. Agnew actually believed the statements to be true.  This knowledge requirement, however, cannot be established by demonstrating that Mr. Agnew was merely negligent or foolish.

Tr. 1176.

Such a conscious avoidance charge was not appropriate here.  "A conscious avoidance charge is appropriate when (a) the element of knowledge is in dispute, and (b) the evidence

would permit a rational juror to conclude beyond a reasonable doubt 'that the defendant was aware of a high probability of the fact in dispute and consciously avoided confirming that fact.'" United States v. Hopkins, 53 F.3d 533, 542 (2d Cir. 1995).  Under this test, this charge was not warranted.

Moreover, the content to the charge as given was error.  The case law is clear that a district court, in giving a conscious avoidance charge, must "instruct the jury that knowledge of the existence of a particular fact is established (1) if a person is aware of a high probability of its existence, (2) unless he actually believes that [the fact] does not exist." United States v. Barber, 2005 U.S. App. LEXIS 9817, *3 (2d Cir. 2005).  Thus, unless the "high probability" and "actual belief" language are incorporated in a conscious avoidance charge, the District Court commits error.  Id.; United States v. Feroz, 848 F.2d 359, 361 (2d Cir. 1988).  While the Court's charge does contain the "actual belief" language, its instruction does not contain the "high probability" language.

## CONCLUSION

For the foregoing reasons, Mr. Agnew respectfully requests that the Court grant him release on bond pending his appeal to the Second Circuit.

Respectfully submitted,

_____

Joseph W. Martini (ct 07225)
Pepe & Hazard LLP
30 Jelliff Lane
Southport, CT 06890
(203) 319-4000
(203) 259-0251 fax
jmartini@pepehazard.com

-29-

**CERTIFICATION**

I hereby certify that a copy of the foregoing was sent via facsimile and U.S. mail, postage prepaid, this the 29th day of July, 2005 to the following:

Maria A. Kahn, Esq.
Assistant United States Attorney
Office of United States Attorney
157 Church Street, 23rd Floor
New Haven, CT  06510

Krishna R. Patel, Esq.
Assistant United States Attorney
Office of United States Attorney
157 Church Street, 23rd Floor
New Haven, CT  06510


_____
Joseph W. Martini