UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA       :    CASE NO. 3:03CR241(JCH)

    V.                             :

GARY AGNEW                     :    August 9, 2005


**GOVERNMENT'S OBJECTION TO
DEFENDANT'S MOTION FOR RELEASE PENDING APPEAL**


The Government submits this memorandum in response to the defendant's motion for release pending appeal pursuant to 18 U.S.C. § 3143(b).

**I.      Standard for Release**

In order to seek release pending appeal, the defendant must make a significant showing of the likelihood of success on appeal.  This is a burden the defendant simply cannot meet in this straight forward fraud case with overwhelming evidence of defendant's guilt and guilty verdict on all counts.

Because the defendant was convicted of non-violent offenses -- mail fraud and worker's compensation fraud -- the defendant's release or detention pending appeal is governed by 18 U.S.C. § 3143(b)(1).  This section, in relevant part, provides that:

> The judicial officer shall order that a person who has been found guilty of an offense and sentenced to a term of imprisonment, and who has filed an appeal be detained, unless the judicial officer finds –
>
> (A) by clear and convincing evidence that the person is not likely to flee or pose a danger to any other person or the community; and

> (B) that the appeal is not for the purpose of
> delay and raises a substantial question of law or fact
> likely to result in
>
>> I.   reversal
>>
>> (ii) an order for a new trial
>>
>> (iii)a sentence that does not include a term of
>>     imprisonment or
>>
>> (iv) a reduced sentence to a term of imprisonment less
>>     that the total of the time already served plus
>>     the expected duration of the appeal process.

18 U.S.C. § 3143(b)(1).

The decision in <u>United States v. Randell</u>, 761 F.2d 122, 125 (2d Cir. 1985), describes the relevant inquiry.  Interpreting the statutory language so as not to require the district court to certify that it is likely to be reversed, the Court stated as follows:

"We thus conclude that before a district court may grant bail pending appeal, it must find:

>> (1) that the defendant is not likely to flee or pose a
>> danger to the safety of any other person or the
>> community if released;
>>
>> (2) that the appeal is not for purpose of delay;
>>
>> (3) that the appeal raises a substantial question of
>> law or fact;  and
>>
>> (4) that if that substantial question is determined
>> favorably to defendant on appeal, that decision is
>> likely to result in reversal or an order for a new
>> trial on all counts on which imprisonment has been
>> imposed."

<u>Randell</u>, 761 F.2d at 125, citing <u>U.S. v. Miller</u>, 753 F.2d 19, 24

2

(3d Cir. 1985); and U.S. v. Giancola, 754 F.2d 898, 901 (11th Cir. 1985).  A question is "substantial" if is a "'close' question or one that very well could be decided the other way" Randell, 761 F.2d at 125 (citation omitted).  The burden is on the defendant to show that all the requirements for release pending appeal have been met.  Randell, 761 F.2d at 125.

In this case, the defendant has not and cannot identify a single substantial issue of law or fact that is likely to result in reversal and this motion is sought -- defendant's fourth attempt – simply to put off serving the sentence imposed by the Court.  The issues that the defendant  intends to assert on appeal do not "raise substantial questions of law or fact likely to result in reversal, new trial, or sentence of no imprisonment or term of imprisonment less than the expected duration of the appeal process." Id.

Prior to the filing of this motion, the defendant sought three extensions of his surrender date based, not on the merits of his upcoming appeal, but rather to provide assistance to his wife who underwent a surgical procedure in January of 2005.  At the conclusion of the Crosby hearing, the defendant requested and the Court granted him another 45 days to get his affairs in order and advised him no further extensions would be granted absent a strong showing.  The defendant has only recently filed a written

motion[1] for bond pending appeal.[2]  Given defendant's conduct, a
stay pending appeal would serve only as a tool to delay the
imposition of the sentence and further his frivolous claims for a
reduced sentence and continued compensation from the U.S. Postal
Service.

## II.        Defendant has Failed to Raise Substantial Issues on Appeal

_____The defendant has raised two sentencing issues relating to
calculation of the loss and the imposition of an obstruction
enhancement that he intends to raise on appeal and believes will
reduce his sentence to a level that justifies a bond pending
appeal.  In addition, the defendant lists three issues that
amount to 2255 claims which he believes will affect the validity
of the conviction.  However, none of the claims asserted by the
defendant raise any substantial issues of law or fact likely to
result in either a reversal or reduced sentence.  As set forth
below, the claims raised are devoid of merit.

_____

[1] The defendant had made an oral motion for bond pending
appeal and the Court noted that while it did not "want to
prejudge it . . . [the Court was] not inclined to see there's a
grounds to grant it but . . . would have to have it briefed after
the appeal [was] filed." Tr. of December 6, 2004 at 116.

[2] On July 19, 2005, the Second Circuit Court of Appeals
issued a scheduling order in this case as follows:
Defendant's/Appellant's Brief is due on September 9, 2005 and the
Government's reply is due on October 11, 2005.  Argument on the
appeal will be heard after November 28, 2005.

## A. Court Appropriately Imposed Obstruction Enhancement

Defendant claims that the Court erred in imposing a two level enhancement for obstruction of justice and, if successful on appeal, his sentence will be significantly reduced. However, the obstruction enhancement was well supported by case law and evidence. Even assuming, arguendo, the enhancement was inappropriately applied, reversal on this issue would not result in a significant reduction, if any, of the defendant's sentence because the Court sentenced him within the guideline range without an obstruction enhancement[3].

The facts to support an obstruction enhancement need only be proven by a preponderance of the evidence. See United States v. Carty, 264 F.3d 191, 194 (2d Cir. 2001). The Second Circuit reviews the findings of fact of a district court in connection with an increase for obstruction of justice for clear error. See United States v. Woodward, 239 F.3d 159, 161 (2d Cir. 2001). However, the Second Circuit has held that a ruling as to whether the facts found constitute obstruction of justice or attempted obstruction under the Sentencing Guidelines is a matter of legal

---

[3] While the Court found the defendant to be in a guideline range of 21 to 27 months and sentenced him to 21 months, the guideline range without the obstruction enhancement would have been 15 to 21 months. Even if the Court of Appeals were to reverse on this issue, this Court could, on remand, impose the same sentence.

interpretation which should be reviewed <u>de</u> <u>novo</u>, giving "'due deference to the district court's application of the guidelines to the facts.'" <u>United States v. Cassiliano</u>, 137 F.3d 742, 745 (2d Cir. 1998) (quoting 18 U.S.C. § 3742(e)).

Courts have recognized that the district court must make specific findings of perjury to support an obstruction of justice enhancement. <u>See</u> <u>United States v. Dunnigan</u>, 507 U.S. 87, 94 (1993) (finding of perjury required for enhancement under U.S.S.G. § 3C1.1 based upon defendant's false testimony "concerning material matter with the willful intent to provide false testimony"); <u>United States v. Onumonu</u>, 999 F.2d 43, 45-46 (2d Cir. 1993) ("A district court may enhance a defendant's sentence for obstruction of justice if the defendant commits perjury.").

Because the record here plainly supports a finding of perjury, the Court appropriately imposed an upward adjustment for obstruction of justice. <u>See</u> U.S.S.G. § 3C1.1. Simply stated, the defendant's blatant false testimony constituted an effort on his part to manufacture evidence and obstruct justice. The Government submitted three specific areas where the defendant testified falsely on material issues: 1) denying that he worked for IM or was compensated for that work from IM; 2) testifying that he informed his treating physicians of his activities at the used car dealership in direct contradiction of both physicians'

testimony that they never knew about the used car dealership; and 3)testifying that he never lied on his CA-1032 (an offense the jury convicted him of) or admitted to the agents that he lied on that form, which stood in stark contrast to the testimony of the case agents.   While rejecting the third basis for an obstruction enhancement[4], the Court accepted the other instances of defendant's false testimony in support of the obstruction enhancement.  Tr. of December 6, 2004 at 81-2.

Defendant claims that the Court erred in contrasting his testimony to that of the doctors' medical reports, which contained no reference to his activities at the used car dealership, as a basis for the obstruction enhancement because obstruction cannot be based on documents, (doctors' reports) whose contents are completely within the control of a person other than Mr. Agnew. . . " Defendant's Motion at 10.   However, the Court did not contrast the defendant's testimony against the doctors' medical reports.  Rather, the Court reviewed the defendant's testimony in relation to the testimony of the doctors that, consistent with their medical records, the defendant never informed them about his activities at the used car dealership.

---

[4]  In rejecting the third basis, the Court credited the agents' testimony that the defendant admitted he lied on the DOL form but concluded that since "people can have different recollections about what was said or done at any one time . . ." it would not rely on this difference in testimony as a basis for obstruction." Tr. of December 6, 2004 at 80-1.

Specifically, the Court noted that it had a "distinct
recollection during the trial of listening to the evidence and
viewing the testimony concerning the two doctors' testimony and
Mr. Agnew's testimony in that respect as very significant" and
the Court "credit[ed] the doctors' statements that their reports
accurately recounted what Mr. Agnew told them as to the nature of
his activities." Id. at 81.  As the Court concluded, this
testimony not only stood in stark contrast to the defendant's
testimony[5] that he told them about the dealership and even

---

[5]     At trial, the defendant testified that he had "never
concealed" from his physicians defendant's activities at the used
car dealership and even testified that "he talked to Dr.
Pillsbury about a few cars in the lot." (Tr. at 727; 793-794).
However, both of the physicians were asked and testified that
they had no knowledge of IM or defendant's activities at IM.
(Tr. at 386-387 and 903-904).  For example, Dr. Murray was asked
a series of questions about whether the defendant disclosed he
was spending time at a friend's dealership and engaged in the
activities at the dealership.  (Tr. at 386-7).  Dr. Pillsbury
responded to similar questions as follows:

     A:No. I had no idea that he was working in a used car
     dealership.  Q: He never told you that?
     A:I have no recollection that he would have ever told me
     that.
     Q: Would that have been something that you would have noted
     in your records if he told you?
     A: I think I probably would.  I think I would have recorded
     that.
     Q. If, for example, he said I hang out at a car dealership
     Monday through Friday, I usually get there around 8:00, I
     open the business, I show people cars, I take them for test
     drives, would that have been something you would have noted?
     A: I think that would have been an indication of what his
     level of daily activity.  I think most of the time my
     impression was he was having trouble just daily activities.
     Things that one would normally do to get through the day.
     Tr. at 903-904.

offered to sell them cars, it was intended "to persuade [the jury] to find him not guilty" and was material[6]. Id. at pp. 81-2.

The Court also found a second, independent, basis for the obstruction enhancement based on defendant's false testimony is his claim that he did not lie on the DOL form when he failed to disclose his activities at the used car dealership. The defendant claims that he did not intend to obstruct justice when he told the jury that he did not disclose his activities at the used car dealership because he was not getting paid and did not consider it work.

In support of his claim that he believed he was not required to disclose the used car dealership, the defendant points to the

In addition to not being told about defendant's activities, Dr. Pillsbury specifically testified that he "had no discussion about any outside business" and that "[he] was not in the market for a [car]." (Tr. at 906). Dr. Pillsbury also testified that most of the time the defendant visited his office he used a cane. Tr. at 903 and 907.


[6] Based on a misinterpretation of Dr. Pillsbury's testimony, the defendant also claims that since his doctors knew about his activities in general (walking to a car and driving a car) his concealment with respect to his activities at the used car dealership was not material. (Defendant's Memorandum at 11). Defendant fails to note that Dr. Pillsbury admitted on cross examination that the defendant could work at the post office or do something useful at the post office if he was doing the types of activities depicted on the video. (Tr. at 912). Further, these claims were raised by the defendant at sentencing (Tr. of December 6, 2004 at 67-68) and rejected by the Court.

fact that he disclosed his union position on his form CA-1032. However, if the criteria for disclosure was whether the defendant received payment for his activities, then the used car dealership should have been listed by him since there was ample evidence introduced at trial that in fact he had received cash for his services. As the Court noted in responding to the same claim made at sentencing, "that testimony was also obstructionist because he clearly also testified that he reported income from at least the trip driving the van to Florida on his tax returns and so at a minimum, that itself evidences his knowledge that 'he had involvement in an enterprise.'" Id. at 83. Further other evidence introduced at trial established that the defendant received other payments from the used car dealership, including commissions or bird dogs.

Defendant's claim also fails because the form asked about more than simply paid employment activities. At sentencing the Court noted that the form asked about involvement with a business enterprise. Id. at 83. In fact, a review of the form, Government Exhibit 9, reveals that it inquires about all kinds of activities, including volunteer activities. Thus, the Court appropriately concluded that his "efforts were to persuade the jury that he didn't think he had to answer that question affirmatively disclosing his involvement at [the used car dealership]. Given the level of his activity at the dealership .

10

. . [he knew that the] information of his activities was material
and should have been disclosed and . . . when he got on the
witness stand and attempted to persuade the jury that was not the
case, [that] he had no such understanding he had to disclose that
information. That it wasn't anything that would be material to
the government. That itself was also obstructionist." Id. at 83-
84

The Court's imposition of an obstruction enhancement was not
only appropriate in this case but well supported by fact and law.
An appeal on this basis lacks merit and is highly unlikely to
succeed.

### B. Court Adequately Calculated Loss

The loss set forth in the PSR and relied on by the Court in
calculating the sentencing guideline range was not only based on
an actual loss figure, it was a conservative loss calculation.

The mail fraud offenses of conviction, as well as the
worker's compensation fraud offense, concerned a scheme to
defraud the United States, beginning in or about February 2001
through August 2003, by seeking and obtaining disability payments
from OWCP and DOL through means of false or fraudulent pretenses
or representations.  The evidence in this case established that
the defendant concealed his ability to work and his work
activities at IM in order to collect disability payments even
though he was able to and had been working.

11

In addition to thousands of dollars received both in periodic disability payments and a lump sum settlement for the same injury since 1989, the defendant submitted claims for and received total disability payments from DOL between February 2001 and March 2004 totaling $89,704.44. (Ex. C).  Other than the 4 to 6 week periods following his knee replacements in both February of 2001 and 2002, the defendant worked on a full time basis at IM and was not entitled to receive those disability payments. After deducting the disability payments reflected in the checks issued on 3/30/01 ($3,101.44-covering period 2/13/01 to 3/24/01); and 2/23/02 ($2,200-covering period 1/27/02 to 2/23/02)[7], the total net amount of disability payments received by the defendant equal $84,403.00.

The Court could have but did not impose a sentence based on an intended loss calculation which would have resulted in a much higher sentence.  Nor did the loss amount found by the Court include the disability payments the defendant received from the Veterans' Administration for the same injury.  As set forth in the Government's submissions at sentencing, including a letter from DOL, the defendant was not entitled to receive both VA and

---

[7] While the Government suggested it, the PSR included it, and the Court ultimately deducted the entire amount of the DOL checks issued for the 4 to 6 weeks following the defendant's surgery, those amounts could have easily been included because the defendant was not entitled any of the FECA funds based on the fact that he was also receiving benefits from the VA for the same injury.

DOL (FECA) benefits for the same injury.  Specifically, the statutes and DOL policies require the veteran to elect to receive either the amount of the VA increase or the FECA benefit amount. To assist the Court at sentencing, the Government requested DOL to confirm the election requirement in writing.  By applying for and receiving the increase in VA benefits, the defendant was not entitled to receive additional FECA benefits regardless of the merit of his disability claim, a consequence he would have been aware of as a union leader.  Since he failed to disclose his increase in VA benefits to DOL, all of the FECA disability payments he received from DOL while collecting increased benefits from the VA for the same injury should have been returned.  This is yet another basis on which the Court's finding of a loss of $84,403 was justified.

The defendant now claims that the loss to the government should be limited to payments from February 2001 to January of 2002 because at that point the Government had obtained sufficient incriminating statements from the defendant as a result of its undercover investigation and had enough evidence to charge the defendant.  Alternatively, the defendant claims that after he filed his first false CA1032[8] in May of 2002, the Government had

---

[8] Defendant claims that because the CA1032 inquires about the previous 15 months, the loss should be somehow limited to the 15 months prior to May of 2002.  Defendant's Motion at 20. While the form does inquire about the previous 15 months, as noted by the Court at sentencing, the filing of the form by the

sufficient incriminating evidence to charge him and any further
losses were caused by the Government's alleged failure to
terminate the investigation. These claims are not supported by
law and are absurd given the defendant's continued claims of
insufficiency of evidence and innocence.

At sentencing, the defendant unsuccessfully claimed that the
total loss should be reduced by the amounts he received after his
treating physician issued a report that he could return to work.
Specifically, defendant claimed that, even if <u>Blakely</u> was held
not to apply the guidelines, the loss amount should be limited to
either $57,992.69 or $66,3288.29. The defendant argued that the
Government had an obligation to return the defendant to work when
his doctor cleared him for work and disability payments made
thereafter should not be included in the loss amount. The Court
appropriately rejected that claim noting that there was no case
law to support a duty to mitigate on the part of the Government.
In reaching this conclusion, the Court presumed that the Postal
Service "didn't let him back because he kept saying he wasn't
able to work. The jury found that's not true. I find it is not
true. But the fact of the matter is that he continued to take

---

defendant enabled the defendant to continue to collect the
disability payments for the subsequent 12 months until the next
CA1032 is filed. (Tr. of December 6, 2004 at 50). Thus, the
CA1032 not only inquires about the defendant's activities
regarding the previous 15 months, it also enables him to continue
to receive payments in the future.

that position and in taking that position, continued to pocket
monies that he wasn't entitled to and that's a loss to the
Government."  Tr. of December 6, 2004 at pg. 57.

Putting aside the fact that Agnew himself chose not to
return to work and not to cancel his disability payments, there
is no support for a reduction in the loss based on a Government
duty to mitigate by either bringing charges sooner, returning him
to work or terminating payments.  See e.g., United States v.
Glick, 142 F.3d 520 (2d Cir. 1998) (loss amount should not be
reduced by legitimate commissions not paid as a result of bribery
where no aspect of the defendant's transactions that were
legitimate); United States v. Rhodes, 201 F. Supp.2d 906 (C.D.
Ill. 2002) (amount of loss is actual amount company had to
reimburse victims even if it had mitigated the loss by not
selling improperly purchased investments after learning of the
fraud).  There was simply no duty by the USPS or the Government
to mitigate damages.

Moreover, as the representatives from the USPS Injury
Compensation Office and DOL testified, it is the policy of the
office to not initiate any administrative actions until the
criminal matter is resolved.  (Tr. at 124 and 148).  Given the
defendant's continued claims that there is insufficient evidence
to warrant a guilty verdict and that he is unable to work, it is
simply disingenuous for him to claim that he is entitled to a

reduced sentence because the Government had a duty to mitigate its damages by charging him sooner or returning him to work.  In adopting a conservative loss amount based on the actual disability payments received by the defendant (Tr. of december 6, 2004 at 85), including two offsets for post surgical convalescent periods (which based on his receipt of VA benefits he was not entitled to receive), the Court's loss calculation was reasonable and appropriate.

### C. Issues Relating to His Conviction

In addition to the sentencing issues, the defendant claims that his conviction may be affected by his counsel's failure to move to suppress his statements to law enforcement officials and failure to object to two specific jury instructions.  For the reasons set forth below, not only do these claims lack merit, they are not appropriate claims for appeal but rather a 2255 motion.

With respect to counsel's alleged failure to move to suppress the statements by defendant to law enforcement officers, there was no legal basis for suppression of those statements.  Contrary to defendant's conclusory claim, the statements were made by the defendant during a noncustodial interview after he was informed of the purpose of the interview and that he did not have to speak with the agents. (Tr. at 361).  Defendant's post

conviction claims that Inspector Feeney blocked the door to the office they were using during the interview are self-serving. The defendant did not raise any of these allegations at trial. Rather, his testimony suggests the meeting was voluntary and it was the defendant that directed the agents to the office for the interview. (Tr. 738-746). There was no basis for suppression and therefore no reasonable likelihood that this claim will succeed under a 2255 motion, much less a direct appeal.

The jury instructions were not only issued at defendant's request or absent objection, they were appropriate in this case. First, the conscious avoidance instruction was specifically requested by the defendant and he has waived this issue. (Request to Charge at 21). While the Government does not have the benefit of the charging conference transcript to determine the basis for defendant's request for that instruction, it appears that it was related to his claim that he was "mistaken" about the information sought by the forms. Further, the defendant simply states that the charge was unwarranted and its content in error but fails to explain the basis for his claim and how he was harmed. The Government notes that the defendant submitted testimony regarding his interpretation of "work" and the nature of the "work" information sought by the forms he submitted. In fact, the defendant continues to make this argument in his current motion (Defendant's Motion at 14).

While the Government cannot speculate as to the basis for defendant's request for the charge, he now claims was in error, his defense that he was "mistaken" in his understanding of what the forms required may have prompted his submission of the charge.  Regardless, there has been no showing that the charge was harmful, much less likely to result in a reduced sentence or reversal.

Likewise the jury instruction relating to Count 16, the false CA1032 Form, was also appropriate.  Since, as argued by the defendant elsewhere, that form applies to the previous 15 month period, by finding that he lied on the CA1032 about his ability to work, the jury necessarily would have to have found that the amount of compensation he received during the time period for which he lied about his ability to work exceeded $1,000.00. More importantly, the jury was not only given a copy of the indictment in this case, they were instructed that the indictment specifically charged the defendant with

> knowingly and willfully falsif[ying], conceal[ing] and cover[ing] up on an OWCP Form CA-1032 the fact he worked at International Motorcars in Berlin, Connecticut, in connection with the application for and receipt of compensation and other benefits and payments exceeding $1,000 under the Federal Employees' Compensation Act.

Tr. at 1179.  Finally, since he was convicted of the remaining 15 counts of mail fraud, it is unclear how a reversal on this basis, assuming it were likely, would result in a reduced sentence or affect his conviction on other counts.  Thus, the claims relating

18

to the alleged improper jury instructions lack merit and do not
provide a valid basis for bond pending appeal.

## III.        CONCLUSION

The defendant has failed to meet his burden of showing that
the issues that could be asserted on appeal raise substantial
questions of law or fact likely to result in reversal, new trial,
or sentence of a term of imprisonment less than the expected
duration of the appeal process.  Thus, the Government
respectfully requests that the defendant's motion for bond
pending appeal be denied and his surrender date of August 15,
2005 remain in effect.

Respectfully submitted,

KEVIN J. O'CONNOR
UNITED STATES ATTORNEY

/s/
MARIA A. KAHN
ASSISTANT UNITED STATES ATTORNEY
FEDERAL BAR NUMBER ct06573
United States Attorney's Office
157 Church Street
New Haven, Connecticut 06510
(203) 821-3700

/s/
KRISHNA R. PATEL
ASSISTANT UNITED STATES ATTORNEY
FEDERAL BAR NUMBER ct24433
United States Attorney's Office
157 Church Street
New Haven, Connecticut 06510
(203) 821-3700

19

<u>CERTIFICATION OF SERVICE</u>

    This is to certify that the within and foregoing has been sent by fax (without attachments)and federal express, this 9th day of August 2005, to:

Joseph W. Martini, Esq.
Pepe & Hazard LLP
30 Jeliff Lane
Southport, CT 06890

Joseph Zampano, USPO
United States Probation Office
Room 211
915 Lafayette Blvd.
Bridgeport, Ct.  06604

                /s/_____
                MARIA A. KAHN
                ASSISTANT UNITED STATES ATTORNEY